# Exhibit A

## Table of Contents

| State | Executive Order(s) | Date Issued | Page |
|---|---|---|---|
| Arizona | Public Health Emergency Declaration | 11-Mar-20 | 1 |
| | No. 2020-18 | 30-Mar-20 | 4 |
| California | No. N-33-20 | 19-Mar-20 | 9 |
| Colorado | No. D 2020 003 | 11-Mar-20 | 11 |
| | No. D 2020 004 | 14-Mar-20 | 16 |
| | No. D 2020 017 | 25-Mar-20 | 18 |
| Florida | No. 20-52 | 9-Mar-20 | 21 |
| | No. 20-68 | 17-Mar-20 | 28 |
| | No. 20-70 | 20-Mar-20 | 31 |
| | No. 20-82 | 24-Mar-20 | 34 |
| | No. 20-86 | 27-Mar-20 | 37 |
| | No. 20-87 | 27-Mar-20 | 41 |
| | No. 20-90 | 31-Mar-20 | 45 |
| | No. 20-91 | 1-Apr-20 | 47 |
| | No. 20-103 | 10-Apr-20 | 81 |
| Illinois | Disaster Proclamation | 9-Mar-20 | 82 |
| | No. 2020-04 | 13-Mar-20 | 86 |
| | No. 2020-10 | 20-Mar-20 | 88 |
| | No. 2020-18 | 1-Apr-20 | 97 |
| Maryland | No. 20-03-30-01 | 30-Mar-20 | 102 |
| Massachusetts | Order Prohibiting Gatherings of 250+ | 13-Mar-20 | 110 |
| | Order Prohibiting Gatherings of 25+ | 15-Mar-20 | 112 |
| | No. 13 | 23-Mar-20 | 114 |
| | No. 21 | 31-Mar-20 | 119 |
| Nevada | Emergency Declaration | 12-Mar-20 | 122 |
| | No. 010 | 31-Mar-20 | 125 |
| New Jersey | No. 103 | 9-Mar-20 | 128 |
| | No. 104 | 16-Mar-20 | 136 |
| | No. 107 | 21-Mar-20 | 145 |
| | No. 118 | 7-Apr-20 | 158 |
| | No. 119 | 7-Apr-20 | 162 |
| New York | No. 202 | 7-Mar-20 | 167 |
| | No. 202.8 | 19-Mar-20 | 170 |
| North Carolina | No. 116 | 10-Mar-20 | 172 |
| | No. 118 | 17-Mar-20 | 178 |
| | No. 121 | 27-Mar-20 | 183 |
| Pennsylvania | Emergency Declaration | 6-Mar-20 | 196 |

| | | | |
|---|---|---|---|
| | Order Closing All Business That Are Not "Life-Sustaining" | 19-Mar-20 | 199 |
| | Stay-at-Home Order | 23-Mar-20 | 201 |
| Texas | No. GA-08 | 19-Mar-20 | 203 |
| | Public Health Disaster Declaration | 19-Mar-20 | 206 |
| | No. GA-14 | 31-Mar-20 | 208 |
| Washington, D.C. | No. 2020-046 | 11-Mar-20 | 213 |
| | No. 2020-053 | 24-Mar-20 | 215 |
| | No. 2020-054 | 30-Mar-20 | 224 |

# DECLARATION OF EMERGENCY
## *COVID-19*

**WHEREAS,** the World Health Organization declared a Public Health Emergency of International Concern on January 30, 2020, the United States Department of Health and Human Services declared a Public Health Emergency related to the COVID-19 outbreak on January 31, 2020, and the World Health Organization officially declared a pandemic due to COVID-19 on March 11, 2020; and

**WHEREAS,** globally there are 124,908 total confirmed cases and 4,591 total deaths to-date related to COVID-19, and the situation is rapidly evolving with person-to-person transmission and continued community transmission; and

**WHEREAS,** COVID-19 was first discovered in Wuhan, China, and is known to cause respiratory illness, which can result in severe disease complications and death; and

**WHEREAS,** Arizona is proactively leading on the COVID-19 response in the United States, as the third of 39 states that have confirmed cases of COVID-19; and

**WHEREAS,** the Arizona Department of Health Services and local public health departments have identified 9 cases of COVID-19, including cases spreading in the community, and have additional patients under investigation linked to the global outbreak; and

**WHEREAS,** COVID-19 poses a serious public health threat for infectious disease spread to Arizona residents and visitors if proper precautions recommended by public health are not followed; and

**WHEREAS,** the Arizona Department of Health Services in partnership with the Centers for Disease Control and Prevention (CDC) and local public health departments have implemented disease surveillance and testing for confirmed COVID-19 case(s) and patients under investigation; and

**WHEREAS,** in Arizona, public health and health care systems have identified precautions and interventions that can mitigate the spread of COVID-19; and

**WHEREAS,** the Arizona Department of Health Services requires a more robust and integrated response to successfully combat the COVID-19 outbreak; and

**WHEREAS,** the Governor and the Director of the Arizona Department of Health Services have reasonable cause to believe the spread of COVID-19 can lead to severe respiratory illness, disease complications, and death for Arizona residents, particularly those with underlying medical conditions or the elderly; and

**WHEREAS,** it is necessary and appropriate to take action to ensure the spread of COVID-19 is controlled and that the residents of Arizona remain safe and healthy; and

**WHEREAS,** the Governor is authorized to declare an emergency pursuant to A.R.S. § 26-303(D) and in accordance with A.R.S. § 26-301(15).

**WHEREAS,** pursuant to A.R.S. § 26-307(A), a state agency, when designated by the Governor, may make, amend and rescind orders, rules and regulations necessary for emergency functions;

**WHEREAS,** pursuant to A.R.S. § 36-787(A), during a state of emergency declared by the Governor as a result of an occurrence or imminent threat of illness or health condition caused by an epidemic that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability, the Arizona Department of Health Services shall coordinate all matters pertaining to the public health emergency response of the State; and

**WHEREAS,** pursuant to A.R.S. § 36-787(B) and (C), during a state of emergency declared by the Governor, the Governor, in consultation with the Director of the Arizona Department of Health Services, may issue orders pertaining to the public health emergency response of the State; and

**WHEREAS,** pursuant A.R.S. §§ 36-788 and 36-789, during a state of emergency declared by the Governor, the Arizona Department of Health Services, to protect the public health, may establish and maintain places of isolation and quarantine and require the isolation or quarantine of any person who has contracted or been exposed to a highly contagious and fatal disease;

**WHEREAS,** the Legislature has authorized the expenditure of funds in an event of an emergency pursuant to A.R.S. § 35-192; and

**WHEREAS,** Executive Order 2017-06 establishes the Arizona Emergency Response and Recovery Plan to assist in responding to emergencies including public health emergencies; and

**NOW, THEREFORE I,** Douglas A. Ducey, Governor of the State of Arizona, by virtue of the authority vested in me by the Constitution and Laws of the State, do hereby determine that the *COVID-19* outbreak presents conditions in Arizona, which are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city or town, and which require the combined efforts of the State and the political subdivision, and thus justifies a declaration of a State of Emergency; accordingly, pursuant to A.R.S. §§ 26-303(D) and 36-787, I do hereby:

    a.   Declare that a State of Emergency exists in Arizona due to the *COVID-19* outbreak, effective March 11, 2020; and

    b.   Direct that the State of Arizona Emergency Response and Recovery Plan be used, and the Division of Emergency Management to be engaged, as necessary or requested, to assist the Arizona Department of Health Services' coordination of the public health emergency response and authorize the use of state assets as necessary; and

      c.  Authorize the Director of the Arizona Department of Health Services to coordinate all matters pertaining to the public health emergency response of the State in accordance with A.R.S. Title 36, Chapter 6, Article 9;

This Emergency Declaration will be eligible for termination upon the resolution of the outbreak as determined by the Arizona Department of Health Services.

**IN WITNESS WHEREOF,** I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona.

**ATTEST:**

**GOVERNOR**

**DONE** at the Capitol in Phoenix on this 11th day of March in the Year Two Thousand Twenty and of the Independence of the United States of America the Year Two Hundred and Forty-Fourth.

**ATTEST:**

**Secretary of State**

3

GOVERNOR DOUGLAS A. DUCEY

# STATE OF ARIZONA
★
# EXECUTIVE ORDER

### Executive Order 2020-18

**Stay Home, Stay Healthy, Stay Connected**
*Physical Distancing to Mitigate COVID-19 Transmission*

**WHEREAS**, Arizona is committed to combating COVID-19, which represents a serious threat to public health; and

**WHEREAS**, the State of Arizona has taken proactive actions to mitigate the risk of COVID-19 to public health and address the economic impact of the COVID-19 pandemic; and

**WHEREAS**, on March 11, 2020, pursuant to A.R.S. §§ 26-303 and 36-787, I, as Governor of the State of Arizona, issued a declaration of a Public Health State of Emergency due to the necessity to prepare for, prevent, respond to, and mitigate the spread of COVID-19; and

**WHEREAS**, on March 15, 2020, a statewide school closure was issued in coordination with Superintendent of Public Instruction Kathy Hoffman, later extended on March 30, 2020, through the end of the school year; and

**WHEREAS**, many businesses have greatly reduced their hours and operations as directed by health officials and in an effort to protect the public health and slow the spread of COVID-19; and

**WHEREAS**, on March 17, 2020, following updated guidance from the Centers for Disease Control and Prevention (CDC), the Arizona Department of Health Services (ADHS) issued updated guidance that included canceling or postponing gatherings of 10 or more people, recommending telework and other alternatives, restricting access to nursing homes, retirement homes and long-term care facilities to provide critical assistance, and providing recommendations to restaurants and eating establishments to mitigate the risk of COVID-19 transmission; and

**WHEREAS**, on March 19, 2020, Executive Order 2020-09 was issued requiring restaurants in Arizona counties with confirmed COVID-19 cases to provide dine-out options only and required all bars, gyms and movie theaters in those counties to close; and

**WHEREAS**, on March 19, 2020, Executive Order 2020-10 halted all elective surgeries in the State of Arizona to free up medical resources and maintain the capacity for hospitals and providers to continue offering vital services; and

**WHEREAS**, essential services were identified in Executive Order 2020-12 as those specifically necessary to promote the public health, safety and welfare of the state or assist others in fulfilling such functions; and

4

**WHEREAS**, to combat COVID-19, and at the recommendation of the state's health officials, the State of Arizona must continue its efforts by further limiting potential exposure through a policy of physical distancing while maintaining social connectedness; and

**WHEREAS**, pursuant to A.R.S. §§ 26-303(E), the Governor of Arizona, after a Declaration is issued, has "the right to exercise, within the area designated, all police power vested in the state by the constitution and laws of this state"; and

**WHEREAS**, pursuant to A.R.S. § 36-787(A), during a State of Emergency declared by the Governor, the Arizona Department of Health Services has primary jurisdiction, responsibility and authority for:

   (1)     Planning and executing public health emergency assessment, mitigation, preparedness response and recovery of the State;
   (2)     Coordinating public health emergency response among State, local and tribal authorities;
   (3)     Collaborating with relevant federal government authorities, elected officials or other states, private organizations and private sector companies; and
   (4)     Coordinating recovery operations and mitigation initiatives subsequent to public health emergencies; and

**WHEREAS**, on March 30, 2020, the Director of the Arizona Department of Health Services, based on an epidemiological assessment of Arizona specific data and in alignment with CDC guidance, recommended the state implement enhanced mitigation strategies.

**NOW, THEREFORE, I**, Douglas A. Ducey, Governor of the State of Arizona, by virtue of the authority vested in me by the Constitution and laws of the State, including but not limited to A.R.S. § 26-303 and after consultation with the Director of the Arizona Department of Health Services, do hereby order, effective at 5:00 p.m. on March 31, 2020:

1.  Arizona shall institute a "Stay home, Stay healthy, Stay connected" policy that promotes physical distancing, while also encouraging social connectedness. This builds on actions the state has already taken, and further memorializes some already in effect, to slow the spread of COVID-19 and protect our citizens.

2.  Under this policy, all individuals in the State of Arizona shall limit their time away from their place of residence or property, except:
    a.  To conduct or participate in Essential Activities.
    b.  For employment, to volunteer or participate in Essential Functions.
    c.  To utilize any services or products provided by Essential Businesses.
    d.  Employment, if as a sole proprietor or family owned business, work is conducted in a separate office space from your home and the business is not open to serve the public.
    e.  No person shall be required to provide documentation or proof of their activities to justify their activities under this order.

3.  Arizonans are encouraged to improve social connectedness, resiliency, and help-seeking behavior by:

5

    a.  Maintaining ongoing connections and communication with current social supports and structures such as family, friends, neighbors and other social groups;

    b.  Educating fellow Arizonans on the negative health impacts of social isolation;

    c.  Developing habits and activities that increase resilience, such as physical activity, virtual social gatherings, assisting neighbors, implementing or participating in connection campaigns for at-risk populations, and participating in volunteer activities;

    d.  Sharing information and awareness of newly available social services and resources to improve the stability of families and reduce financial stressors; and

    e.  Sharing information and awareness of resources in the community by providing information on where and how high risk populations can access suicide prevention services throughout Arizona, including specific resources that are targeted to high risk populations.

4.  Under this policy, Essential Activities include:

    a.  Obtaining necessary supplies and services for family, household members and pets, such as groceries, food and supplies for household consumption and use, supplies and equipment needed to work from home, assignments for completion of distance learning and products necessary to maintain safety, sanitation and essential maintenance of the home and residence.

    b.  Engaging in activities essential for the health and safety of family, household members and pets, including things such as seeking medical, behavioral health or emergency services and obtaining medical supplies or medication.

    c.  Caring for a family member, friend, or pet in another household or residence, which includes but is not limited to transportation of a family member, friend or their pet for essential health and safety activities and to obtain necessary supplies and services for the other household.

    d.  Engaging in outdoor exercise activities, such as walking, hiking, running, biking or golfing, but only if appropriate physical distancing practices are used.

    e.  Attending or conducting work or volunteering in Essential Functions which includes but is not limited to transporting children to child care services for attending work in an essential service.

    f.  Engaging in constitutionally protected activities such as speech and religion, and any legal or court process provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible.

5.  To the extent individuals are using shared or outdoor spaces when outside their residence or property for Essential Activities, they shall to the extent possible maintain physical distancing of at least six feet from any other person, consistent with guidance from the CDC.

6.  All persons may leave their place of residence only for Essential Activities, to participate in or receive Essential Governmental Functions, or to participate in or fulfill Essential Functions outlined in Executive Order 2020-12.

7.  Individuals shall limit use of public transportation to when absolutely necessary to obtain or conduct Essential Activities or attend work in an Essential Function. While using public transportation, riders shall maintain to the extent possible recommended physical distancing of at least six feet from other riders and the operator.

8. Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter as soon as possible and to the maximum extent practicable.

9. Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.

10. For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

11. Businesses and entities that remain open shall implement rules and procedures that facilitate physical distancing and spacing of individuals of at least six feet.
    a. All businesses that are classified as Essential Functions may remain open and maintain operations, but shall establish and implement social distancing and sanitation measures established by the United States Department of Labor or the Arizona Department of Health Services.
    b. Essential Functions conducted by governmental entities shall remain open. Government leaders may adjust operations to promote physical distancing, including but not limited to offering on-line services as feasible, limiting the number of persons in a physical space or limiting access to specific facilities or areas to protect from the spread of COVID-19.
    c. Employment in Essential Businesses and Operations means an essential employee performing work for an Essential Function as identified in the "Prohibiting the Closure of Essential Services" Executive Order list.

12. Non-essential businesses may continue to operate those activities that do not require in-person, on-site transactions and are encouraged to maintain at least minimum basic operations that maintain the value of the business' inventory, preserve the condition of the business' physical plant and equipment, ensure security, process payroll and employee benefits, facilitate employees of the business being able to continue to work remotely from their residences, and related functions to include mail pickup.

13. This Executive Order shall not be construed to prohibit working from home, operating a single owner business with no in-person, on-site public interaction, or restaurants and food services providing delivery or take-away services, so long as proper physical distancing and sanitation measures are established and implemented.

14. Arizonans are already acting responsibly during this public health emergency. The intent of this Executive Order is to ensure that people maintain physical distance to the maximum extent feasible, while enabling essential services to continue, protecting people's rights and slowing the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with physical distancing recommendations. All provisions of this Executive Order shall be interpreted to effectuate this intent. Prior to any enforcement action being taken to enforce this order in accordance with A.R.S. § 26-317, a person shall be notified and given an opportunity to comply.

15. Pursuant to A.R.S. § 26-307, no county, city or town may make or issue any order, rule or regulation that conflicts with the policy, directives or intent of this Executive Order, including any order, rule or regulation that limits an individual from conducting, participating in or receiving Essential Services, Essential Activities or Non-essential Services as outlined in this order and prior executive orders.

16. If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

17. This Executive Order shall be in effect until April 30, 2020, unless extended.

IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona.



**GOVERNOR**

**DONE** at the Capitol in Phoenix on this Thirtieth Day of March in the Year Two Thousand and Twenty and of the Independence of the United States of America the Two Hundred and Forty-Fourth.

**ATTEST:**

**Secretary of State**

8

## EXECUTIVE DEPARTMENT
## STATE OF CALIFORNIA

### EXECUTIVE ORDER N-33-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

9

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.



**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

10



**JARED POLIS**
GOVERNOR

136 STATE CAPITOL
DENVER, COLORADO 80203

TEL 303-866-2471
FAX 303-866-2003

# D 2020 003

## EXECUTIVE ORDER

### Declaring a Disaster Emergency Due to the Presence of Coronavirus Disease 2019 in Colorado

Pursuant to the authority vested in the Governor of the State of Colorado and, in particular, pursuant to Article IV, Section 2 of the Colorado Constitution and the relevant portions of the Colorado Disaster Emergency Act, C.R.S. § 24-33.5-701, *et seq.* (Act), I, Jared Polis, Governor of the State of Colorado, hereby issue this Executive Order declaring a state of disaster emergency due to the presence of coronavirus disease 2019 (COVID-19) in Colorado, and authorizing response activities associated with the disaster emergency to enable State agencies to coordinate response, recovery, and mitigation efforts.

Further, pursuant to the authority vested in the Governor of the State of Colorado and, in particular, pursuant to Article IV, Section 5 of the Colorado Constitution and C.R.S. § 28-3-104, I hereby authorize employing the Colorado National Guard to support and provide planning resources to State and local authorities as they respond to the presence of COVID-19 in the State.

## I.   Background and Purpose

The Governor is responsible for meeting the dangers to the State and people presented by disasters. C.R.S. § 24-33.5-704(1). The Act defines a disaster as "the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural cause or cause of human origin, including but not limited to . . . epidemic." C.R.S. § 24-33.5-703(3). The threat currently posed by COVID-19, a respiratory illness that can spread from person to person, constitutes a disaster for purposes of the Act.

Like many other states and countries around the world, Colorado identified numerous presumptive positive cases of COVID-19. The virus that causes COVID-19 is a novel coronavirus that was first identified during an investigation into an outbreak in Wuhan, China in December 2019. Transmission of the disease likely occurs in ways similar to other respiratory illnesses. To become sick, an individual must be exposed to the virus, either through prolonged, close (within six (6) feet) exposure to someone with COVID-19, transmission of respiratory droplets by an infected person coughing or sneezing, or touching a surface or object that has the virus on it and then touching your mouth, nose, or eyes. Symptoms include fever, coughing, and difficulty breathing.

11

In response to the growing global threat posed by COVID-19, the Colorado Department of Public Health and Environment (CDPHE) activated its Emergency Operations Center (Center) on February 26, 2020.  CDPHE is coordinating its response to this emerging epidemic through the Center and collaborating with local public health agencies across the State to conduct disease surveillance and control activities.  The Center is open seven (7) days per week, and State epidemiologists are on call twenty-four (24) hours per day.  This work is further informed by guidance and assistance from the Centers for Disease Control and Prevention (CDC).  CDPHE received approval from the CDC and began laboratory testing for COVID-19 on February 28, 2020. CDPHE currently has the capacity to run over 200 tests per day.  On March 5, 2020, CDPHE's public health laboratory confirmed the first presumptive positive test result from Colorado.

On March 3, 2020, I verbally ordered the Office of Emergency Management to implement the State Emergency Operations Plan and to take all necessary and appropriate State actions to assist the affected jurisdictions with their response, recovery, and mitigation efforts (Incident CO-COEM-I070).  At approximately 9:00 AM on March 10, 2020, I verbally declared a disaster emergency due to the presence of COVID-19 in Colorado.  I also verbally authorized employing the Colorado National Guard to support and provide planning resources to State and local authorities as they respond to the presence of COVID-19 in the State.

As of March 11, 2020, CDPHE identified thirty-three (33) presumptive positive COVID-19 cases and one (1) indeterminate test result.  Out of an abundance of caution, CDPHE treats an indeterminate test as a positive case until the State receives conclusive test results from the CDC.  The State lab has run tests on hundreds of people in Colorado since testing started on February 28, 2020.  In the coming days, the State anticipates there will be additional presumptive positive cases.  Based on the course of the disease so far in the State, CDPHE has reason to suspect we are seeing limited community spread in Colorado.

Current guidance from CDPHE and CDC indicates that older adults and people who have serious chronic medical conditions such as heart disease, diabetes, and lung disease are most at risk of getting very sick from COVID-19.

The presence of COVID-19 in Colorado presents unique challenges and strains the resources of our emergency and medical facilities and personnel.  The measures I am ordering through this Executive Order are designed to meet these challenges by limiting the spread and mitigating the harm caused by COVID-19, protecting our most vulnerable populations, and maximizing our chances of avoiding widespread disruptions to our economy and to the daily lives of Colorodans.  I have consulted with public health officials and studied the responses of other nations.  The State's approach is based on models that have proven effective, and we will modify it if necessary to respond to new information or changed circumstances.

## II.   Declarations and Directives

A.   The presence of COVID-19 in Colorado constitutes a disaster emergency under C.R.S. § 24-33.5-701, *et seq.*  My verbal order of March 10, 2020, declaring a disaster emergency, pursuant to C.R.S. § 24-33.5-704(4), is hereby memorialized by this Executive Order and shall have the full force and effect of law as if it were contained within this Executive Order.

B.   Pursuant to C.R.S. § 28-3-104, my verbal orders of March 10, 2020, activating the National Guard, and authorizing the use of National Guard assets to support and provide planning, logistics, personnel and facilities to State and local authorities as they respond to the presence of COVID-19 in the State are hereby memorialized by this Executive Order and shall have the full force and effect of law as if they were contained within this Executive Order.

C.   Pursuant to C.R.S. § 24-33.5-706(4), I order that four million dollars ($4,000,000) from the Disaster Emergency Fund be encumbered for response activities related to the COVID-19 response efforts.  This amount is an estimate of the immediate funding needed for COVID-19 response efforts and may be adjusted in subsequent Executive Orders if necessary. These funds shall remain available for this purpose until twelve (12) months from the date of this Executive Order and any unexpended funds shall remain in the Disaster Emergency Fund.

D.   Pursuant to C.R.S. § 24-33.5-704.5, the Governor's Expert Emergency Epidemic Response Committee (Committee) has convened to consider evidence presented by CDPHE's State Epidemiologist that there is an occurrence or imminent threat of an emergency epidemic based on the COVID-19 cases present in Colorado. The Committee will continue to convene regularly to advise me regarding reasonable and appropriate measures to reduce or prevent spread of COVID-19 and to protect public health.

E.   Pursuant to C.R.S. § 24-33.5-704(5), I hereby activate the disaster response and recovery aspects of applicable State, local, and interjurisdictional disaster emergency plans. Furthermore, I authorize the employment and use of any forces to which such plans apply and for use or distribution of any supplies, equipment, and materials and facilities assembled, stockpiled, or arranged to be made available under the Act or other applicable law.

F.   I direct CDPHE to issue all public health orders necessary to protect individuals who reside or are cared for in a Colorado licensed or certified skilled nursing facility, intermediate care facility, assisted living facility, or similar entity.

G.   I direct the Colorado Department of Labor and Employment (CDLE) to engage in emergency rulemaking to ensure workers in the following industries get paid sick

leave if they exhibit flu-like symptoms and have to miss work while they await testing results for COVID-19:  leisure and hospitality, food services, child care, education at all levels (including but not limited to cafeterias and transportation to, from, and on campuses), home health care (working with elderly, disabled, ill, or otherwise high-risk individuals), operating a nursing home, or operating a community living facility.  I make this order not only to prevent the spread of the virus, but also to assure both Coloradans and visitors to our State that we are minimizing risks.  For those workers who test positive and lack access to paid leave, I have asked CDLE to identify additional supports and wage replacement such as access to emergency unemployment assistance.

H.    I direct the Department of Revenue (DOR) to temporarily allow Coloradans over the age of 65, a vulnerable population, to renew their driver's licenses online to avoid having to congregate at a Department of Motor Vehicles office.

I.    I direct the Department of Personnel and Administration (DPA) to promulgate emergency rules relating to leave policies to ensure that state workers who are subject to mandatory or voluntary quarantine or isolation and who cannot work from home have access to paid leave.  I also hereby suspend those provisions of C.R.S. § 24-50-603(7) that exclude temporary employees from the definition of "employee" for the purposes of leave benefits eligibility, and direct the State Personnel Director to determine what, if any, state leave benefits may be provided to temporary employees.

J.    I hereby suspend the requirement that state employees who are absent from work due to COVID-19-like symptoms for three or more consecutive days provide a medical certificate form from a health care provider, set forth at C.R.S. § 24-50-104(7)(a).  I also direct the State Personnel Director to create and promulgate an Employee Self-Certification Form that shall be used by employees in lieu of a medical certificate form from a health care provider.  The suspension of the medical certificate requirement as set forth in this Executive Order does not suspend any documentation requirements that pertain to serious health conditions or injuries, as defined in the State Personnel Administrative Procedures, Rule 1-69, that may qualify for job-protection under the Family Medical Leave Act.

### III.   <u>Duration</u>

This Executive Order shall expire thirty (30) days from March 11, 2020, unless extended further by Executive Order, except that the funds described in Section II(C) above shall remain available for the described purposes for twelve (12) months from the date of this Executive Order.



GIVEN under my hand and the Executive Seal of the State of Colorado, this eleventh day of March, 2020.

Jared Polis
Governor



**JARED POLIS**
GOVERNOR

136 STATE CAPITOL
DENVER, COLORADO 80203

TEL 303-866-2471
FAX 303-866-2003

# D 2020 004

## EXECUTIVE ORDER

### Ordering Closure of Downhill Ski Resorts Due to the Presence of COVID-19 in the State of Colorado

Pursuant to the authority vested in the Governor of the State of Colorado and, in particular, pursuant to Article IV, Section 2 of the Colorado Constitution and the relevant portions of the Colorado Disaster Emergency Act, C.R.S. § 24-33.5-701, *et seq.* (Act), I, Jared Polis, Governor of the State of Colorado, hereby issue this Executive Order requiring the closure of downhill ski resorts due to the presence of coronavirus disease 2019 (COVID-19) in mountain communities with limited care capacity.

### I. Background and Purpose

On March 5, 2020, the Colorado Department of Public Health and Environment's (CDPHE) public health laboratory confirmed the first presumptive positive COVID-19 test result from Colorado. Since then, CDPHE confirmed more than one hundred (100) additional presumptive positive cases and concluded that we are now seeing community spread of the disease. I declared a disaster emergency on March 11, 2020, and issued Executive Order D 2020 003.

COVID-19 is a highly contagious viral disease that has spread throughout many of our communities. Public health officials have concluded that disease control measures aimed at specific individuals or groups are no longer sufficient to contain the further spread of the virus.

Summit, Eagle, Pitkin, and Gunnison Counties, where many of Colorado's premier ski resorts are located, have been particularly hard-hit by the emerging COVID-19 outbreak in the State. As of March 14, 2020, Summit County has two (2) cases, Eagle twenty (20) cases, Pitkin eleven (11) cases, and Gunnison six (6) cases. Medical centers in these areas have limited ability to meet the needs of individuals with COVID-19. Further strain on their resources creates a risk that medical personnel in the area will be unable to provide needed care to residents and visitors to our mountain communities.

On March 14, 2020, Vail Resorts announced that it would suspend operations in its North American resort and retail business for one week from March 15-22, 2020. Alterra Resorts, which operates Winter Park and Steamboat Springs ski areas, immediately followed suit. I applaud their leadership and willingness to prioritize public health and safety during these difficult times.

The challenges posed by COVID-19 are unique and place significant burdens on hospitals and medical personnel. We are aware of the great cost that mountain communities face

16

if our downhill ski resorts close, even temporarily.  These costs will be borne by local residents and businesses, and by the individuals and families who come to Colorado to enjoy our beautiful mountains and world-renowned skiing.  But in the face of this pandemic emergency we cannot hesitate to protect public health and safety.

By this Executive Order, I direct downhill ski resorts to suspend operations for one week to slow the spread of COVID-19 and conserve medical resources in our mountain communities. We will continue to monitor the course of the COVID-19 outbreak in the State and may amend this Executive Order accordingly.

**II.** **Directives**

A.      I direct all downhill ski resorts in the State of Colorado to suspend operations from March 15-22, 2020.

B.      I further direct CDPHE and all local public health agencies in the relevant counties to inform the public of this Executive Order through messages broadcast by electronic and print media, communication with affected private and public organizations, and any other means that will inform the public.

**III. Duration**

This Executive Order shall expire thirty (30) days from March 14, 2020, unless extended further by Executive Order.

GIVEN under my hand and the Executive Seal of the State of Colorado, this fourteenth day of March, 2020.

Jared Polis
Governor



JARED POLIS
GOVERNOR

136 STATE CAPITOL
DENVER, COLORADO 80203
TEL 303-866-2471
FAX 303-866-2003

# D 2020 017

## EXECUTIVE ORDER

### Ordering Coloradans to Stay at Home
### Due to the Presence of COVID-19 in the State

Pursuant to the authority vested in the Governor of the State of Colorado and, in particular, pursuant to Article IV, Section 2 of the Colorado Constitution and the relevant portions of the Colorado Disaster Emergency Act, C.R.S. § 24-33.5-701, *et seq.* (Act), I, Jared Polis, Governor of the State of Colorado, hereby issue this Executive Order ordering Coloradans to stay at home whenever possible due to the presence of coronavirus disease 2019 (COVID-19) in the State.

## I.    <u>Background and Purpose</u>

On March 5, 2020, the Colorado Department of Public Health and Environment's (CDPHE) public health laboratory confirmed the first presumptive positive COVID-19 test result in Colorado. Since then, the number of confirmed cases has continued to climb, and we have evidence of community spread throughout the State. I verbally declared a disaster emergency on March 10, 2020, and issued the corresponding Executive Order D 2020 003 on March 11, 2020 and requested that the President of the United States declare a Major Disaster for the State of Colorado, pursuant to the Stafford Act, on March 25, 2020.

My administration, along with other state, local, and federal authorities, has taken a wide array of actions to mitigate the effects of the pandemic, prevent further spread, and protect against overwhelming our health care resources.

The actions we have undertaken to date are not yet doing enough to reduce the spread of the virus, and we must take additional action to minimize the duration of this epidemic and of the disruption to our daily lives.  The virus that causes COVID-19 is spread primarily by close contact between people and through respiratory droplets when an infected person coughs or sneezes.  Public health experts recommend we practice "social distancing," or maintaining a physical distance of six (6) feet or more from other people, as a way to slow the spread of COVID-19.

This Executive Order requires Coloradans to stay at home, and subject to certain limited exceptions, orders the Executive Director of the CDPHE to issue a public health order defining

18

critical emergency personnel, infrastructure, government functions, and other activities that are exempt from the directives in this Executive Order.

II.   **Directives**

A.   This Executive Order will become effective Thursday, March 26, 2020, at 6:00 a.m.

B.   I direct all Coloradans to stay at home, subject to limited exceptions such as obtaining food and other household necessities, going to and from work at critical businesses, seeking medical care, caring for dependents or pets, or caring for a vulnerable person in another location.

C.   I direct all businesses other than those qualified as "Critical Businesses" under Public Health Order 20-24 or any Public Health Order issued pursuant to this Executive Order, to close temporarily, except as necessary to engage in minimum basic operations needed to protect assets and maintain personnel functions, as of the effective date of this Executive Order.

D.   I direct the Executive Director of the CDPHE to issue a public health order consistent with the directives in this Executive Order.

1.   Certain individuals must continue to work outside their residences to provide goods and services critical to our response to the COVID-19 epidemic emergency.  The public health order must therefore identify:

a.   critical emergency personnel and infrastructure necessary to ensure continuity of critical healthcare, government functions, public safety, manufacturing, and supply chain operations;

b.   certain critical businesses exempt from this Executive Order, provided they comply with social distancing requirements;

c.   steps all critical businesses must take to comply with social distancing requirements; and

d.   a process by which a local public health authority may obtain relief from this Executive Order or any related Public Health Order issued by CDPHE to more effectively meet local conditions and needs without burdening public health resources in other parts of the State.

e.   Nothing in this Executive Order prevents a local public health authority from issuing an order more protective of public than this Executive Order. For clarity, any stay at home or similar order issued by a local jurisdiction remains in full force and effect.

    2.   Individuals must be permitted to carry on basic activities necessary to care for themselves, their families, and to maintain their places of residence. The public health order must therefore identify authorized activities individuals may engage in consistently with the goals of this Executive Order.

III.   **<u>Duration</u>**

    This Executive Order remains in effect through April 11, 2020 unless rescinded or modified by further Executive Order.



GIVEN under my hand and the Executive Seal of the State of Colorado, twenty-fifth day of March, 2020

Jared Polis
Governor

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-52
(Emergency Management - COVID-19 Public Health Emergency)

**WHEREAS**, Novel Coronavirus Disease 2019 (COVID-19) is a severe acute respiratory illness that can spread among humans through respiratory transmission and presents with symptoms similar to those of influenza; and

**WHEREAS**, in late 2019, a new and significant outbreak of COVID-19 emerged in China; and

**WHEREAS**, the World Health Organization previously declared COVID-19 a Public Health Emergency of International Concern; and

**WHEREAS**, in response to the recent COVID-19 outbreak in China, Iran, Italy, Japan and South Korea, the Centers for Disease Control and Prevention ("CDC") has deemed it necessary to prohibit or restrict non-essential travel to or from those countries; and

**WHEREAS**, on March 1, 2020, I issued Executive Order number 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 7, 2020, I directed the Director of the Division of Emergency Management to activate the State Emergency Operations Center to Level 2 to provide coordination and response to the COVID-19 emergency; and

**WHEREAS**, as of March 9, 2020, eight counties in Florida have positive cases for COVID-19, and COVID-19 poses a risk to the entire state of Florida; and

1

**WHEREAS**, the CDC currently recommends community preparedness and everyday prevention measures be taken by all individuals and families in the United States, including voluntary home isolation when individuals are sick with respiratory symptoms, covering coughs and sneezes with a tissue and disposal of the tissue immediately thereafter, washing hands often with soap and water for at least 20 seconds, using of alcohol-based hand sanitizers with 60%-95% alcohol if soap and water are not readily available and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and

**WHEREAS**, the CDC currently recommends mitigation measures for communities experiencing an outbreak including staying at home when sick, keeping away from others who are sick, limiting face-to-face contact with others as much as possible, consulting with your healthcare provider if individuals or members of a household are at high risk for COVID-19 complications, wearing a facemask if advised to do so by a healthcare provider or by a public health official, staying home when a household member is sick with respiratory disease symptoms if instructed to do so by public health officials or a health care provider; and

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.  Because of the foregoing conditions, I declare a state of emergency exists in the State of Florida.

2

Section 2.  I designate the Director of the Division of Emergency Management ("Director") as the State Coordinating Officer for the duration of this emergency and direct him to execute the State's Comprehensive Emergency Management Plan and other response, recovery, and mitigation plans necessary to cope with the emergency.  Additionally, I designate the State Health Officer and Surgeon General as a Deputy State Coordinating Officer and State Incident Commander.

Pursuant to section 252.36(1)(a), Florida Statutes, I delegate to the State Coordinating Officer the authority to exercise those powers delineated in sections 252.36(5)-(10), Florida Statutes, which he shall exercise as needed to meet this emergency, subject to the limitations of section 252.33, Florida Statutes.  In exercising the powers delegated by this Order, the State Coordinating Officer shall confer with the Governor to the fullest extent practicable.  The State Coordinating Officer shall also have the authority to:

A.  Seek direct assistance and enter into agreements with any and all agencies of the United States Government as may be needed to meet the emergency.

B.  Designate additional Deputy State Coordinating Officers, as necessary.

C.  Suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency.

D.  Enter orders as may be needed to implement any of the foregoing powers; however, the requirements of sections 252.46 and 120.54(4), Florida Statutes, do not apply to any such orders issued by the State Coordinating Officer; however, no such order shall remain in effect beyond the expiration of this Executive Order, to include any extension.

Section 3.  I order the Adjutant General to activate the Florida National Guard, as needed, to deal with this emergency.

3

23

Section 4.   I find that the special duties and responsibilities resting upon some State, regional, and local agencies and other governmental bodies in responding to the emergency may require them to suspend the application of the statutes, rules, ordinances, and orders they administer.  Therefore, I issue the following authorizations:

A.  Pursuant to section 252.36(1)(a), Florida Statutes, the Executive Office of the Governor may suspend all statutes and rules affecting budgeting to the extent necessary to provide budget authority for state agencies to cope with this emergency.  The requirements of sections 252.46 and 120.54(4), Florida Statutes, do not apply to any such suspension issued by the Executive Office of the Governor; however, no such suspension shall remain in effect beyond the expiration of this Executive Order, to include any extension.

B.  Each State agency may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of that agency, if strict compliance with the provisions of any such statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency.  This includes, but is not limited to, the authority to suspend any and all statutes, rules, ordinances, or orders which affect leasing, printing, purchasing, travel, and the condition of employment and the compensation of employees.  For the purposes of this Executive Order, "necessary action in coping with the emergency" means any emergency mitigation, response, or recovery action: (1) prescribed in the State Comprehensive Emergency Management Plan ("CEMP"); or (2) ordered by the State Coordinating Officer.  The requirements of sections 252.46 and 120.54, Florida Statutes, shall not apply to any such suspension issued by a State agency; however, no such suspension shall remain in effect beyond the expiration of this Executive Order, to include any extensions.

4

C.   In accordance with section 465.0275, Florida Statutes, pharmacists may dispense up to a 30-day emergency prescription refill of maintenance medication to persons who reside in an area or county covered under this Executive Order and to emergency personnel who have been activated by their state and local agency but who do not reside in an area or county covered by this Executive Order.

D.   In accordance with section 252.38, Florida Statutes, each political subdivision within the State of Florida may waive the procedures and formalities otherwise required of the political subdivision by law pertaining to:

1)   Performance of public work and taking whatever prudent action is necessary to ensure the health, safety, and welfare of the community;

2)   Entering into contracts; however, political subdivisions are cautioned against entering into time and materials contracts without ceiling as defined by 2 CFR 200.318(j) or cost plus percentage contracts as defined by 2 CFR 200.323(d);

3)   Incurring obligations;

4)   Employment of permanent and temporary workers;

5)   Utilization of volunteer workers;

6)   Rental of equipment;

7)   Acquisition and distribution, with or without compensation, of supplies, materials, and facilities; and,

8)   Appropriation and expenditure of public funds.

E.   All State agencies responsible for the use of State buildings and facilities may close such buildings and facilities in those portions of the State affected by this emergency, to the extent necessary to meet this emergency. I direct each State agency to report the closure of any State

5

25

building or facility to the Secretary of the Department of Management Services. Under the authority contained in section 252.36, Florida Statutes, I direct each County to report the closure of any building or facility operated or maintained by the County or any political subdivision therein to the Secretary of the Department of Management Services. Furthermore, I direct the Secretary of the Department of Management Services to:

> 1) Maintain an accurate and up-to-date list of all such closures; and,
>
> 2) Provide that list daily to the State Coordinating Officer.

Section 5.  I find that the demands placed upon the funds appropriated to the agencies of the State of Florida and to local agencies are unreasonably great and the funds currently available may be inadequate to pay the costs of coping with this emergency. In accordance with section 252.37(2), Florida Statutes, I direct that sufficient funds be made available, as needed, by transferring and expending moneys appropriated for other purposes, moneys from unappropriated surplus funds, or from the Budget Stabilization Fund.

Section 6.  All State agencies entering emergency final orders or other final actions in response to this emergency shall advise the State Coordinating Officer contemporaneously or as soon as practicable.

Section 7.  Medical professionals and workers, social workers, and counselors with good and valid professional licenses issued by states other than the State of Florida may render such services in Florida during this emergency for persons affected by this emergency with the condition that such services be rendered to such persons free of charge, and with the further condition that such services be rendered under the auspices of the American Red Cross or the Florida Department of Health.

Section 8.  All activities taken by the Director of the Division of Emergency Management and the State Health Officer and Surgeon General with respect to this emergency before the issuance of this Executive Order are ratified.  This Executive Order shall expire sixty days from this date unless extended.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 9th day of March, 2020.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

FILED
2020 MAR -9  PM 5:52

7

27

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-68
(Emergency Management - COVID-19)

**WHEREAS**, Novel Coronavirus Disease 2019 (COVID-19) is a severe acute respiratory illness that can spread among humans through respiratory transmission and presents with symptoms similar to those of influenza; and

**WHEREAS**, on March 1, 2020, I issued Executive Order number 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the 15 Days to Slow the Spread guidance advising individuals to adopt far-reaching social distancing measures, such as working from home and avoiding gatherings of more than 10 people; and

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

1

<u>Section 1.</u>      Bars, Pubs and Nightclubs

A.  Pursuant to sections 252.36(5)(g)-(h), Florida Statutes, any licensee authorized to sell alcoholic beverages for consumption on premises that derive more than 50% of its gross revenue from the sale of alcoholic beverages shall suspend all sale of alcoholic beverages for thirty days from the date of this order, effective at 5 p.m. today, March 17, 2020.

B.  The Department of Business and Professional Regulation shall utilize its authorities under Florida law to further implement and enforce the provisions of this Section and shall take additional measures with respect to bars, pubs and nightclubs as necessary to protect the public health, safety and welfare.

<u>Section 2.</u>      Beaches

Pursuant to section 252.36(5)(k), Florida Statutes, I direct parties accessing public beaches in the State of Florida to follow the CDC guidance by limiting theirs gatherings to no more than 10 persons, distance themselves from other parties by 6 feet, and support beach closures at the discretion of local authorities.

<u>Section 3.</u>      Restaurants

A.  Pursuant to section 252.36(5)(g), Florida Statutes, a restaurant shall immediately limit its occupancy to 50% of its current building occupancy.

B.  Pursuant to section 252.36(5)(g), Florida Statutes, a restaurant shall follow the CDC guidance by ensuring, at minimum, a 6-foot distance between any group of patrons and limiting parties to no more than 10 individuals.

C.  The Department of Business and Professional Regulation shall ensure all restaurants implement employee screening and prohibit any employee from entering the restaurant premises if they meet any of the criteria listed below:

1) Any person infected with COVID-19 who has not had two consecutive negative test results separated by 24 hours;

2) Any person showing, presenting signs or symptoms of, or disclosing the presence of a respiratory infection, including cough, fever, shortness of breath or sore throat;

3) Any person who has been in contact with any person(s) known to be infected with COVID-19, who has not yet tested negative for COVID-19 within the past 14 days;

4) Any person who traveled through any airport within the past 14 days; or

5) Any person who traveled on a cruise ship within the past 14 days.

D. The Department of Business and Professional Regulation shall utilize its authorities under Florida law to further implement and enforce the provisions of this Section and shall take additional measures with respect to bars, pubs and nightclubs as necessary to protect the public health, safety and welfare.

For purposes of this section, "restaurant" shall include any Food Service Establishment, licensed under Chapter 500, Florida Statutes, and Public Food Service Establishment, licensed under Chapter 509, Florida Statutes.

Section 4.      This Executive Order shall expire thirty days from this date unless extended.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 17th day of March, 2020.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

3

2020 MAR 17 PM 1: 34

30

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-70
(Emergency Management – COVID-19 – Broward and Palm Beach County Closures)

**WHEREAS**, on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt far-reaching social distancing measures, such as avoiding gatherings of more than 10 people, and in states with evidence of community spread, bars, restaurants, food courts, and gyms should be closed; and

**WHEREAS**, my Administration has consulted with Broward County and Palm Beach County authorities, both of which requested application of the CDC recommendations; and

**WHEREAS**, COVID-19 poses a health risk to Broward County and Palm Beach County residents and minimization of contact is necessary to avoid COVID-19 infection for the residents of the counties; and

**WHEREAS**, restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, cafeterias, movie theaters, concert houses, auditoriums, playhouses, bowling alleys, arcades, gymnasiums, fitness studios and beaches are potential gathering places for the spread of COVID-19; and

31

**WHEREAS**, Broward County and Palm Beach County seek to harmonize with Miami-Dade County which has already restricted access to venues and closed its beaches to public access due to the risk of community spread; and

**WHEREAS**, it is necessary and appropriate to take action to ensure that COVID-19 remains controlled, and that residents and visitors in Florida remain safe and secure;

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.      I hereby order all restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, cafeterias and any other alcohol and/or food service business establishment with seating for more than ten (10) people within the incorporated and unincorporated areas of Broward County and Palm Beach County to close on-premises service of customers. Notwithstanding the foregoing, such establishments may operate their kitchens for the purpose of providing delivery services, as authorized in Section 3 below, and employees, janitorial personnel, contractors and delivery personnel shall be allowed access to such establishments.

Section 2.      This order shall not apply to grocery stores, pharmacies, gas stations and convenience stores, except that those discrete portions of such establishments that provide alcohol and/or food service with seating for more than ten (10) people shall abide by the restrictions in Section 1.

Section 3.      This order shall not apply to delivery services, pick-up or take out services provided by any of the establishments listed in Sections 1 or 2.

32

Section 4.    This order shall not apply to restaurants that are ancillary to essential services, including the airports, port facilities, secure facilities and hospitals. Other essential services may be determined by the county administrators.

Section 5.    All movie theatres, concert houses, auditoriums, playhouses, bowling alleys, arcades, gymnasiums, fitness studios and beaches shall close. This order shall not apply to gymnasiums or fitness centers which are: (i) amenities of hotels which have a capacity of 10 persons or less, (ii) are an amenity of a residential building, (iii) are interior to any fire or police stations or (iv) are located inside any single-occupant office building.

Section 6.    The closures in this order shall remain in effect in accordance with the President's "15 Days to Slow the Spread", initiated on March 16, 2020.  These closures shall expire on March 31, 2020, but may be renewed upon the written request of the County Administrator.

Section 7.    The Broward County Administrator and the Palm Beach County Administrator shall have the ability to enforce, relax, modify or remove these closures, as warranted, pursuant to the directives and parameters as set forth in Executive Order 20-68.

Section 8.    The provisions of this order shall serve as minimum standards. Municipalities may impose more stringent standards within their jurisdictions.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 20th day of March, 2020

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

2020 MAR 20  AM 10: 45

33

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-82
(Emergency Management - COVID-19 –Isolation of Individuals Traveling to Florida)

**WHEREAS**, Novel Coronavirus Disease 2019 (COVID-19) is a severe acute respiratory illness that can spread among humans through respiratory transmission and presents with symptoms similar to those of influenza; and

**WHEREAS**, on March 1, 2020, I issued Executive Order number 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, many cases of COVID-19 in Florida have resulted from individuals coming into the State of Florida from international travel and other states, posing great risk to Florida residents; and

**WHEREAS**, on March 23, 2020, I issued Executive Order 20-80 requiring the screening, isolation and quarantine of individuals whose point of departure originated outside the State of Florida in an area with substantial community spread, to include the New York Tri-State Area; and

**WHEREAS**, Florida is experiencing an increase in individuals fleeing to Florida from states where "shelter-in-place" orders are being implemented, including from the New York Tri-State Area; and

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

34

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.

A.  I hereby direct all persons who enter the State of Florida from an area with substantial community spread, to include the New York Tri-State Area (Connecticut, New Jersey and New York), to isolate or quarantine for a period of 14 days from the time of entry into the State of Florida or the duration of the person's presence in the State of Florida, whichever is shorter. This Order shall not apply to persons employed by the airlines and those performing military, emergency or health response. This Order shall take effect immediately and apply retroactively to all persons who have entered Florida after being in any area with substantial community spread within the previous 14 days. All persons isolating or quarantining under this Section shall be responsible for all costs associated with their isolation or quarantine, including transportation, lodging, food, medical care and any other expenses to sustain the person during the period of isolation or quarantine.

B.  I hereby direct all persons covered under Section 1(A) of this Order to inform any individual in Florida with whom they have had direct physical contact in the past 21 days that they traveled from an area with substantial community spread.

Section 2.  Failure to follow Section 1 of this Order is a second-degree misdemeanor pursuant to section 252.50, Florida Statutes, and is punishable by imprisonment not to exceed 60 days, a fine not to exceed $500, or both.

Section 3.

A.  Pursuant to section 252.47, Florida Statutes, I hereby direct all state, county and local law enforcement authorities to enforce this Order. Any law enforcement authority that interacts with a

2

person in violation of Section 1(A) of this Order shall immediately report the individual, along with personal identifying and contact information, to the Florida Department of Health.

      B.  Pursuant to section 381.0012(5), Florida Statutes, "it shall be the duty of every state and county attorney, sheriff, police officer, and other appropriate city and county officials upon the request to assist the Department of Health" in enforcing any isolation or quarantine, state health law and order of the Department of Health issued pursuant to this Order.

      Section 4. This Executive Order shall expire upon the expiration of Executive Order 20-52, including any extensions, or upon an Executive Order lifting the isolation or quarantine after advice from the State Health Officer and Surgeon General.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 24th day of March, 2020.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

3

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-86
(Emergency Management - COVID-19 –Additional Requirements of Certain Individuals
Traveling to Florida)

**WHEREAS**, Novel Coronavirus Disease 2019 (COVID-19) is a severe acute respiratory illness that can spread among humans through respiratory transmission and presents with symptoms similar to those of influenza; and

**WHEREAS**, on March 1, 2020, I issued Executive Order number 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 24, 2020, I issued Executive Order number 20-82 directing all persons from an area with substantial community spread who enter the State of Florida to isolate or quarantine for a period of 14 days; and

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

37

Section 1.

A. I hereby direct all persons who enter the State of Florida from an area with substantial community spread, to include the State of Louisiana, inclusive of those entering the State of Florida by roadways, to isolate or quarantine for a period of 14 days from the time of entry into the State of Florida or the duration of the person's presence in the State of Florida, whichever is shorter. This section shall not apply to persons performing military, emergency, health or infrastructure response, or persons involved in any commercial activity. This Order shall take effect immediately and apply retroactively to all persons who have entered Florida after being in any area with substantial community spread. All persons isolating or quarantining under this Section shall be responsible for all costs associated with their isolation or quarantine, including transportation, lodging, food, medical care and any other expenses to sustain the person during the period of isolation or quarantine.

B. I hereby direct all persons covered under Section 1(A) of this Order to inform any individual in Florida with whom they have had direct physical contact in the past 21 days that they traveled from an area with substantial community spread.

C. I direct the establishment of appropriate checkpoints on the roadways for those persons and vehicles entering the State of Florida and to require those persons to provide information, including in a written form, regarding the origin of their travel and on the address of their location of isolation or quarantine for a period of 14 days. I further direct the Florida Department of Transportation to facilitate locations for appropriate checkpoints, including at welcome centers and rest stops, and to facilitate the placement of road signs and advisories to provide information on this Order and to direct traffic to the appropriate checkpoint.

D.  Pursuant to sections 252.36(5)(b) and 252.47, Florida Statutes, the Florida Highway Patrol and County Sheriffs are directed to assist with the establishment of appropriate checkpoints, the flow of traffic to those checkpoints and any enforcement actions.

Section 2.  Failure to follow Section 1 of this Order is a second-degree misdemeanor pursuant to section 252.50, Florida Statutes, and is punishable by imprisonment not to exceed 60 days, a fine not to exceed $500, or both.

Section 3.

A.  Pursuant to section 252.47, Florida Statutes, I hereby direct all state, county and local law enforcement authorities to enforce this Order.  Any law enforcement authority that interacts with a person in violation of Section 1(A) of this Order shall immediately report the individual, along with personal identifying and contact information, to the Florida Department of Health.

B.  Pursuant to section 381.0012(5), Florida Statutes, "it shall be the duty of every state and county attorney, sheriff, police officer, and other appropriate city and county officials upon the request to assist the Department of Health" in enforcing any isolation or quarantine, state health law and order of the Department of Health issued pursuant to this Order.

Section 4.  To the extent necessary, the exceptions of this Executive Order are applicable to Executive Order 20-80, Section 1(A) and 20-82, Section 1(A).

Section 5. This Executive Order shall expire upon the expiration of Executive Order 20-52, including any extensions, or upon an Executive Order lifting the isolation or quarantine after advice from the State Health Officer and Surgeon General.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 27th day of March, 2020.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

FILED
2020 MAR 27   PM 5: 24
(TALLAHASSEE, FLORIDA)

4

40

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-87
(Emergency Management - COVID-19 – Vacation Rental Closures)

**WHEREAS**, on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt far-reaching social distancing measures; and

**WHEREAS**, the CDC has cautioned against non-essential travel within the United States; and

**WHEREAS,** Florida is experiencing an increase in individuals fleeing to Florida from out-of-state locations where "shelter-in-place" orders are being implemented and/or community spread exists; and

**WHEREAS**, many cases of COVID-19 in Florida have resulted from individuals coming into the State of Florida from international travel and other states, posing great risk to Florida residents; and

**WHEREAS**, vacation rentals and third-party platforms advertising vacation rentals in Florida present attractive lodging destinations for individuals coming into Florida; and

1

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.    Vacation Rentals

I hereby order all parties engaged in rental of vacation rental properties, as defined in section 509.242(1)(c), Florida Statutes, to suspend vacation rental operations. Vacation rentals are prohibited from making new reservations or bookings and shall not accept new guests for check-in for the duration of this order. This directive shall include the:

A.    Rental of any house, condominium, cooperative, or dwelling unit that is also a transient public lodging establishment, as defined under Section 509.013(4)(a), Florida Statutes; and

    i.    Which is rented for periods of less than 30 days or 1 calendar month, whichever is less; or

    ii.   Which is advertised or held out to the public as a place regularly rented to guests; or

    iii.  Which is otherwise regulated by the Department of Business and Professional Regulation ("DBPR") as a vacation rental pursuant to section 509.241, Florida Statutes.

B.    This directive shall not include the following:

    i.    Hotels, motels, inns, resorts, non-transient public lodging establishments,

2

42

or time share projects; or

ii.      Long-term rentals; or

iii.     Rental stays where guests are currently staying in a vacation rental or have previously booked a stay and are schedule to check-in no later than March 28, 2020; or

iv.      Rentals to persons performing military, emergency, governmental, health or infrastructure response, or travelers engaged in non-vacation commercial activities.

<u>Section 2.</u>      Violations of the Order

A.  DBPR shall supplement this directive with guidance or directives as necessary to implement the order and shall take steps necessary to inspect licensed properties or third-party platforms whereby Florida vacation rentals may be advertised.

B.  DBPR shall revoke the vacation rental license of any party that violates this order or otherwise advertises vacation rental opportunities during the duration of this order; and

C.  DBPR shall alert the state authorities to evidence of violations or attempts to violate this order; and

D.  Parties that violate this order or attempt to violate the order through advertising or other means of solicitation may be charged with a second-degree misdemeanor, punishable as provided in Sections 775.082 or 775.083, Fla. Stat.

<u>Section 3.</u>      This Executive Order shall expire in 14 days unless extended by subsequent order.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 27th day of March, 2020.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

FILED
2020 MAR 27  PM 5: 24
TALLAHASSEE, FLORIDA

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-90
(Emergency Management – COVID-19 – Broward and Palm Beach County Closures)

**WHEREAS**, on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 20, 2020, I issued Executive Order 20-70 directing the closure of beaches in Broward County and Palm Beach County; and

**WHEREAS**, recognizing that Executive Order 20-70 expires on March 31, 2020, Broward County and Palm Beach County seek to have the restrictions related to beach closures extended; and

**WHEREAS**, it is necessary and appropriate to take action to ensure that COVID-19 remains controlled, and that residents and visitors in Florida remain safe and secure;

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.    Broward County and Palm Beach County beaches shall remain closed.

Section 2.    The Broward County Administrator and the Palm Beach County Administrator shall have the ability to enforce, relax, modify or remove these beach closures, as warranted, pursuant to the directives and parameters set forth in Executive Order 20-68, Section 2.

Section 3.    This Executive Order shall remain in effect for the length of Executive Order 20-52, including any extensions, unless otherwise modified and suspended pursuant to subsequent order.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 31st day of March, 2020.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

2020 MAR 31 PM 7:49
DEPARTMENT OF STATE
TALLAHASSEE, FLORIDA

FILED

2

46

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-91
(Essential Services and Activities During COVID-19 Emergency)

**WHEREAS,** on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS,** on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS,** on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS,** on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt far-reaching social distancing measures, such as avoiding gatherings of more than 10 people, and in states with evidence of community spread, recommending restrictions to certain establishments conducive to mass gatherings and congregations; and

**WHEREAS,** on March 29, 2020, the President extended such guidance to be in effect until April 30, 2020; and

**WHEREAS,** on March 31, 2020, the President updated the guidance, renaming it "30 Days to Slow the Spread", and along with the White House Coronavirus Task Force urged Americans to continue to adhere to the guidelines and expand community mitigation efforts; and

47

**WHEREAS,** the majority of individuals in Florida that have tested positive for COVID-19 have been concentrated in its southeastern counties and other urban cores; and

**WHEREAS,** positive cases of COVID-19 have continued to rise in other states in close proximity to Florida, resulting in increased risk to counties in northern Florida; and

**WHEREAS,** many thousands of people fled the New York City region to Florida following New York State issuing a "shelter-in-place" order, thereby jeopardizing the health and safety of Floridians; and

**WHEREAS,** on March 23, 2020, I issued Executive Order 20-80, requiring all individuals that fly into Florida from states with substantial community spread to self-isolate in Florida for 14 days or the duration of their trip, whichever is shorter; and

**WHEREAS,** on March 27, 2020, I issued Executive Order 20-86, requiring all individuals that drive into Florida from states with substantial community spread to self-isolate in Florida for 14 days or the duration of their trip, whichever is shorter; and

**WHEREAS,** persistent interstate travel continues to pose a risk to the entire state of Florida; and

**WHEREAS,** on March 24, 2020, I issued Executive Order 20-83, directing the State Surgeon General and State Health Officer to issue a public health advisory urging the public to avoid all social or recreational gatherings of 10 or more people and urging those who can work remotely to do so; and

**WHEREAS,** it is necessary and appropriate to take action to ensure that the spread of COVID-19 is slowed, and that residents and visitors in Florida remain safe and secure.

**NOW, THEREFORE, I, RON DESANTIS,** as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (l)(a) of the Florida Constitution Chapter

2

48

252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.    Safer At Home

A. Senior citizens and individuals with a significant underlying medical condition (such as chronic lung disease, moderate-to-severe asthma, serious heart conditions, immunocompromised status, cancer, diabetes, severe obesity, renal failure and liver disease) shall stay at home and take all measures to limit the risk of exposure to COVID-19.

B. In concert with the efforts of President Trump and the White House Coronavirus Task Force to fight COVID-19, and based on guidance provided by Florida Surgeon General and State Health Officer, Dr. Scott Rivkees, all persons in Florida shall limit their movements and personal interactions outside of their home to only those necessary to obtain or provide essential services or conduct essential activities.

Section 2.    Essential Services

A. For purposes of this Order and the conduct it limits, "essential services" means and encompasses the list detailed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, v. 2 (March 28, 2020) (attached) and any subsequent lists published.

B. Essential services also include those businesses and activities designated by Executive Order 20-89 and its attachment which consists of a list propounded by Miami-Dade County in multiple orders.

C. Other essential services may be added under this Order with the approval of the State Coordinating Officer, in close coordination with the State Health Officer. The State Coordinating Officer shall maintain an online list of essential services, as specified in this Order along with any approved additions. The online list shall be available on the Division of

3

49

Emergency Management's website at www.floridadisaster.org and the Florida Department of Health's website at www.floridahealth.gov.

      D.  Nothing in this order prohibits individuals from working from home; indeed, this Order encourages individuals to work from home.

      E.  All businesses or organizations are encouraged to provide delivery, carry-out or curbside service outside of the business or organization, of orders placed online or via telephone, to the greatest extent practicable.

    <u>Section 3.</u>    Essential Activities

      A.  For purposes of this Order and the conduct it limits, "essential activities" means and encompasses the following:

        i.    Attending religious services conducted in churches, synagogues and houses of worship; and

        ii.    Participating in recreational activities (consistent with social distancing guidelines) such as walking, biking, hiking, fishing, hunting, running, or swimming; and

        iii.    Taking care of pets; and

        iv.    Caring for or otherwise assisting a loved one or friend.

      B.  Other essential activities may be added to this list with the approval of the State Coordinating Officer, in close coordination with the State Health Officer. The State Coordinating Officer shall maintain an online list of essential activities, as specified in this Order along with any approved additions.

      C.  A social gathering in a public space is not an essential activity.  Local jurisdictions shall ensure that groups of people greater than ten are not permitted to congregate in any public space.

Section 4.     Local Orders in Response to COVID-19

This Order shall supersede any conflicting official action or order issued by local officials in response to COVID-19 but only to the extent that such action or order allows essential services or essential activities prohibited by this Executive Order.

Section 5.     Previous Executive Orders

This Executive Order does not supersede any Executive Order related to COVID-19.

Section 6.     Effective Date and Expiration Date

This Order is effective 12:01 am on April 3, 2020. This Order shall expire on April 30, 2020 unless extended by subsequent order. Executive Order 20-68 (bars, restaurants) and Executive Order 20-71 (alcohol sales, restaurants) shall remain in effect through the duration of Executive Order 20-52, including any extensions.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 1st day of April, 2020

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

2020 APR -1  PM 1: 15
TALLAHASSEE, FLORIDA

FILED

U.S. Department of Homeland Security
Cybersecurity & Infrastructure Security Agency
*Office of the Director*
Washington, DC 20528



March 28, 2020

## ADVISORY MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE

FROM:       Christopher C. Krebs
            Director
            Cybersecurity and Infrastructure Security Agency (CISA)

---

As the Nation comes together to slow the spread of COVID-19, on March 16th the President issued updated Coronavirus Guidance for America that highlighted the importance of the critical infrastructure workforce.

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's authorities to secure critical infrastructure. Consistent with these authorities, CISA has developed, in collaboration with other federal agencies, State and local governments, and the private sector, an "Essential Critical Infrastructure Workforce" advisory list. This list is intended to help State, local, tribal and territorial officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security. Decisions informed by this list should also take into consideration additional public health considerations based on the specific COVID-19-related concerns of particular jurisdictions.

**This list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue during the COVID-19 response across all jurisdictions. Individual jurisdictions should add or subtract essential workforce categories based on their own requirements and discretion.**

The advisory list identifies workers who conduct a range of operations and services that are typically essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing operational functions, among others. It also includes workers who support crucial supply chains and enable functions for critical infrastructure. The industries they support represent, but are not limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, law enforcement,

52

and public works.

State, local, tribal, and territorial governments are responsible for implementing and executing response activities, including decisions about access and reentry, in their communities, while the Federal Government is in a supporting role. Officials should use their own judgment in issuing implementation directives and guidance. Similarly, while adhering to relevant public health guidance, critical infrastructure owners and operators are expected to use their own judgement on issues of the prioritization of business processes and workforce allocation to best ensure continuity of the essential goods and services they support. All decisions should appropriately balance public safety, the health and safety of the workforce, and the continued delivery of essential critical infrastructure services and functions. While this advisory list is meant to help public officials and employers identify essential work functions, it allows for the reality that some workers engaged in activity determined to be essential may be unable to perform those functions because of health-related concerns.

CISA will continue to work with our partners in the critical infrastructure community to update this advisory list if necessary as the Nation's response to COVID-19 evolves.

Should you have questions about this list, please contact CISA at CISA.CAT@cisa.dhs.gov.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Version 2.0"



# Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response

Version 2.0 (March 28, 2020)

## THE IMPORTANCE OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special responsibility in these times to continue operations.

This advisory guidance and accompanying list are intended to support state, local, tribal, territorial and industry partners in identifying the critical infrastructure sectors and the essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response.

This document gives advisory guidance on defining essential critical infrastructure workers. Promoting the ability of such workers to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions.

CISA will continually solicit and accept feedback on the list and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. Feedback can be sent to CISA.CAT@CISA.DHS.GOV.

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, state managed, and federally supported.

2. Everyone should follow guidance from the CDC, as well as State and local government officials, regarding strategies to limit disease spread.

3. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

4. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not necessarily limited to, separating staff by off-setting shift hours or days and/or social distancing. These steps can preserve the workforce and allow operations to continue.

5. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the

---

**CONNECT WITH US**
www.cisa.gov

**For more Information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

54

health and safety of the employees.

6. Reliance on technology and just-in-time supply chains means that certain workers must be able to access certain sites, facilities, and assets to ensure continuity of functions.

7. Government employees, such as emergency managers, and the business community need to establish and maintain lines of communication.

8. When government and businesses engage in discussions about essential critical infrastructure workers, they need to consider the implications of business operations beyond the jurisdiction where the asset or facility is located. Businesses can have sizeable economic and societal impacts as well as supply chain dependencies that are geographically distributed.

9. Whenever possible, jurisdictions should align access and movement control policies related to critical infrastructure workers to lower the burden of workers crossing jurisdictional boundaries.

## IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of identified essential critical infrastructure workers is intended to be overly inclusive reflecting the diversity of industries across the United States.



**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

55

## HEALTHCARE / PUBLIC HEALTH

- Workers who perform critical clinical research, development, and testing needed for COVID-19 response.

- Healthcare providers and Caregivers including physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, optometrists, speech pathologists, chiropractors, and diagnostic and therapeutic technicians and technologists.

- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.).

- Workers in other medical and biomedical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Nursing Care Facilities, Organ Pharmacies, Procurement Organizations, Psychiatric Residential, Rural Health Clinics and Federally Qualified Health Centers, and retail facilities specializing in medical good and supplies).

- Manufacturer workers for health manufacturing (including biotechnology companies), materials and parts suppliers, logistics and warehouse operators, distributors of medical equipment (including those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including materials used in radioactive drugs), dietary supplements, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

- Public health / community health workers, including those who compile, model, analyze and communicate public health information.

- Blood and plasma donors and the employees of the organizations that operate and manage related activities.

- Workers who manage health plans, billing, and health information, who cannot practically work remotely.

- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely.

- Workers performing information technology and cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely.

- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.

- Pharmacy employees necessary to maintain uninterrupted prescription filling.

- Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers, and coffin makers.

- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental/behavioral health services to the family members, responders, and survivors of an incident.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

  @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

56

## LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS

- Public, private, and voluntary personnel (front line and management) in emergency management, law enforcement, fire and rescue services, emergency medical services, and private security, to include public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.
- 911 call center employees and Public Safety Answering Points who can't perform their duties remotely.
- Fusion Center employees.
- Workers – including contracted vendors – who maintain, manufacture, or supply equipment and services supporting law enforcement emergency service and response operations (to include electronic security and life safety security personnel).
- Workers supporting the manufacturing of safety equipment and uniforms for law enforcement, public safety personnel, and first responder.
- Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges.
- Public agency workers responding to abuse and neglect of children, elders, and dependent adults.
- Workers who support weather disaster / natural hazard mitigation and prevention activities.
- Security staff to maintain building access control and physical security measures.

## FOOD AND AGRICULTURE

- Workers supporting groceries, pharmacies, convenience stores, and other retail (including unattended and vending) that sells human food, animal/pet food and pet supply, and beverage products, including retail customer support service and information technology support staff necessary for online orders, pickup and delivery.
- Restaurant carry-out and quick serve food operations, including dark kitchen and food prep centers, and carry-out and delivery food employees.
- Food manufacturer employees and their supplier employees—to include those employed in food ingredient production and processing facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging.
- Farmers, farm workers, and agribusiness support services to include those employed in auction and sales: grain and oilseed handling, processing and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically and for export.
- Farmers, farm workers, support service workers, and their supplier employees to include those engaged in producing and harvesting field crops; commodity inspection; fuel ethanol facilities; biodiesel and renewable diesel facilities; storage facilities; and other agricultural inputs.
- Employees and firms supporting the distribution of food, feed, and beverage and ingredients used in these products, including warehouse workers, vendor- managed inventory controllers and blockchain managers.
- Workers supporting the sanitation and pest control of all food manufacturing processes and operations from wholesale to retail.
- Employees in cafeterias used to feed employees, particularly employee populations sheltered against COVID-19.
- Workers in animal diagnostic and food testing laboratories in private industries and in institutions of higher education.

**CONNECT WITH US**
www.cisa.gov

**For more Information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure security agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.
- Employees of companies engaged in the production, storage, transport, and distribution of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.
- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.
- Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, live animals, animal by-products, and deceased animals for disposal.
- Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products.
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.

## ENERGY

- Workers supporting the energy sector, regardless of the energy source (including but not limited to nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, or who are needed to monitor, operate, engineer, and maintain the reliability, safety, environmental health, and physical and cyber security of the energy system.
- Energy/commodity trading/scheduling/marketing functions, who can't perform their duties remotely.
- IT and OT technology for essential energy sector operations including support workers, customer service operations; energy management systems, control systems, and Supervisory Control and Data Acquisition SCADA systems, and energy sector entity data centers; cybersecurity engineers; and cybersecurity risk management.
- Workers supporting the energy sector through renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, ocean, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers and security staff involved in nuclear re-fueling operations.
- Providing services related to energy sector fuels (including, but not limited, petroleum (crude oil), natural gas, propane, natural gas liquids, other liquid fuels, nuclear, and coal), supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation/maintenance, security, waste disposal and storage, and monitoring of support for resources.
- Environmental remediation/monitoring, limited to immediate critical needs technicians.
- Manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities (across all energy sector segments).

### Electricity industry:

- Workers who maintain, ensure, or restore, or are involved in the development, transportation, fuel procurement, expansion, or operation of the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, constraint maintenance, and fleet maintenance technicians- who cannot perform their duties remotely.
- Workers at coal mines, production facilities, and those involved in manufacturing, transportation, permitting, operation/maintenance and monitoring at coal sites which is critical to ensuring the reliability of the electrical system.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

58

- Workers who produce, process, ship and handle coal used for power generation and manufacturing.
- Workers needed for safe and secure operations at nuclear generation to include but not limited to, the broader nuclear supply chain, parts to maintain nuclear equipment, fuel manufacturers and fuel components used in the manufacturing of fuel.
- Workers at renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers at generation, transmission, and electric black start facilities.
- Workers at Reliability Coordinator, Balancing Authorities, and primary and backup Control Centers, including but not limited to independent system operators, regional transmission organizations, and local distribution control centers.
- Mutual assistance personnel which may include workers from outside of the state or local jurisdiction.
- Vegetation management and traffic control for supporting those crews.
- Environmental remediation/monitoring workers limited to immediate critical needs technicians.
- Instrumentation, protection, and control technicians.
- Essential support personnel for electricity operations.
- Generator set support workers such as diesel engineers used in power generation including those providing fuel.

**Petroleum industry:**

- Workers for onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.
- Workers for crude oil, petroleum and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities and racks and road transport for use as end-use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.
- Petroleum and petroleum product security operations center employees and workers who support maintenance and emergency response services.
- Petroleum and petroleum product operations control rooms/centers and refinery facilities.
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.

**Natural Gas, Natural Gas Liquids (NGL), Propane, and other liquid fuels**

- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.
- Transmission and distribution pipeline workers, including compressor stations and any other required, operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.
- Natural gas, propane, natural gas liquids, and other liquid fuel processing plants, including construction, maintenance, and support operations.
- Natural gas processing plants workers, and those that deal with natural gas liquids.
- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms/centers, and emergency response and customer emergencies (including leak calls) operations.
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

59

chemical manufacturing, or use in electricity generation.

- Dispatch and control rooms and emergency response and customer emergencies, including propane leak calls.
- Propane gas service maintenance and restoration, including call centers.
- Propane, natural gas liquids, and other liquid fuel distribution centers.
- Propane gas storage, transmission, and distribution centers.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.
- Ethanol and biofuel production, refining, and distribution.
- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation/maintenance, and monitoring of support for resources.

## WATER AND WASTEWATER

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities.
- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Chemical and equipment suppliers to water and wastewater systems and personnel protection.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

## TRANSPORTATION AND LOGISTICS

- Employees supporting or enabling transportation functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, Department of Motor Vehicle (DMV) employees, towing/recovery services, roadside assistance workers, intermodal transportation personnel, and workers who maintain and inspect infrastructure (including those that require cross-jurisdiction travel).
- Workers supporting the distribution of food, pharmaceuticals (including materials used in radioactive drugs) and other medical materials, fuels, chemicals needed for water or water treatment and energy Maintenance and operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Employees of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use. Includes cold- and frozen-chain logistics for food and critical biologic products.
- Mass transit workers and providing critical transit services and/or performing critical or routine maintenance to mass transit infrastructure or equipment.
- Employees supporting personal and commercial transportation services – including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers responsible for operating and dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment.
- Maritime transportation workers, including dredgers, port workers, mariners, ship crewmembers, ship pilots and tug boat operators, equipment operators (to include maintenance and repair, and maritime-specific medical

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

60

providers), ship supply, chandler, and repair companies.

- Workers including truck drivers, railroad employees and contractors, maintenance crew, and cleaners supporting transportation of chemicals, hazardous, medical, and waste materials to support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.

- Bus drivers and workers who provide or support intercity, commuter and charter bus service in support of other essential services or functions.

- Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities (including those who repair and maintain electric vehicle charging stations).

- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.

- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations.

- Postal, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies.

- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.

- Air transportation employees, including air traffic controllers and maintenance personnel, ramp workers, aviation and aerospace safety, security, and operations personnel and accident investigations.

- Workers who support the operation, distribution, maintenance, and sanitation, of air transportation for cargo and passengers, including flight crews, maintenance, airport operations, those responsible for cleaning and disinfection, and other on- and off- airport facilities workers.

- Workers supporting transportation via inland waterways such as barge crew, dredging, river port workers for essential goods.

- Workers critical to rental and leasing of vehicles and equipment that facilitate continuity of operations for essential workforces and other essential travel.

- Warehouse operators, including vendors and support personnel critical for business continuity (including HVAC & electrical engineers; security personnel; and janitorial staff) and customer service for essential functions.

## PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES

- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues.

- Workers such as plumbers, electricians, exterminators, builders, contractors, HVAC Technicians, landscapers, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses and buildings such as hospitals, senior living facilities, any temporary construction required to support COVID-19 response.

- Workers who support, such as road and line clearing, to ensure the availability of and access to needed facilities, transportation, energy and communications.

- Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste, including landfill operations.

- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees.

- Workers who support the inspection and maintenance of aids to navigation, and other government provided services that ensure continued maritime commerce.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

  Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

  @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

61

## COMMUNICATIONS AND INFORMATION TECHNOLOGY

### Communications:

- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call -centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
- Government and private sector employees (including government contractors) with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots and submarine cable ship facilities.
- Government and private sector employees (including government contractors) supporting Department of Defense internet and communications facilities.
- Workers who support radio, television, and media service, including, but not limited to front-line news reporters, studio, and technicians for newsgathering, and reporting, and publishing news.
- Network Operations staff, engineers and/or technicians to include IT managers and staff, HVAC & electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes construction of new facilities and deployment of new technology as these are required to address congestion or customer usage due to unprecedented use of remote services.
- Installation, maintenance and repair technicians that establish, support or repair service as needed.
- Central office personnel to maintain and operate central office, data centers, and other network office facilities, critical support personnel assisting front line employees.
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, logistics, and troubleshooting.
- Workers providing electronic security, fire, monitoring and life safety services, and to ensure physical security, cleanliness and safety of facilities and personnel, including temporary licensing waivers for security personnel to work in other States of Municipalities.
- Dispatchers involved with service repair and restoration.
- Retail customer service personnel at critical service center locations for onboarding customers, distributing and repairing equipment and addressing customer issues in order to support individuals' remote emergency communications needs, supply chain and logistics personnel to ensure goods and products are on-boarded to provision these front-line employees.
- External Affairs personnel to assist in coordinating with local, state and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

### Information Technology:

- Workers who support command centers, including, but not limited to Network Operations Command Centers, Broadcast Operations Control Centers and Security Operations Command Centers.
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators, for all industries (including financial services).

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, and information technology equipment (to include microelectronics and semiconductors), and HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment(to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.

- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, securities/other exchanges, other entities that support the functioning of capital markets, public works, critical manufacturing, food & agricultural production, transportation, and other critical infrastructure categories and personnel, in addition to all cyber defense workers (who can't perform their duties remotely).

- Suppliers, designers, transporters and other workers supporting the manufacture, distribution and provision and construction of essential global, national and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions/services, web-based services, and critical manufacturing.

- Workers supporting communications systems and information technology- and work from home solutions- used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food & agricultural production, financial services, education, and other critical industries and businesses.

- Employees required in person to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## OTHER COMMUNITY- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

- Elections personnel to include both public and private sector elections support.

- Workers supporting the operations of the judicial system.

- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks.

- Trade Officials (FTA negotiators; international data flow administrators).

- Employees necessary to maintain news and media operations across various media.

- Employees supporting Census 2020.

- Weather forecasters.

- Clergy for essential support.

- Workers who maintain digital systems infrastructure supporting other critical government operations.

- Workers who support necessary credentialing, vetting and licensing operations for critical infrastructure workers.

- Customs and immigration workers who are critical to facilitating trade in support of the national emergency response supply chain.

- Educators supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other essential functions.

- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

---

- Residential and commercial real estate services, including settlement services.
- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, and supply chain and COVID 19 relief efforts.

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains, and for supply chains associated with transportation, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.
- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and personal protective equipment (PPE).
- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.
- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce (including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or datacenters).

## HAZARDOUS MATERIALS

- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production), testing operations (laboratories processing test kits), and energy (nuclear facilities) Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing tests Workers who support hazardous materials response and cleanup.
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

## FINANCIAL SERVICES

- Workers who are needed to provide, process and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; and capital markets activities).
- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, and to move currency, checks, securities, and payments (e.g., armored cash carriers).
- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.
- Workers supporting production and distribution of debit and credit cards.
- Workers providing electronic point of sale support personnel for essential businesses and workers.

**CONNECT WITH US**
www.cisa.gov

**For more Information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

64

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.

- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.

- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential.

- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.

- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing.

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals include, but are not limited to, space and aerospace; mechanical and software engineers (various disciplines), manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers; and sanitary workers who maintain the hygienic viability of necessary facilities.

- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense, as well as personnel at government-owned/contractor- operated and government-owned/government-operated facilities, and who provide materials and services to the Department of Defense, including support for weapon systems, software systems and cybersecurity, defense and intelligence communications and surveillance, space systems and other activities in support of our military, intelligence and space forces.

## COMMERCIAL FACILITIES

- Workers who support the supply chain of building materials from production through application/installation, including cabinetry, fixtures, doors, cement, hardware, plumbing, electrical, heating/cooling, refrigeration, appliances, paint/coatings, and employees who provide services that enable repair materials and equipment for essential functions.

- Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions.

- Workers in hardware and building materials stores, consumer electronics, technology and appliances retail, and related merchant wholesalers and distributors - with reduced staff to ensure continued operations.

- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

## RESIDENTIAL/SHELTER FACILITIES AND SERVICES

- Workers in dependent care services, in support of workers in other essential products and services.

**CONNECT WITH US**
www.cisa.gov

**For more Information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

65

- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders (including travelling medical staff).
- Workers in animal shelters.
- Workers responsible for the leasing of residential properties to provide individuals and families with ready access to available housing.
- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
- Workers performing housing construction related activities to ensure additional units can be made available to combat the nation's existing housing supply shortage.
- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.
- Workers supporting the construction of housing, including those supporting government functions related to the building and development process, such as inspections, permitting and plan review services that can be modified to protect the public health, but fundamentally should continue and serve the construction of housing (e.g., allow qualified private third-party inspections in case of government shutdown).

## HYGIENE PRODUCTS AND SERVICES

- Workers who produce hygiene products.
- Workers in laundromats, laundry services, and dry cleaners.
- Workers providing personal and household goods repair and maintenance.
- Workers providing disinfection services, for all essential facilities and modes of transportation, and supporting the sanitation of all food manufacturing processes and operations from wholesale to retail.
- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
- Support required for continuity of services, including commercial disinfectant services, janitorial/cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line employees.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

  Facebook.com/CISA

66

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-89

(Emergency Management – COVID-19 – Miami-Dade County, Broward County, Palm Beach County, Monroe County Public Access Restrictions)

**WHEREAS**, on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt far-reaching social distancing measures, such as avoiding gatherings of more than 10 people, and in states with evidence of community spread, recommending restrictions to certain establishments conducive to mass gatherings and congregations; and

**WHEREAS,** on March 29, 2020, the President extended such guidance to be in effect until April 30, 2020; and

**WHEREAS,** Miami-Dade County, Broward County, and Palm Beach County have already implemented orders restricting certain public access to non-essential retail and commercial establishments; and

**WHEREAS,** over sixty (60) percent of Florida's identified COVID-19 cases are in these neighboring southern counties, which make up a large percentage of Florida's population; and

67

WHEREAS, my Administration has consulted with the authorities from Miami-Dade County, Broward County, Palm Beach County and Monroe County who seek to harmonize restricted public access mandates in order to establish uniformity and consistency throughout their counties of close proximity; and

WHEREAS, it is necessary and appropriate to take action to ensure that COVID-19 remains controlled, and that residents and visitors in Florida remain safe and secure.

NOW, THEREFORE, I, RON DESANTIS, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.    I hereby order Miami-Dade County, Broward County, Palm Beach County and Monroe County to restrict public access to businesses and facilities deemed non-essential pursuant to the guidelines established by Miami-Dade County pursuant to its March 19, 2020 Emergency Order 07-20, and as modified by subsequent amendments and orders prior to the date of this order.

Section 2.    At their discretion, such county administrators may determine additional "essential" retail and commercial establishments—or other institutions providing essential services—that shall not be subject to complete closure. No county or local authority may restrict or prohibit any "essential" service from performing a function allowed under this order.

Section 3.    Essential service establishments not subject to closure shall continue to determine, adopt and maintain reasonable measures to ensure sanitation and cleanliness of premises and items that may come into contact with employees and the public, and such establishments shall take reasonable action to ensure that people adhere to the CDC's social distancing guidelines.

68

Section 4.    The above-named counties shall not institute curfews pertaining to transit to or from the essential service establishments.

Section 5.    This order shall remain in effect until April 15, 2020 unless renewed or otherwise modified by subsequent order.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 30th day of March, 2020.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

69



## MIAMI-DADE COUNTY EMERGENCY ORDER 07-20

WHEREAS, Section 252.38(3)(a), Florida Statutes, gives political subdivisions the authority to declare and enact a State of Local Emergency for a period of up to seven days, thereby waiving the procedures and formalities otherwise required of the political subdivision by law; and

WHEREAS, on March 1, 2020, the Governor of Florida issued Executive Order Number 20-51, directing the State Health Officer and Surgeon General to declare a Public Health Emergency due to the discovery of COVID-19/novel Coronavirus in Florida; and

WHEREAS, on March 9, 2020, the Governor of Florida issued Executive Order Number 20-52, declaring a State of Emergency for the state of Florida related to COVID-19/novel Coronavirus; and

WHEREAS, on March 12, 2020, the County Mayor declared a State of Emergency for all of Miami-Dade County; and

WHEREAS, COVID-19/novel Coronavirus poses a health risk to Miami-Dade County residents, particularly elderly residents and those who are immunosuppressed or otherwise have high-risk medical conditions; and

WHEREAS, minimization of contact is necessary to avoid risk of COVID-19 infection for the residents of the County; and

WHEREAS, the Centers for Disease Control (CDC) has issued guidance entitled "15 Days to Slow the Spread," encouraging social distancing and maintaining a 6 foot separation between residents to slow the spread of infection and that events with more than ten attendees either be cancelled or held virtually; and

WHEREAS, the CDC guidelines are based upon the amount of community spread within a community and become more stringent where there is minimal to moderate or substantial community spread; and

WHEREAS, section 8B-7(2)(f) of the Code authorizes the County Mayor to order the closure of any commercial establishment; and

Miami-Dade County Declaration of Local State of Emergency

WHEREAS, sections 8B-7(2)(e) and (o) of the Code authorize the County Mayor to limit the movement of persons inside Miami-Dade County in order to safeguard life and health,

THEREFORE, as County Mayor of Miami-Dade County, I hereby order:

1.      All non-essential retail and commercial establishments are ordered closed.

2.      Essential retail and commercial businesses, which may remain open, are:

     a.      Healthcare providers, including, but not limited to, hospitals, doctors' and dentists' offices, urgent care centers, clinics, rehabilitation facilities, physical therapists, mental health professionals, psychiatrists, therapists, and pharmacies;

     b.      Grocery stores, farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products).  This authorization includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operations of residences;

     c.      Food cultivation, including farming, livestock, and fishing;

     d.      Businesses that provide food, shelter, social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

     e.      Newspapers, television, radio, and other media services;

     f.      Gas stations and auto-supply, auto-repair, and related facilities;

     g.      Banks and related financial institutions;

     h.      Hardware stores;

     i.      Contractors and other tradesmen, appliance repair personnel, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences and other structures;

     j.      Businesses providing mailing and shipping services, including post office boxes;

     k.      Private colleges, trade schools, and technical colleges, but only as needed to facilitate online or distance learning;

     l.      Laundromats, dry cleaners, and laundry service providers;

     m.      Restaurants and other facilities that prepare and serve food, but subject to the limitations and requirements of Emergency Order 3-20.  Schools and other entities that typically

Miami-Dade County Declaration of Local State of Emergency

provide free food services to students or members of the public may continue to do so on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

n.     Businesses that supply office products needed for people to work from home;

o.     Businesses that supply other essential businesses with the support or supplies necessary to operate, and which do not interact with the general public;

p.     Businesses that ship or deliver groceries, food, goods, or services directly to residences;

q.     Airlines, taxis, and other private transportation providers providing transportation services via automobile, truck, bus, or train;

r.     Home-based care for seniors, adults, or children;

s.     Assisted living facilities, nursing homes, and adult day care centers, and senior residential facilities;

t.     Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

u.     Landscape and pool care businesses, including residential landscape and pool care services;

v.     Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities should operate under the following mandatory conditions:
   1. Childcare must be carried out in stable groups of 10 or fewer (inclusive of childcare providers for the group).
   2. Children and child care providers shall not change from one group to another.
   3. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix or interact with each other.

w.     Businesses operating at any airport, seaport, or other government facility, including parks and government offices;

x.     Pet supply stores;

y.     Logistics providers, including warehouses, trucking, consolidators, fumigators, and handlers;

z.     Telecommunications providers, including sales of computer or telecommunications devices and the provision of home telecommunications;

Page 3 of 5

Miami-Dade County Declaration of Local State of Emergency

    aa.    Provision of propane or natural gas;

    bb.    Office space and administrative support necessary to perform any of the above-listed activities;

    cc.    Open construction sites, irrespective of the type of building;

    dd.    Architectural, engineering, or land surveying services;

    ee.    Factories, manufacturing facilities, bottling plants, or other industrial uses;

    ff.    Waste management services, including collection and disposal of waste; and

    gg.    Any business that is interacting with customers solely through electronic or telephonic means, and delivering products via mailing, shipping, or delivery services

3.    This order does not affect or limit the operations of Miami-Dade County, any public utility, any municipality, the Miami-Dade County School District, or any State or Federal office or facility, except that such entities shall abide by the restrictions of any County, Municipal, State or Federal emergency order, as applicable.

4.    This order does not limit the number of persons who may be physically present performing services at any location where an essential business is being conducted except as expressly set forth herein or otherwise governed by any State or Federal order or regulation. Employers and employees are urged, but are not required, to practice social distancing, such as keeping six feet between persons and limiting group size to less than ten people.

5.    This order does not limit the number of persons who may be physically present at any religious service. Persons attending religious services are urged, but are not required, to practice social distancing, such as keeping six feet between persons and limiting group size to less than ten people.

6.    The County Mayor may amend the provisions of paragraph 2, 3, and 4 by written notice to the County Clerk.

7.    The provisions of this order shall serve as minimum standards. Municipalities may impose more stringent standards within their jurisdictions.

8.    This order shall expire upon the expiration of the existing Miami-Dade County State of Local Emergency, except that if such State of Local Emergency is extended, this order shall also be deemed to extend for the duration of such extension. This order may be cancelled earlier by action of the County Mayor.

9.    This order shall be effective as of 9:00 p.m., March 19, 2020.

Miami-Dade County Declaration of Local State of Emergency

9.      This order shall be effective as of 9:00 p.m., March 19, 2020.

10.     This order shall be provided to all appropriate media consistent with the requirements of section 8B-7(2)(n) of the Code of Miami-Dade County.

Enacted:
Signed: _____
                    COUNTY MAYOR

                    Date: 3/19/2020          Time: 00:30

                    Witness: _____

Cancelled:
Signed: _____
                    COUNTY MAYOR

                    Date: _____          Time: ___:___

                    Witness: _____

Page 5 of 5



**AMENDMENT NO. 1 TO MIAMI-DADE COUNTY EMERGENCY ORDER 07-20**

WHEREAS, on March 19, 2020, the County Mayor issued Emergency Order 07-20; and

WHEREAS, Emergency Order 07-20 directed the closure of all non-essential retail and commercial establishments and included a list of essential businesses that may still operate; and

WHEREAS, Emergency Order 07-20 provided for amendment by filing written notice with the clerk; and

WHEREAS, hotels, motels, other commercial lodging establishments, and temporary vacation rentals provide essential business services during emergencies; and

WHEREAS, marinas and boat launches, docking, fueling, marine supply and other marina services provide essential business services during emergencies, including access to living space, repair services, and other vital needs; and

WHEREAS, additional retail and commercial establishments listed below provide essential business services during emergencies,

THEREFORE, as County Mayor of Miami-Dade County, I hereby order:

1.      Paragraph 2 of Emergency Order 07-20 is hereby amended and restated to clarify that additional following essential businesses may remain open:

      2.      Essential retail and commercial businesses, which may remain open, are:

                *      *      *

      f. Gas stations>>; new and used automobile dealerships;<< and auto-supply, auto-repair, and related facilities>>, provided however that such businesses should ensure that customers practice the social distancing as advised by the CDC<<;

                *      *      *

      k. Private colleges, trade schools, and technical colleges, but only as needed to facilitate online or distance learning >>and university, college, or technical college residence halls, to the extent needed to accommodate students who cannot return to their homes<<;

Page 1 of 2

75

Miami-Dade County Declaration of Local State of Emergency

\*      \*      \*

ff. Waste management services, including collection and disposal of waste; [[and]]

gg. Any business that is interacting with customers solely through electronic or telephonic means, and delivering products via mailing, shipping, or delivery services>>;<<

>>hh. Private and municipal marinas and boat launches, docking, fueling, marine supply and other marina services;

ii.  Hotels, motels, other commercial lodging establishments and temporary vacation rentals. Notwithstanding the foregoing, restaurants, bars, and fitness center restrictions within these establishments remain as stated in Emergency Order 03-20;

jj. Veterinarians and pet boarding facilities; and

kk. Mortuaries, funeral homes, and cemeteries.<<

2.      The balance of Emergency Order 07-20 remains in full force and effect and is subject to further amendment as set forth in Emergency Order 07-20.

Enacted:
Signed: _____

COUNTY MAYOR

Date: 7/19/2020          Time: 8:45 PM

Witness: _____

Cancelled:
Signed: _____

COUNTY MAYOR

Date: _____          Time: ___:___

Witness: _____



**AMENDMENT NO. 2 TO MIAMI-DADE COUNTY EMERGENCY ORDER 07-20**

WHEREAS, on March 19, 2020, the County Mayor issued Emergency Order 07-20; and

WHEREAS, Emergency Order 07-20 directed the closure of all non-essential retail and commercial establishments and included a list of essential businesses that may still operate; and

WHEREAS, Emergency Order 07-20 provided for amendment by filing written notice with the clerk; and

WHEREAS, Governor DeSantis issued Executive Order 20-71 which promulgated standards for the sale of alcohol; and

WHEREAS, additional retail and commercial establishments listed below provide essential business services during emergencies,

THEREFORE, as County Mayor of Miami-Dade County, I hereby order:

1.    Paragraph 2 of Emergency Order 07-20 is hereby amended and restated to clarify that additional following essential businesses may remain open:

   2.    Essential retail and commercial businesses, which may remain open, are:

*    *    *

   hh. Private and municipal marinas and boat launches, docking, fueling, marine supply and other marina services;

   ii. Hotels, motels, other commercial lodging establishments and temporary vacation rentals. Notwithstanding the foregoing, restaurants, bars, and fitness center restrictions within these establishments remain as stated in Emergency Order 03-20;

   jj. Veterinarians and pet boarding facilities; and

   kk. Mortuaries, funeral homes, and cemeteries.

 >>ll. The sale of alcoholic beverages is authorized consistent with Executive Order 20-71.

   mm. Firearm and ammunition supply stores.

Page 1 of 2

77

Miami-Dade County Declaration of Local State of Emergency

<u>2</u>

nn.    Businesses providing services to any local, state, or Federal government, including municipalities, pursuant to a contract with such government.<<

2.    The balance of Emergency Order 07-20 remains in full force and effect and is subject to further amendment as set forth in Emergency Order 07-20.

Enacted:
Signed: _____
                    COUNTY MAYOR

                    Date: 3/01/2020          Time: 09 : 15

                    Witness: _____

Cancelled:
Signed: _____
                    COUNTY MAYOR

                    Date: _____          Time: ___:___

                    Witness: _____

Page 2 of 2



## AMENDMENT NO. 3 TO MIAMI-DADE COUNTY EMERGENCY ORDER 07-20

WHEREAS, on March 19, 2020, the County Mayor issued Emergency Order 07-20; and

WHEREAS, Emergency Order 07-20 directed the closure of all non-essential retail and commercial establishments and included a list of essential businesses that may still operate; and

WHEREAS, Emergency Order 07-20 provided for amendment by filing written notice with the clerk; and

WHEREAS, Amendment No. 1 to Emergency Order 07-20 stated that marinas and boat launches, docking, fueling, marine supply and other marina services provide essential business services; and

WHEREAS, large numbers of boaters congregated without observing social distancing and promoted large parties, the occurrence of which would have increased the risk of spreading COVID-19 throughout the community; and

WHEREAS, as a result it is necessary to further limit the use of marinas and boat launches, docking, fueling, marine supply and other marina services; and

WHEREAS, Emergency Order 06-20 as amended from time to time contains detailed information on the use of marinas, boat launches, docking, fueling, marine supply and other marina services for the duration of the state of emergency,

THEREFORE, as County Mayor of Miami-Dade County, I hereby order:

1.    Paragraph 2 of Emergency Order 07-20 as amended is hereby amended and restated to clarify that additional following essential businesses may remain open:

    2.    Essential retail and commercial businesses, which may remain open, are:

*      *      *

[[hh. Private and municipal marinas and boat launches, docking, fueling, marine supply and other marina services]]

\>>hh. Marinas, boat launches, docking, fueling, marine supply and other marina services only as set forth in Emergency Order 06-20 as amended from time to time.<<

Page 1 of 2

Miami-Dade County Declaration of Local State of Emergency

\*     \*     \*

2.      The balance of Emergency Order 07-20 as amended remains in full force and effect and is subject to further amendment as set forth in Emergency Order 07-20.

Enacted:
Signed: _____
                        **COUNTY MAYOR**

                        Date: 3/23/2020          Time: 12.20

                        Witness: Jeanette _____

Cancelled:
Signed: _____
                        **COUNTY MAYOR**

                        Date: _____          Time: ___:___

                        Witness: _____

Page 2 of 2

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-103

(Emergency Management - COVID-19 – Extending Executive Order 20-87 on
Vacation Rental Closures)

**WHEREAS**, Executive Order 20-87 expires 14 days from March 27, 2020, unless extended.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority

vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and

all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.          I hereby extend Executive Order 20-87 until April 30, 2020, unless extended by

subsequent order.



IN TESTIMONY WHEREOF, I have hereunto set my
hand and caused the Great Seal of the State of Florida to be
affixed, at Tallahassee, this 10th day of April, 2020.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

2020 APR 10  PM 5:05
FILED
TALLAHASSEE, FLORIDA

1



## **GUBERNATORIAL DISASTER PROCLAMATION**

**WHEREAS**, in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged in China; and,

**WHEREAS**, COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS**, certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS**, we are continuing our efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

**WHEREAS**, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS**, the World Health Organization has reported 109,578 confirmed cases of COVID-19 and 3,809 deaths attributable to COVID-19 globally as of March 9, 2020; and,

**WHEREAS**, in response to the recent COVID-19 outbreaks in China, Iran, Italy and South Korea, the Centers for Disease Control and Prevention ("CDC") has deemed it necessary to prohibit or restrict non-essential travel to or from those countries; and,

**WHEREAS**, the CDC has advised older travelers and those with chronic medical conditions to avoid nonessential travel, and has advised all travelers to exercise enhanced precautions; and,

**WHEREAS**, the CDC currently recommends community preparedness and everyday prevention measures be taken by all individuals and families in the United States, including voluntary home isolation when individuals are sick with respiratory symptoms, covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, use of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

**WHEREAS**, a vaccine or drug is currently not available for COVID-19; and,

**WHEREAS**, in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including staying at home when sick, when a household

82

member is sick with respiratory disease symptoms or when instructed to do so by public health officials or a health care provider and keeping away from others who are sick; and,

**WHEREAS**, despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to spread; and,

**WHEREAS**, there are currently 11 confirmed cases of COVID-19 and an additional 260 persons under investigation in Illinois; and,

**WHEREAS**, one of the confirmed cases of COVID-19 in Illinois has not been linked to any travel activity or to an already-confirmed COVID-19 case, which indicates community transmission in Illinois; and,

**WHEREAS**, based on the foregoing, the circumstances surrounding COVID-19 constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized and that residents and visitors in the State remain safe and secure; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

**WHEREAS**, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

**NOW, THEREFORE**, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1**. Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area.

**Section 2**. The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3**. The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4**. The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5**. To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6**. Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7**. The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8**. The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address chronic absenteeism due to transmission of COVID-19 and to alleviate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9**. Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect:

**Section 10**. This proclamation can facilitate a request for Federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 11**. This proclamation shall be effective immediately and remain in effect for 30 days.

JB Pritzker
Governor

Date:  March 9, 2020

# STATE OF ILLINOIS

## EXECUTIVE DEPARTMENT

### SPRINGFIELD, ILLINOIS

March 13, 2020                                      Executive Order 2020-04

### EXECUTIVE ORDER IN RESPONSE TO COVID-19
### (COVID-19 EXECUTIVE ORDER NO. 2)

**WHEREAS,** in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged; and,

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the Center for Disease Control (CDC) indicate that it is expected to spread; and,

**WHEREAS,** in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including practicing social distancing, staying at home when sick, staying home when a household member is sick with respiratory disease symptoms or when instructed to do so by public health officials or a health care provider, and keeping away from others who are sick; and,

**WHEREAS,** I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 ("Gubernatorial Disaster Proclamation"); and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic; and,

**WHEREAS,** the James R. Thompson Center is a popular public space that experiences heavy foot traffic on a daily basis and also houses many state agencies and essential state employees that perform critical functions for the well-being of the State; and,

**WHEREAS,** it is necessary to take measures to ensure that essential state employees are able to carry out critical state functions effectively and safely; and,

**WHEREAS,** it is necessary and appropriate for the State of Illinois to immediately take measures to protect the public's health in public spaces in response to COVID-19;

**THEREFORE,** by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(8) and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, I hereby order the following:

Section 1. Beginning March 13, 2020, all public and private gatherings in the State of Illinois of 1,000 or more people are cancelled for the duration of the Gubernatorial Disaster Proclamation. A public or private gathering includes any event in which appropriate social distancing measures

cannot be maintained, such as concerts, festivals, conferences, sporting events, or other planned events with large numbers of people in attendance. A public or private gathering does not include normal school or work attendance.

Section 2. Beginning March 16, 2020, the James R. Thompson Center, located at 100 W. Randolph Street, Chicago, Illinois, is closed for the duration of the Gubernatorial Disaster Proclamation to members of the public, except as necessary for the conduct of state business, to obtain services from a state agency or constitutional office, or to operate a business located in the James R. Thompson Center. This closure does not affect public access to businesses located on the ground floor in the James R. Thompson Center through exterior entrances.

Section 3. Beginning March 13, 2020, the two-year continuous service requirement for state employees to receive advancement of sick leave pursuant to Title 80, Section 303.110 of the Illinois Administrative Code Personnel Rules, is suspended during the duration of the Gubernatorial Disaster Proclamation.

**JB Pritzker, Governor**

Issued by the Governor March 13, 2020
Filed by the Secretary of State March 13, 2020



March 20, 2020                                    Executive Order 2020-10

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 8)

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **Stay at home or place of residence.**  With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order.  To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order.  All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make

88

such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH)). Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.** All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

All Essential Businesses and Operations are encouraged to remain open. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.** All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.** For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

   a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

   b. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need

to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work.** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations**. For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure**. For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions**. For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

91

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

   a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

   d. **Media**. Newspapers, television, radio, and other media services;

   e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

   f. **Financial institutions**. Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

   g. **Hardware and supply stores**. Hardware stores and businesses that sell electrical, plumbing, and heating material;

---

[1] On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency, issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response*. The definition of Essential Businesses and Operations in this Order is meant to encompass the workers identified in that Memorandum.

h. **Critical trades.** Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services**. Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**. Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services**. Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**. Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**. Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services**.  Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**.  Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**.  Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**.  Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**.  Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**.  Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**.  Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**.  Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**.  For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.**  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

b. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

c. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

d. Travel to return to a place of residence from outside the jurisdiction.

e. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

f. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**. For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

a. **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

i. **Designate six-foot distances**. Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

ii. **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

iii. **Separate operating hours for vulnerable populations**. Implementing separate operating hours for elderly and vulnerable customers; and

iv. **Online and remote access**. Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**. The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**. This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. **No limitation on authority**. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government

95

body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

**Section 2. Order ceasing evictions.**

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation.  No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

**Section 3. Savings clause.**

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor March 20, 2020
Filed by the Secretary of State March 20, 2020

FILED
INDEX DEPARTMENT

MAR. 2 0 2020

IN THE OFFICE OF
SECRETARY OF STATE



STATE OF ILLINOIS

EXECUTIVE DEPARTMENT

SPRINGFIELD, ILLINOIS

FILED
INDEX DEPARTMENT

APR 1 2020

IN THE OFFICE OF
SECRETARY OF STATE

April 1, 2020                                  Executive Order 2020-18

### EXECUTIVE ORDER IN RESPONSE TO COVID-19
### (COVID-19 EXECUTIVE ORDER NO. 16)

**WHEREAS,** Coronavirus 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization (WHO) and the federal Centers for Disease Control and Prevention (CDC) have declared that it is expected to spread; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS,** social distancing, which requires maintaining at least a six-foot distance between people, is a paramount strategy for minimizing the spread of COVID-19 in our communities; and,

**WHEREAS,** current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; and,

**WHEREAS,** the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified, to reduce the number of people who become sick at any given time and the possibility of exhausting our health care resources; and,

**WHEREAS,** I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (the First Gubernatorial Disaster Proclamation) in response to the outbreak of COVID-19; and,

**WHEREAS,** I again declared all counties in the State of Illinois as a disaster area on April 1, 2020 (the Second Gubernatorial Disaster Proclamation, and, together with the First Gubernatorial Disaster Proclamation, the Gubernatorial Disaster Proclamations) in response to the exponential spread of COVID-19; and,

97

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19; and,

**WHEREAS**, I find it necessary to continue and extend the Executive Orders issued to date in response to the outbreak of COVID-19, Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17, and hereby incorporate the WHEREAS clauses of those Executive Orders;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, pursuant to Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following:

**Part 1: Continuing and Extending Prior Executive Orders.**

Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17 hereby are continued and extended by this Executive Order 2020-18 as follows:

**Executive Order 2020-04 (Closure of James R. Thompson Center; Waiver of Sick Leave Requirement for State Employees):**

Section 1.  Beginning March 16, 2020, the James R. Thompson Center located at 100 W. Randolph Street, Chicago, Illinois, is closed for the duration of the Gubernational Disaster Proclamations to members of the public, except as necessary for the conduct of state business, to obtain services from a state agency or constitutional office, or to operate a business located in the James R. Thompson Center. This closure does not affect public access to businesses located on the ground floor in the James R. Thompson Center through exterior entrances, except as otherwise specified in this Order.

Section 2.  Beginning March 13, 2020, the two-year continuous service requirement for state employees to receive advancement of sick leave pursuant to Title 80, Section 303.110 of the Illinois Administrative Code Personnel Rules, is suspended during the duration of the Gubernational Disaster Proclamations.

**Executive Orders 2020-05 and 2020-06 (School Closures):**

Executive Orders 2020-05 and 2020-06 are continued and extended in their entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-07 (Suspension of on-premises consumption at restaurants and bars; Unemployment insurance; Open Meetings Act):**

Section 1.  Beginning March 16, 2020 at 9 p.m. through **April 30, 2020**, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. Such businesses are permitted and encouraged to serve food and beverages so that they may be consumed off-premises, as currently permitted by law, through means such as in-house delivery, third-party delivery, drive-through, and curbside pick-up. In addition, customers may enter the premises to purchase food or beverages for carry-out. However, establishments offering food or beverages for carry-out, including food trucks, must ensure that they have an environment where patrons maintain adequate social distancing. Businesses located in airports, hospitals, and dining halls in colleges and universities are exempt from the requirements of this Executive Order. Hotel restaurants may continue to provide room service and carry-out. Catering services may continue.

Section 2.  Pursuant to Sections 7(2) and 7(3) of the Illinois Emergency Management Act, the Illinois State Police, the Illinois Department of Public Health, the State Fire

Marshal, and the Illinois Liquor Control Commission are directed to cooperate with one another and to use available resources to enforce the provisions of this Executive Order with respect to entities under their jurisdiction under Illinois law.

Section 3. Nothing in this Executive Order shall amend or supersede the authority of the Illinois Department of Public Health pursuant to Section 2310-15 of the Department of Public Health Powers and Duties Law, 20 ILCS 2310/2310-15.

Section 4. During the duration of the Gubernatorial Disaster Proclamations, the provision of the Unemployment Insurance Act, 820 ILCS 405/500(D), requiring a one-week waiting period for unemployment insurance claims is suspended for claimants who are unemployed and who are otherwise eligible for unemployment insurance benefits.

Section 5. During the duration of the Gubernatorial Disaster Proclamations, the provisions of the Open Meetings Act, 5 ILCS 120, requiring or relating to in-person attendance by members of a public body are suspended. Specifically, (1) the requirement in 5 ILCS 120/2.01 that "members of a public body must be physically present" is suspended; and (2) the conditions in 5 ILCS 120/7 limiting when remote participation is permitted are suspended. Public bodies are encouraged to postpone consideration of public business where possible. When a meeting is necessary, public bodies are encouraged to provide video, audio, and/or telephonic access to meetings to ensure members of the public may monitor the meeting, and to update their websites and social media feeds to keep the public fully apprised of any modifications to their meeting schedules or the format of their meetings due to COVID-19, as well their activities relating to COVID-19.

**Executive Order 2020-08 (Secretary of State Operations):**

Executive Order 2020-08 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-09 (Telehealth):**

Executive Order 2020-09 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-10 (Stay at Home; Social distancing; Evictions ceased):**

Executive Order 2020-10 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-11 (Revisions to Executive Orders 2020-05 and 2020-10; Department of Corrections notification period):**

Executive Order 2020-11 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-12 (Health care worker background checks; Department of Juvenile Justice notification period; Coal Mining Act):**

Executive Order 2020-12 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-13 (Suspending Department of Corrections admissions from county jails):**

Executive Order 2020-13 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-14 (Notary and witness guidelines):**

Executive Order 2020-14 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

Executive Order 2020-14, Section 2, Paragraphs (h) and (i) hereby are amended and revised as follows:

> h.  The signatory must transmit by <u>overnight mail</u>, fax, or electronic means a legible copy of the entire signed document directly to the witness no later than the day after the document is signed;

> i.  The witness must sign the transmitted copy of the document as a witness and transmit the signed copy of the document back via <u>overnight mail</u>, fax, or electronic means to the signatory within 24 hours of receipt; and

**<u>Executive Order 2020-15 (Suspending provisions of the Illinois School Code):</u>**

Executive Order 2020-15 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-16 (Repossession of vehicles; suspension of classroom training requirement for security services):</u>**

Executive Order 2020-16 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Orders 2020-03 and 2020-17 (Cannabis deadlines and applications):</u>**

<u>Section 1</u>. The application submission deadlines in the Cannabis Regulation and Tax Act and implementing regulations for submitting applications by March 16, 2020, which previously were suspended pursuant to Executive Order 2020-03 and extended through March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, hereby are suspended as follows:

> a.  The March 16, 2020, deadline for submission of craft grower license applications pursuant to Title 8, Section 1300.300(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**; and

> b.  The March 16, 2020, deadline for submission of infuser license applications pursuant to Section 35-5(b) of the Cannabis Regulation and Tax Act, 410 ILCS 705/35-5(b) and Title 8, Section 1300.400(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**; and

> c.  The March 16, 2020, deadline for submission of transporter license applications pursuant to Section 40-5(b) of the cannabis Regulation and Tax Act, 40 ILCS 705/40-5(b) and Title 8, Section 1300.510(b)(1)(A) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**.

<u>Section 2</u>. Any statutory or regulatory requirement to accept such applications in-person is suspended and the Department of Agriculture is directed to cease accepting in-person applications beginning 5 p.m. Central Time March 12, 2020.

<u>Section 3</u>. The Illinois Department of Agriculture is further directed to accept all craft grower, infuser, and transporter license applications post-marked on or before April 30, 2020, via certified US Mail at:

100

Illinois Department of Agriculture
c/o Bureau of Medicinal Plants
P.O. Box 19281
Springfield, IL 62794-9281 USA

**Part 2: Savings Clause.** If any provision of this Executive Order or its application to any person
or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not
affect any other provision or application of this Executive Order, which can be given effect
without the invalid provision or application. To achieve this purpose, the provisions of this
Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor April 1, 2020
Filed by the Secretary of State April 1, 2020

FILED
INDEX DEPARTMENT

APR 0 1 2020

IN THE OFFICE OF
SECRETARY OF STATE

 

### Executive Department

# ORDER
OF THE
## GOVERNOR OF THE STATE OF MARYLAND

NUMBER 20-03-30-01

AMENDING AND RESTATING THE ORDER OF MARCH 23, 2020, PROHIBITING
LARGE GATHERINGS AND EVENTS AND CLOSING SENIOR CENTERS, AND
ALL NON-ESSENTIAL BUSINESSES AND OTHER ESTABLISHMENTS, AND
ADDITIONALLY REQUIRING ALL PERSONS TO STAY AT HOME

| | |
|---|---|
| WHEREAS, | A state of emergency and catastrophic health emergency was proclaimed on March 5, 2020, and renewed on March 17, 2020, to control and prevent the spread of COVID-19 within the state, and the state of emergency and catastrophic health emergency still exists; |
| WHEREAS, | COVID-19, a respiratory disease that spreads easily from person to person and may result in serious illness or death, is a public health catastrophe and has been confirmed throughout Maryland; |
| WHEREAS, | To reduce the spread of COVID-19, the U.S. Centers for Disease Control and Prevention and the Maryland Department of Health recommend canceling large gatherings and social distancing in smaller gatherings; |
| WHEREAS, | The currently known and available scientific evidence and best practices support limitations on large gatherings and social distancing to prevent exposures and transmissions, and reduce the threat to especially vulnerable populations, including older individuals and those with chronic health conditions; |
| WHEREAS, | To reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, and to protect and save lives, it is necessary and reasonable that individuals in the state refrain from congregating; |
| WHEREAS, | To protect the public health, welfare, and safety, prevent the transmission of the novel coronavirus, control the spread of COVID-19, |

and save lives, it is necessary to control and direct the movement of individuals in Maryland, including those on the public streets;

WHEREAS,    It is further necessary to control and direct in Maryland the occupancy and use of buildings and premises, as well as places of amusement and assembly; and

WHEREAS,    the Coronavirus Response Team will continue to advise on related public health and emergency management decisions;

NOW, THEREFORE,    I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, INCLUDING BUT NOT LIMITED TO TITLE 14 OF THE PUBLIC SAFETY ARTICLE, AND IN AN EFFORT TO CONTROL AND PREVENT THE SPREAD OF COVID-19 WITHIN THE STATE, DO HEREBY ORDER:

I.    The Order of the Governor of the State of Maryland, dated March 12, 2020, entitled "Prohibiting Large Gatherings and Events and Closing Senior Centers," as amended and restated on March 16, 2020, and further amended and restated on March 19, 2020 by Order Number 20-03-19-01, and further amended and restated on March 23, 2020 by Order Number 20-03-29-01, is further amended and restated in its entirety as set forth herein.

II.    <u>Stay-at-Home Order</u>.

    a.   All persons living in the State of Maryland are hereby ordered, effective as of 8:00 p.m. on March 30, 2020, to stay in their homes or places of residences ("Homes") except:

        i.   to conduct or participate in Essential Activities (defined below);

        ii.   staff and owners of businesses and organizations that are not required to close pursuant to paragraph IV or paragraph V below may travel:

            1.   between their Homes and those businesses and organizations; and

            2.   to and from customers for the purpose of delivering goods or performing services; and

        iii.   staff and owners of Non-Essential Businesses (defined below) may travel:

            1.   between their Homes and those Non-Essential Businesses for the purpose of engaging in Minimal Operations; and

            2.   to and from customers for the purpose of delivering goods.

    b.   As used herein, "Essential Activities" means:

    i.   Obtaining necessary supplies or services for one's self, family, household members, pets, or livestock, including, without limitation: groceries, supplies for household consumption or use, supplies and equipment needed to work from home, laundry, and products needed to maintain safety, sanitation, and essential maintenance of the home or residence;

    ii.   Engaging in activities essential for the health and safety of one's self, family, household members, pets, or livestock, including such things as seeking medical or behavior health or emergency services, and obtaining medication or medical supplies;

    iii.   Caring for a family member, friend, pet, or livestock in another household or location, including, without limitation, transporting a family member, friend, pet, or livestock animal for essential health and safety activities, and to obtain necessary supplies and services;

    iv.   Traveling to and from an educational institution for purposes of receiving meals or instructional materials for distance learning;

    v.   Engaging in outdoor exercise activities, such as walking, hiking, running, or biking, but only in compliance with paragraph III below and applicable social distancing guidance published by the U.S. Centers for Disease Control and Prevention ("CDC") and the Maryland Department of Health ("MDH");

    vi.   Travel required by a law enforcement officer or court order; or

    vii.   Traveling to and from a federal, State, or local government building for a necessary purpose.

III.    <u>Gatherings Large Than 10 Persons Prohibited</u>.

    a.   Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events ("large gatherings and events") of more than 10 people are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers.

    b.   Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

IV.    <u>Closure of Non-Essential Businesses, Generally</u>.

    a.   This Order controls the occupancy and use of all businesses, organizations, establishments, and facilities that are <u>not</u> part of the critical infrastructure sectors identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (currently described at

https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19)
(collectively, "Non-Essential Businesses").

b.  Subject to paragraph IV.c, all Non-Essential Businesses shall remain closed to the general public.

c.  Staff and owners may continue to be on-site at Non-Essential Businesses for only the following purposes ("Minimal Operations"):

  i.  Facilitating remote working (a/k/a/ telework) by other staff;

  ii.  Maintaining essential property;

  iii.  Preventing loss of, or damage to property, including without limitation, preventing spoilage of perishable inventory;

  iv.  Performing essential administrative functions, including without limitation, picking up mail and processing payroll;

  v.  Caring for live animals; and

  vi.  In the case of Non-Essential Businesses that are retail establishments, continuing to sell retail products on a delivery basis.

d.  All businesses, organizations, establishments, and facilities that are required to close pursuant to paragraph V, pursuant to any other Order of the Governor of the State of Maryland or any other Order of a political subdivision, shall be and remain closed in accordance with paragraph V or such other Order, as the case may be.

V.  Closure of Certain Specific Businesses, Organizations, and Facilities.

a.  *Senior Centers*.  All senior citizen activities centers (as defined in Section 10-501(i) of the Human Services Article of the Maryland Code) shall remain closed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded.

b.  *Restaurants and Bars*.

  i.  This Order controls the occupancy and use of restaurants, bars, and other similar establishments that sell food or beverages for consumption on-premises in Maryland ("Restaurants and Bars").  This Order does not apply to food or beverage services in health care facilities, which are expressly excluded from the definition of "Restaurants and Bars."

  ii.  All Restaurants and Bars shall remain closed to the general public, except that, to the extent permitted by applicable law, and in accordance with any social-distancing recommendations of MDH, food and beverages may be:

      1.   sold if such food or beverages are promptly taken from the premises, i.e., on a carry-out or drive-through basis; or

      2.   delivered to customers off the premises.

c.   *Fitness Centers*.

      i.   This Order controls the occupancy and use of fitness centers, health clubs, health spas, gyms, aquatic centers, and self-defense schools in Maryland ("Fitness Centers").

      ii.   All Fitness Centers shall remain closed to the general public, except that the portion of any Fitness Center that is licensed or otherwise permitted by applicable law, regulation, or order to provide child care services may remain open to the general public for the purpose of continuing to provide such child care services.

d.   *Theaters*.

      i.   This Order controls the occupancy and use of theatres in Maryland at which live performances occur or motion pictures are shown ("Theaters").

      ii.   All Theaters shall remain closed to the general public.

e.   *Malls*.

      i.   This Order controls the occupancy and use of shopping centers in Maryland that have one or more enclosed pedestrian concourses ("Enclosed Malls").

      ii.   The following portions of Enclosed Malls shall remain closed to the general public:

            1.   pedestrian concourses and other interior common areas open to the general public, including without limitation, food courts; and

            2.   retail establishments only accessible to the general public from enclosed pedestrian concourses or other interior areas.

      iii.   This paragraph V.e does not require closure of retail establishments attached to Enclosed Malls that are directly accessible from the outside.

      iv.   Notwithstanding paragraph V.e.ii, local governments may approve access by the general public to the following parts of Enclosed Malls:

            1.   retail establishments (a) that primarily sell groceries or pharmacy products, or (b) at which licensed professionals provide health care services; and

2. pedestrian concourses and other interior common areas, but solely to the extent necessary for the general public to access the retail establishments described in paragraph V.e.iv.1.

f.   *Other Recreational Establishments*.

i.   This Order controls the occupancy and use of the following establishments in Maryland ("Recreational Establishments"):

1. bingo halls;
2. bowling alleys;
3. pool halls;
4. amusement parks;
5. roller and ice skating rinks;
6. all golf courses (public and private), miniature golf establishments, and driving ranges;
7. social and fraternal clubs, including without limitation, American Legion posts, VFW posts, and Elks Clubs;
8. campgrounds; and
9. any other establishment not listed above that is subject to the admission and amusement tax under Title 4 of the Tax-General Article of the Maryland Code.

ii.  All Recreational Establishments are hereby closed to the general public (including members, in the case of private clubs), effective as of 5:00 p.m. on March 30, 2020 (or shall remain closed, if closed by a prior Order).

g.   *Other Miscellaneous Establishments*.

i.   This Order controls the occupancy and use of the following establishments in Maryland:

1. tattoo parlors;
2. tanning salons;
3. barber shops; and
4. beauty salons and all other establishments that provide esthetic services, provide hair services, or provide nail services (as described in Title 5, Subtitle 2 of the Business Occupations Article of the Maryland Code).

ii.  The establishments listed in paragraph V.g.i above shall remain closed to the general public.

VI.   Specific Exclusions.  For avoidance of doubt:

a.   This Order does not require the closure of, or prohibit the movement of any staff or volunteer traveling to, from, or in connection with their duties at any:

- 6 -

107

     i.  Any federal, State, or local government unit, building, or facility;

     ii.  Any newspaper, television, radio, or other media service; or

     iii.  Any non-profit organization or facility providing essential services to low-income persons, including, without limitation, homeless shelters, food banks, and soup kitchens.

b.  Paragraph II of this Order does not apply to:

     i.  Persons whose homes or residences have become unsafe, such as victims of domestic violence; and

     ii.  Persons who are experiencing homelessness, but governmental and other entities are strongly encouraged to make shelter available for such persons to the maximum extent practicable, in a manner consistent with the social distancing guidelines of the CDC and MDH.

VII.   <u>Government Buildings and Facilities with Large Occupancy or Attendance</u>.

a.  State and local government buildings and facilities with an expected occupancy or attendance of more than 10 people shall:

     i.  Promptly and conspicuously post in the building or facility a copy of the MDH recommendations for social distancing; and

     ii.  Provide all occupants and attendees with the capability to wash their hands.

b.  A copy of this Order shall be made available to all occupants or attendees at any State or local government building and facility with an expected occupancy or attendance of more than 10 people.

VIII.   <u>General Provisions</u>.

a.  Each law enforcement officer of the State or a political subdivision shall execute and enforce this Order.

b.  A person who knowingly and willfully violates this Order is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both.

c.  This Order remains effective until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded, or until rescinded, superseded, amended, or revised by additional orders.

d.  The effect of any statute, rule, or regulation of an agency of the State or a political subdivision inconsistent with this order is hereby suspended.

e.  The underlined paragraph headings in this Order are for convenience of reference

only and shall not affect the interpretation of this Order.

ISSUED UNDER MY HAND THIS 30TH DAY OF MARCH, 2020, AND EFFECTIVE IMMEDIATELY.

Lawrence J. Hogan, Jr.
Governor

- 8 -

109



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

## ORDER PROHIBITING GATHERINGS OF MORE THAN 250 PEOPLE

**WHEREAS**, on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19"); and

**WHEREAS**, the Federal Centers for Disease Control and Prevention ("CDC") and the Massachusetts Department of Public Health ("DPH") recommend implementation of community mitigation strategies, including the cancellation of large events.  Additionally, the CDC and DPH have advised high-risk individuals, including people over the age of 60, anyone with underlying health conditions or a weakened immune system, and pregnant women, to avoid large gatherings.

**WHEREAS**, sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise authority over public assemblages as necessary to protect the health and safety of persons;

**NOW, THEREFORE,** I hereby order the following:

Gatherings of over 250 people are prohibited throughout the Commonwealth.  Gatherings subject to this Order include, without limitation, community, civic, public, leisure, faith-based events, sporting events with spectators, concerts, conventions, fundraisers, parades, fairs, festivals, and any similar event or activity that brings together 250 or more persons in a single room or single space at the same time in a venue such as an auditorium, stadium, arena, large conference room, meeting hall, theatre, or any other confined indoor or outdoor space. This Order shall not apply to any municipal legislative body or to the General Court or to the judiciary.

The Department of Public Health is directed to issue guidance, subject to my approval, to implement the terms of this Order.  The Department of Public Health, along with any board of health or authorized agent pursuant to G. L. c. 111, §30, shall enforce this Order and if necessary may do so with the assistance of State or municipal police.  Violation of the terms of this this

110

PRINTED ON RECYCLED PAPER

Order or the guidance issued by the Department of Public Health may be result in penalties pursuant to Section 8 of Chapter 631 of the Acts of 1950.

This Order is effective immediately and shall remain in effect until rescinded or until the State of Emergency is terminated, whichever happens first.

Given in Boston at 9:15 AM this 13th day of March, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

### ORDER PROHIBITING GATHERINGS OF MORE THAN 25 PEOPLE AND ON-PREMISES CONSUMPTION OF FOOD OR DRINK

**WHEREAS**, on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS**, on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS**, the number of presumptive positive and confirmed cases of COVID-19 continues to rise in the Commonwealth.  As of March 15, 2020, 164 cases of COVID-19 were reported by the Department of Public Health, with 10 of the 14 counties in the Commonwealth impacted;

**WHEREAS**, the Federal Centers for Disease Control and Prevention and the Massachusetts Department of Public Health recommend implementation of community mitigation strategies, including the cancellation of large events;

**WHEREAS,** the Department of Public Health is urging all residents of the Commonwealth to practice social distancing when outside of their homes; and

**WHEREAS**, sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over public assemblages in order to protect the health and safety of persons;

**NOW, THEREFORE,** I hereby order the following:

112

Gatherings of over 25 people are prohibited throughout the Commonwealth. Gatherings subject to this Order include, without limitation, community, civic, public, leisure, faith-based events, sporting events with spectators, concerts, conventions, fundraisers, parades, fairs, festivals, and any similar event or activity that brings together 25 or more persons in a single room or single space at the same time in a venue such as an auditorium, stadium, arena, large conference room, meeting hall, theatre, gymnasium, fitness center, private club, or any other confined indoor or outdoor space.

Any restaurant, bar, or establishment that offers food or drink shall not permit on-premises consumption of food or drink; provided that such establishments may continue to offer food for take-out and by delivery provided that they follow the social distancing protocols set forth in Department of Public Health guidance.

This Order shall not apply to any municipal legislative body or to the General Court or to the judiciary.

The Commissioner of Public Health is directed to issue guidance, subject to my approval, to implement the terms of this Order. The Department of Public Health, along with any board of health or authorized agent pursuant to G.L. c. 111, §30, shall enforce this Order and if necessary may do so with the assistance of State or municipal police. Violation of the terms of this Order or the guidance issued by the Commissioner of Public Health may result in penalties pursuant to Section 8 of Chapter 631 of the Acts of 1950.

This Order is effective March 17, 2020 and shall remain in effect through April 5, 2020 unless further extended. On the effective date of this Order, the March 13, 2020 Order Prohibiting Gatherings of More than 250 People is hereby rescinded.

Given in Boston at *a.17* PM this 15th day of March, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

113



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

## ORDER ASSURING CONTINUED OPERATION OF ESSENTIAL SERVICES IN THE COMMONWEALTH, CLOSING CERTAIN WORKPLACES, AND PROHIBITING GATHERINGS OF MORE THAN 10 PEOPLE

### COVID-19 Order No. 13

**WHEREAS**, on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS**, on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS**, the number of presumptive positive and confirmed cases of COVID-19 continues to rise exponentially in the Commonwealth.  As of March 22, 2020, the Department of Public Health had reported 646 cases of COVID-19, including 5 deaths, with 13 of the 14 counties in the Commonwealth impacted;

**WHEREAS,** the Department of Public Health is urging all residents of the Commonwealth to limit activities outside of the home and to practice social distancing at all times, both inside and outside of the home to limit the spread of this highly contagious and potentially deadly virus;

**WHEREAS**, on March 19, 2020, the Federal Cybersecurity and Infrastructure Security Agency issued guidance to assist States that identifies 14 critical infrastructure sectors whose workers provide services and functions that are essential to maintain in order to support a strong response to the COVID-19 pandemic;

**WHEREAS**, as Governor, I have identified additional services and functions that likewise are essential to promote the public health and welfare of the Commonwealth, and

114

therefore it is imperative to ensure that workers providing critical services and functions in these State and Federally designated sectors may continue to work to ensure community resilience and continuity of response efforts; and

**WHEREAS**, sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over public assemblages in order to protect the health and safety of persons, regulating the sale of articles of food and household articles, and policing, protection, and preservation of public and private property;

**NOW, THEREFORE,** in order to minimize all unnecessary activities outside of the home during the state of emergency, I hereby order the following:

1.  Maintaining Operation of COVID-19 Essential Services and Workforces

The production and service sectors identified in Exhibit A are hereby designated as "COVID-19 Essential Services." The workforces engaged and working in these production and service sectors are hereby designated as "COVID-19 Essential Workforces." I shall amend and publish updates to Exhibit A as I determine necessary in response to conditions as they develop.

Businesses and other organizations that provide the services and functions identified as COVID-19 Essential Services in Exhibit A are urged to continue operations during the state of emergency, but to do so with allowance for social distancing protocols consistent with guidance provided by the Department of Public Health.

Restaurants, bars, and other retail establishments that sell food and beverage products to the public provide COVID-19 Essential Services and are designated as such in Exhibit A. These establishments are therefore encouraged to continue to offer food and beverages for take-out and by delivery provided that they follow the social distancing protocols set forth in Department of Public Health guidance. Restaurants, bars, or other establishments that offer food or beverages to the public shall not permit on-premises consumption of food or beverages.

2.  Temporary Closing of Other Businesses and Organizations

All businesses and other organizations that do not provide COVID-19 Essential Services shall close their physical workplaces and facilities ("brick-and-mortar premises") to workers, customers, and the public as of 12:00 noon on March 24, 2020 and shall not re-open to workers, customers, or the public before 12:00 noon on April 7, 2020. Churches, temples, mosques, and other places of worship shall not be required to close their brick and mortar premises to workers or the public; provided, however, that such institutions shall be required to comply with all limitations on gatherings established in section 3 below.

Businesses and other organizations that do not provide COVID-19 Essential Services are encouraged to continue operations where they are able to operate through remote means that do not require workers, customers, or the public to enter or appear at the brick-and-mortar premises closed by this Order.

3.    Limitations on Gatherings

Gatherings of more than 10 people are prohibited throughout the Commonwealth. Gatherings subject to this Order include, without limitation, community, civic, public, leisure, faith-based, or sporting events, concerts, conferences, conventions, fundraisers, parades, fairs, festivals, weddings, funerals, and any similar event or activity that brings together more than 10 persons in any confined indoor or outdoor space.  This limitation shall not apply to the operations or activities of any business or organization in its provision or delivery of COVID-19 Essential Services.

This Order does not prohibit gatherings of more than 10 people in an unenclosed, outdoor space such as a park, athletic field, or parking lot.

Athletic and recreational activities that bring participants into close, physical contact are prohibited even when involving 10 or fewer people and regardless of where conducted.

4.    Exceptions

(a)  This Order shall not apply to any municipal legislative body or to the General Court or to the Judiciary.

(b)  This Order shall not apply to residential schools for special needs students.  This Order also does not apply to public and private elementary and secondary (K-12) schools in the Commonwealth, which are subject to the March 15, 2020 Order Temporarily Closing All Public and Private Elementary and Secondary Schools, as may be subsequently amended, which suspended all normal, in-person instruction.

(c)  This Order does not apply to the operation of child care programs in the Commonwealth, which are subject to the March 18, 2020 Order Temporarily Closing All Child Care Programs and Authorizing the Temporary Creation and Operation of Emergency Child Care Programs, as may be subsequently amended.

5.    Implementing Guidance and Enforcement

The Commissioner of Public Health is directed to issue guidance ("DPH Guidance"), subject to my approval, to implement the terms of this Order.  The DPH Guidance shall include a requirement that grocery stores and other retailers with substantial retail grocery sales establish special limited access hours during which elderly and other vulnerable populations may have exclusive access to make grocery purchases.

116

The Department of Public Health, along with any board of health or authorized agent pursuant to G. L. c. 111, § 30, shall enforce this Order and if necessary may do so with the assistance of State or municipal police.  Violation of the terms of this Order or the DPH Guidance may result in a criminal penalty pursuant to Section 8 of Chapter 639 of the Acts of 1950 or a civil fine of up to $300 per violation, in the manner provided for non-criminal disposition of violations of municipal by-law, ordinance, rule, or regulation pursuant to G. L. c. 40, § 21D.   A criminal complaint for violation of or a motion for an injunction to enforce this Order or the DPH Guidance shall be filed in the district court with jurisdiction for the municipality in which the violation has been charged.

In addition, I hereby direct the Commissioner of Public Health to act under the authority of G. L. c. 17, § 2A and G. L. c. 111, § 6 or any other appropriate authority to supplement the terms of this Order in the event she determines additional measures are required to ensure that the terms of this Order are observed.

This Order supersedes and makes inoperative any order or rule issued by a municipality that will or might in any way impede or interfere with the achievement of the objectives of this Order.  With respect to work and travel in particular, any order or rule issued by a municipality is hereby made inoperative to the extent: (1) such municipal order or rule will or might interfere with provisions of this Order ensuring the continued operation of COVID-19 Essential Services; or (2) such municipal order or rule will or might interfere with the free travel anywhere within the Commonwealth of any person who is a member of any COVID-19 Essential Workforce where such travel is made in connection with the ongoing operation of COVID-19 Essential Services.

This Order rescinds and revokes the Order Prohibiting Gatherings of More than 25 People and On-Premises Consumption of Food or Drink, issued March 15, 2020.

If any provision of this Order or the application thereof to any person or entity or circumstance is determined to be invalid by a court of competent jurisdiction, such judgment shall not affect or impair the validity of the other provisions of this Order or the application thereof to other persons, entities, and circumstances.

117

This Order shall be effective at 12:00 noon March 24, 2020 and shall remain in effect through 12:00 noon on April 7, 2020 unless further extended.

Given in Boston at 9:11 AM this 23rd day of March, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

118



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

### ORDER EXTENDING THE CLOSING OF CERTAIN WORKPLACES
### AND THE PROHIBITION ON GATHERINGS OF MORE THAN 10 PEOPLE

COVID-19 Order No. 21

Extending the Operation of COVID-19 Order No. 13

**WHEREAS,** on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS,** on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS,** the number of presumptive positive and confirmed cases of COVID-19 continues to rise exponentially in the Commonwealth.  As of March 30, 2020, the Department of Public Health had reported 5,752 cases of COVID-19, including 56 deaths, with all counties in the Commonwealth impacted;

**WHEREAS,** the Department of Public Health continues to urge all residents of the Commonwealth to limit activities outside of the home and to practice social distancing at all times to limit the spread of this highly contagious and potentially deadly virus;

**WHEREAS,** on March 19, 2020, the Federal Cybersecurity and Infrastructure Security Agency issued guidance to assist States with identifying critical infrastructure sectors whose workers provide services and functions that are essential to maintain in order to support a strong response to the COVID-19 pandemic;

**WHEREAS,** on March 23, 2020, I issued an Order that designated COVID-19 Essential Services, temporary closed the bricks-and-mortar premises of businesses and organizations that do not provide COVID-19 Essential Services, and prohibited gatherings of more than 10 people;

119

**WHEREAS,** on March 28, 2020, the Federal Cybersecurity and Infrastructure Security Agency issued updated guidance on the identification of critical infrastructure sectors during the COVID-19 Response;

**WHEREAS,** as Governor, I have identified additional services and functions that likewise are essential to promote the public health and welfare of the Commonwealth, and therefore it is imperative to ensure that workers providing critical services and functions in these State and Federally designated sectors may continue to work to ensure community resilience and continuity of response efforts; and

**WHEREAS,** sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over public assemblages in order to protect the health and safety of persons, transportation and travel by any means or mode, regulating the sale of articles of food and household articles, and policing, protection, and preservation of public and private property;

**NOW, THEREFORE,** I hereby order the following:

The provisions of the March 23, 2020 Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More than 10 People ("COVID-19 Order No. 13") are hereby extended until May 4, 2020. Accordingly, all businesses and other organizations that do not provide COVID-19 Essential Services shall not re-open their bricks-and-mortar premises to workers, customers, or the public before May 4, 2020.

Gatherings of more than 10 people also remain prohibited until May 4, 2020.

Effective at 12:00 noon on April 1, 2020, Exhibit A of the previously issued COVID-19 Order No. 13 is hereby replaced with the attached, updated Exhibit A of even date with this Order to reflect the revised guidance of the Federal Cybersecurity and Infrastructure Security Agency and the additional services and functions that I, as Governor, have identified as essential to promote the public health and welfare of the Commonwealth.

The Commissioner of Public Health shall continue to issue guidance as necessary and subject to my approval to implement the terms of COVID-19 Order No. 13.

The Massachusetts Department of Transportation, in consultation with the Division of Capital and Asset Management and Maintenance, shall issue guidance and enforcement procedures for the safe operation of public works construction sites, consistent with the terms of Exhibit A of COVID-19 Order No. 13.

The Department of Public Health, along with any board of health or authorized agent pursuant to G. L. c. 111, § 30, shall continue to enforce the terms of COVID-19 Order No. 13 and implementing guidance issued under the authority of that Order as here amended.

In addition, I renew my directive to the Commissioner of Public Health to act under the authority of G. L. c. 17, § 2A and G. L. c. 111, § 6 or any other appropriate authority to supplement the terms of  COVID-19 Order No. 13 in the event she determines additional measures are required to ensure that its terms are observed.

This Order is effective immediately and shall remain in effect until May 4, 2020 unless further extended.

Given in Boston at /·3 ( PM this 31st day of March, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

121



## DECLARATION OF EMERGENCY

**WHEREAS,** Nevada Revised Statutes, Chapter 414, authorizes the Governor to issue a proclamation declaring a state of emergency when a natural emergency or disaster of major proportions has occurred within this state, and the assistance of state agencies is needed to supplement the efforts and capabilities of political subdivisions to save lives, protect property, and protect the health and safety of persons in this state, particularly through a coordinated response; and

**WHEREAS,** the Centers of Disease Control and Prevention (CDC) are responding to an outbreak of a respiratory illness that has since been confirmed in numerous countries, including the United States; and

**WHEREAS,** the respiratory disease has been named coronavirus disease 2019, abbreviated as COVID-19; and

**WHEREAS,** the World Health Organization declared the COVID-19 outbreak a pandemic; and

**WHEREAS,** the State of Nevada has been coordinating with the federal government, as well as local health authorities, health care facilities, and providers of health care to prepare for, and identify possible cases of COVID-19 in the State of Nevada; and

**WHEREAS,** the nearby states of California, Washington, Oregon, Arizona, and Utah have been impacted by COVID-19 and have already declared a state of emergency; and

**WHEREAS,** there are multiple confirmed and presumptive cases of COVID-19 in the State of Nevada; and

**WHEREAS,** the Nevada Department of Health and Human Services is working with local health authorities to identify any other potential cases of COVID-19 in the State; and

**WHEREAS,** the Chief Medical Officer has reported that a public health emergency exists in the State; and

***WHEREAS,*** the Governor has determined that the State of Nevada is experiencing events that require a coordinated response for the health and safety of the public; and

***WHEREAS,*** Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada."

***NOW THEREFORE,*** I, Steve Sisolak, Governor of the State of Nevada, pursuant to the authority vested in me by the Constitution and laws of the State of Nevada, hereby declare an emergency and direct all state agencies to supplement the efforts of all impacted and threatened counties to save lives, protect property, and protect the health and safety of persons in this state. Under my authority, I will perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population.

IT IS HEREBY ORDERED THAT:

SECTION 1:   The State Emergency Operations Center be activated to coordinate a response to minimize the impacts, and prevent the further transmission of, COVID-19 to persons in this state; and

SECTION 2:   An Emergency Team be established to coordinate the response to COVID-19; and

SECTION 3:   The Emergency Team will consult with the Nevada Tribal Emergency Coordinating Council to ensure a coordinated response to COVID-19; and

SECTION 4:   The Administrator of the State Purchasing Division, pursuant to Nevada Administrative Code 333.114, to the extent necessary, may authorize an emergency purchase for any amount, or provide the using agency with written authorization for the emergency purchase, including, without limitation, a description of the justification for authorizing the emergency purchase, and suspend the standard procurement process to allow the purchase of food, supplies, services, and equipment; and

SECTION 5:   Law enforcement, including the Nevada Attorney General, will diligently monitor and investigate a coordinated increase in prices for goods or services, and particularly goods or services necessary for the health and safety of the public or that result in economic hardships, making false representations, "bait and switch" practices, failure to disclose material facts in conjunction with the sale of goods or services, or the use of coercion, duress, or intimidation in a transaction in violation of consumer protection laws; and

SECTION 6:   Law enforcement, including the Nevada Attorney General, will diligently ensure that persons or corporations act and perform in a lawful manner which ensures the safety, health, comfort, or repose of any considerable number of the public, do not offend public decency, or in any way renders a considerable number of persons insecure in life or the use of property.

SECTION 7:   This declaration will remain in effect until the Chief Medical Officer notifies the Governor that the health event has been abated and the Governor issues an order terminating the emergency.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed at the State Capitol in Carson City, this 12th day of March, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State

124



## DECLARATION OF EMERGENCY

### DIRECTIVE 010

### STAY AT HOME ORDER

**WHEREAS,** on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

**WHEREAS,** on March 13, 2020, Donald J. Trump, President of the United States declared a nationwide emergency pursuant to Sec. 501 (b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS,** the World Health Organization and United States Centers for Disease Control and Prevention have advised that there is a correlation between density of persons gathered and the risk of transmission of COVID-19; and

**WHEREAS,** close proximity to other persons is currently contraindicated by public health and medical best practices to combat COVID-19; and

**WHEREAS,** recreational social gatherings unnecessarily extend periods of interpersonal contact and promulgates spread of COVID-19; and

**WHEREAS,** the rate of community spread of COVID-19 can only be reduced by minimizing contact between infected persons and non-infected persons; and

**WHEREAS,** public health experts and epidemiologists indicate that COVID-19 may spread from infected persons to non-infected persons prior to the expression of symptoms in the infected person; and

**WHEREAS,** immediate containment of the spread of COVID-19 is vital to protect the Health and Safety of the Nevada public; and

**WHEREAS,** on March 17, 2020, I directed Nevadans to implement physical distancing measures to minimize opportunities for the disease to spread from infected persons to non-infected persons; and

**WHEREAS,** on March 20, 2020, I issued Directive 003 pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic and ordered the closure of all non-essential

125

businesses, and restricted the activities of essential businesses to reduce opportunities for interpersonal contact whereby the novel coronavirus that causes COVID-19 may be spread from infected persons to non-infected persons; and

**WHEREAS,** on March 20, 2020, the Department of Public Safety promulgated emergency regulations defining essential and non-essential businesses, specifically including Essential Healthcare operations and Essential Infrastructure operations;

**WHEREAS,** on March 24, 2020, I issued Directive 007 pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic and ordered Nevadans to cease congregating in public spaces; and

**WHEREAS,** on March 29, 2020, Donald J. Trump, President of the United States, recommended the continuation of limitations on gatherings through April 30, 2020, and

**WHEREAS,** as of March 31, 2020, the State of Nevada Department of Health and Human Services is reporting 1,113 positive cases of COVID-19, and 17 deaths resulting from COVID-19; and

**WHEREAS,** the Governor's COVID-19 Medical Advisory Team has advised that Nevada has not yet experienced its peak infection rates of the COVID-19 disease; and

**WHEREAS,** NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

**WHEREAS,** NRS 414.070 outlines additional powers delegated to the Governor during the existence of a state of emergency, including without limitation, enforcing all laws and regulations relating to emergency management and assuming direct operational control of any or all forces, including, without limitation, volunteers and auxiliary staff for emergency management in the State; providing for and compelling the evacuation of all or part of the population from any stricken or threatened area or areas within the State and to take such steps as are necessary for the receipt and care of those persons; and performing and exercising such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population; and

**WHEREAS,** Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;" and

***NOW THEREFORE,*** by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020, Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION 1:   The March 12, 2020 Declaration of Emergency is hereby extended to April 30, 2020. All Directives promulgated pursuant to this Declaration shall be in force for the duration that the Declaration of Emergency shall be in effect, unless specifically terminated by a subsequent order.

SECTION 2:   With limited exceptions identified below, all Nevadans are ordered to stay in their residences. Gatherings of individuals outside the home is prohibited, subject to the same exceptions.

126

SECTION 3:    Individuals may leave their residences to provide services, perform work necessary, or obtain services from Essential Healthcare operations (as defined by Section 1(a) of the March 20, 2020 Emergency Regulations) on behalf of themselves, pets, or those in their household.

SECTION 4:    Individuals may leave their residences to provide services or perform work necessary to the operations of Essential Infrastructure operations (as defined by Section 1(b) of the March 20, 2020 Emergency Regulations).

SECTION 5:    Individuals may leave their residences to perform work necessary or obtain services or goods necessary from other Essential Licensed Businesses (as defined by Section 1 of the March 20, 2020 Emergency Regulations).

SECTION 6:    This Directive does not prohibit individuals from engaging in outdoor activity, including without limitation, activities such as hiking, walking, or running, so long as the activity complies with all requirements of Emergency Directive 007, participants maintain at least 6 feet distancing from other individuals, and individuals do not congregate in groups beyond their household members.

SECTION 7:    Individuals experiencing homelessness are exempt from this Directive.

SECTION 8:    This Directive shall remain in effect until April 30, 2020, unless renewed by a subsequent Directive promulgated pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed at the State Capitol in Carson City, this 31st day of March, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State

127

**EXECUTIVE ORDER NO. 103**

WHEREAS, Coronavirus disease 2019 ("COVID-19") is a contagious, and at times fatal, respiratory disease caused by the SARS-CoV-2 virus; and

WHEREAS, COVID-19 is responsible for the 2019 novel coronavirus outbreak, which was first identified in Wuhan, the People's Republic of China in December 2019 and quickly spread to the Hubei Province and multiple other countries; and

WHEREAS, symptoms of the COVID-19 illness include fever, cough, and shortness of breath, which may appear in as few as two or as long as 14 days after exposure, and can spread from person to person via respiratory droplets produced when an infected person coughs or sneezes; and

WHEREAS, on January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak a "public health emergency of international concern," which means "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response," and thereafter raised its global risk assessment of COVID-19 from "high" to "very high"; and

WHEREAS, on January 31, 2020, the United States Department of Health and Human Services Secretary declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19; and

WHEREAS, as of March 9, 2020, according to the Centers for Disease Control and Prevention ("CDC"), there were more than 114,000 confirmed cases of COVID-19 worldwide, with over 4,000 of those cases having resulted in death; and

WHEREAS, as of March 9, 2020, there were more than 500 confirmed cases of COVID-19 in the United States, with 22 of those cases having resulted in death; and

2

WHEREAS, as of March 9, 2020, there were 11 presumed positive cases of COVID-19 in New Jersey, with 24 additional "Persons Under Investigation" spread across the counties of Bergen, Camden, Cumberland, Essex, Hunterdon, Middlesex, Monmouth, Passaic, Union, and Sussex; and

WHEREAS, as of March 9, 2020, there were 142 positive cases of COVID-19 in the State of New York and seven presumptive positive cases in the Commonwealth of Pennsylvania; and

WHEREAS, the CDC expects that additional cases of COVID-19 will be identified in the coming days, including more cases in the United States, and that person-to-person spread is likely to continue to occur; and

WHEREAS, if COVID-19 spreads in New Jersey at a rate comparable to the rate of spread in other affected areas, it will greatly strain the resources and capabilities of county and municipal governments, including public health agencies, that provide essential services for containing and mitigating the spread of contagious diseases, such as COVID-19, and the situation may become too large in scope to be handled in its entirety by the normal county and municipal operating services in some parts of this State, and this situation may spread to other parts of the State; and

WHEREAS, the spread of COVID-19 may make it difficult or impossible for citizens to obtain consumer goods and other necessities of life due to supply chain disruption and price increases, as well as hamper the delivery of essential services such as police, fire, and first aid; and

WHEREAS, the State's public bidding act, N.J.S.A. 52:34-6 et seq., provides a public exigency exemption, N.J.S.A. 52:34-10(b), that in the event of a threat to the life, health, or safety to the public, advertised bidding is not required to obtain those

3

goods and services necessary to address the public exigency where the Division of Purchase of Property provides preapproval in accordance with Treasury Circular 18-14-DPP; and

WHEREAS, in the event of a declared emergency pursuant to Treasury Circular 19-10-DPP, the threshold for delegated purchasing by individual State Departments is raised to $100,000 such that purchases at or below that amount do not require prior approval or action by DPP; and

WHEREAS, the spread of COVID-19 may disrupt the timely delivery of State contracted goods or services, the immediate delivery and fulfillment of which is necessary for the life, safety, or health of the public; and

WHEREAS, the State of New Jersey has been working closely with the CDC, local health departments, and healthcare facilities to monitor, plan for and mitigate the spread of COVID-19 within the State; and

WHEREAS, through Executive Order No. 102, which I signed on February 3, 2020, I created the State's Coronavirus Task Force, chaired by the Commissioner of the New Jersey Department of Health ("DOH"), in order to coordinate the State's efforts to appropriately prepare for and respond to the public health hazard posed by COVID-19; and

WHEREAS, it is critical to prepare for and respond to suspected or confirmed COVID-19 cases in New Jersey, to implement appropriate measures to mitigate the spread of COVID-19, and to prepare in the event of an increasing number of individuals requiring medical care or hospitalization; and

WHEREAS, the State of New Jersey also acts as an employer with tens of thousands of employees, and the spread of COVID-19 requires preparedness for staffing shortages and flexibility in work rules to ensure that its employees can fully comply with all

4

medically appropriate measures while also ensuring the continuous delivery of State services performed by Executive branch agencies; and

WHEREAS, the continuous delivery of services at the county and municipal level performed by those governments and their employees is also essential; and

WHEREAS, the spread of COVID-19 within New Jersey constitutes an imminent public health hazard that threatens and presently endangers the health, safety, and welfare of the residents of one or more municipalities or counties of the State; and

WHEREAS, it is necessary and appropriate to take action against this public health hazard to protect and maintain the health, safety, and welfare of New Jersey residents and visitors; and

WHEREAS, the facts as set forth above and consultation with the Commissioner of DOH confirms that there exists a public health emergency in the State; and

WHEREAS, New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-107 et seq., prohibits excessive price increases during a declared state of emergency, or for 30 days after the termination of the state of emergency; and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, in order to protect the health, safety and welfare of the people of the State of New Jersey,  DO DECLARE and PROCLAIM that a Public Health Emergency and State of Emergency exist in the State of New Jersey, and I hereby ORDER and DIRECT the following:

5

1.   I authorize and empower the State Director of Emergency Management, who is the Superintendent of State Police, in conjunction with the Commissioner of DOH, to take any such emergency measures as the State Director may determine necessary, including the implementation of the State Emergency Operations Plan and directing the activation of county and municipal emergency operations plans, in order to fully and adequately protect the health, safety and welfare of the citizens of the State of New Jersey from any actual or potential threat or danger that may exist from the possible exposure to COVID-19.   The State Director of Emergency Management, in conjunction with the Commissioner of DOH, is authorized to coordinate the relief effort from this emergency with all governmental agencies, volunteer organizations, and the private sector.

2.   The State Director of Emergency Management, in conjunction with the   Commissioner of DOH, shall also supervise and coordinate all activities of all State, regional and local political bodies and agencies in order to ensure the most effective and expeditious implementation of this order, and, to this end, may call upon all such agencies and political subdivisions for any assistance necessary.

3.   Given the concurrent invocation of both a State of Emergency pursuant to N.J.S.A. App.A.:9-33 et seq. and a Public Health Emergency as contemplated by N.J.S.A. 26:13-1 et seq., I reserve the right as specifically contemplated by N.J.S.A. 26:13-3 to exercise the authority and powers specific to the Emergency Health Powers Act as I deem necessary and appropriate to ensure the public health for New Jersey's residents.

4.   It shall be the duty of every person or entity in this State or doing business in this State and of the members of the governing body and every official, employee, or agent of every

6

political subdivision in this State and of each member of all other governmental bodies, agencies, and authorities in this State of any nature whatsoever, to cooperate fully with the State Director of Emergency Management and the Commissioner of DOH in all matters concerning this state of emergency.

5.   The Coronavirus Task Force established under Executive Order No. 102 is continued with the Commissioner of DOH as the chair, and shall provide assistance on the State's efforts preparing for and responding to the public health hazard posed by COVID-19.

6.   I authorize and empower the executive head of any agency or instrumentality of the State government with authority to promulgate rules to waive, suspend, or modify any existing rule, where the enforcement of which would be detrimental to the public welfare during this emergency, notwithstanding the provisions of the Administrative Procedure Act or any law to the contrary for the duration of this Executive Order, subject to my prior approval and in consultation with the State Director of Emergency Management and the Commissioner of DOH.   Any such waiver, modification, or suspension shall be promulgated in accordance with N.J.S.A. App. A:9-45.

7.   All State agencies, and specifically the Departments of Banking and Insurance, Health, Human Services, Education, and the Civil Service Commission are authorized to take appropriate steps to address the public health hazard of COVID-19, including increasing access and eliminating barriers to medical care, protecting the health and well-being of students, and protecting the health and well-being of State, county, and municipal employees while ensuring the continuous delivery of State, county, and municipal services.

8.    I authorize and empower the State Director of Emergency Management, in conjunction with the Commissioner of DOH, to order the evacuation of all persons, except for those emergency and governmental personnel whose presence the State Director deems necessary, from any area where their continued presence would present a danger to their health, safety, or welfare because of the conditions created by this emergency.

9.    I authorize and empower the State Director of Emergency Management, in conjunction with the Commissioner of DOH, to utilize all property, equipment, and facilities owned, rented, operated, and maintained by the State of New Jersey to house and shelter persons who may need to be evacuated from a residence, dwelling, building, structure, or vehicle during the course of this emergency.

10.    I authorize and empower the Adjutant General, in accordance with N.J.S.A. 38A:2-4 and N.J.S.A. 38A:3-6.1, to order to active duty such members of the New Jersey National Guard who, in the Adjutant General's judgment, are necessary to provide aid to those localities where there is a threat or danger to the public health, safety, and welfare and to authorize the employment of any supporting vehicles, equipment, communications, or supplies as may be necessary to support the members so ordered.

11.    In accordance with the N.J.S.A. App. A:9-34 and N.J.S.A. App. A:9-51, I reserve the right to utilize and employ all available resources of the State government and of each and every political subdivision of the State, whether of persons, properties, or instrumentalities, and to commandeer and utilize any personal services and any privately-owned property necessary to protect against this emergency.

8

12. In accordance with N.J.S.A. App. A:9 40, no municipality, county, or any other agency or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance, or resolution which will or might in any way conflict with any of the provisions of this Order, or which will in any way interfere with or impede the achievement of the purposes of this Order.

13. In accordance with N.J.S.A. App. A:9-34, N.J.S.A. App. A:9-40.6, and N.J.S.A. 40A:14-156.4, no municipality or public or semipublic agency shall send public works, fire, police, emergency medical, or other personnel or equipment into any non-contiguous impacted municipality within this State, nor to any impacted municipality outside this State, unless and until such aid has been directed by the county emergency management coordinator or his or her deputies in consultation with the State Director of Emergency Management in conjunction with the Commissioner of DOH.

14. This Order shall take effect immediately and shall remain in effect until such time as it is determined by me that an emergency no longer exists.

> GIVEN, under my hand and seal this 9th day of March, Two Thousand and Twenty, and of the Independence of the United States, the Two Hundred and Forty-Fourth.

[seal]                    /s/ Philip D. Murphy

                          Governor

Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

EXECUTIVE ORDER NO. 104

WHEREAS, through Executive Order No. 102, which I signed on February 3, 2020, I created the State's Coronavirus Task Force, chaired by the Commissioner of the New Jersey Department of Health ("DOH"), in order to coordinate the State's efforts to appropriately prepare for and respond to the public health hazard posed by Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, in light of the dangers posed by COVID-19, I issued Executive Order No. 103 (2020) on March 9, 2020, the facts and circumstances of which are adopted by reference herein, which declared both a Public Health Emergency and State of Emergency; and

WHEREAS, in accordance with N.J.S.A. App. A:9-34 and -51, I reserved the right to utilize and employ all available resources of State government to protect against the emergency created by COVID-19; and

WHEREAS, in accordance with N.J.S.A App. A:9-40, I declared that, due to the State of Emergency, no municipality, county, or any agency or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance, or resolution which will or might in any way conflict with any of the provisions of my Executive Orders, or which will in any way interfere with or impede their achievement; and

WHEREAS, on March 11, 2020, COVID-19 was declared to be a global pandemic by the World Health Organization; and

WHEREAS, on March 13, 2020, the President of the United States declared a national emergency pursuant to his constitutional and statutory powers, including those granted by Sections 201 and 301 of the National Emergencies Act (50 U.S.C. § 1601, *et seq.*) and consistent with Section 1135 of the Social Security Act, as amended (42 U.S.C. § 1320b-5); and

2

WHEREAS, the President of the United States also determined on March 13, 2020, that the COVID-19 pandemic was of sufficient severity and magnitude to warrant an emergency determination under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121-5207; and

WHEREAS, as of March 16, 2020, according to the Centers for Disease Control and Prevention ("CDC"), there were more than 130,000 confirmed cases of COVID-19 worldwide, with over 6,500 of those cases having resulted in death; and

WHEREAS, as of March 16, 2020, there were more than 4,900 confirmed cases of COVID-19 in the United States, with 67 of those cases having resulted in death; and

WHEREAS, as of March 16, 2020, there were 178 positive cases of COVID-19 in New Jersey, spread across numerous counties; and

WHEREAS, social mitigation strategies for combatting COVID-19 requires every effort to reduce the rate of community spread of the disease; and

WHEREAS, as of March 15, 2020, the CDC recommends that for the next eight weeks, gatherings of 50 or more people be canceled or postponed throughout the United States; and

WHEREAS, public and private preschool programs, elementary and secondary schools, and institutions of higher education are locations where significant numbers of students, educators, and support staff gather, often in close proximity in classrooms, hallways, cafeterias, and gymnasiums; and

WHEREAS, suspending in-person preschool programs, K-12 education, and in-person instruction at institutions of higher education are part of the State's mitigation strategy to combat COVID-19 and reduce the rate of community spread; and

3

WHEREAS, my Administration is committed to ensuring that all students will continue to have access to a quality education, in addition to school meals that are provided or subsidized for students from low-income families; and

WHEREAS, casinos, racetracks, gyms, fitness centers, movie theaters, performing arts centers, other concert venues, nightclubs, and other entertainment centers, which are vital to the economic health of the State, are also locations where large numbers of individuals gather in close proximity; and

WHEREAS, many individuals also come into contact with common surfaces at gyms, fitness centers, and other entertainment centers; and

WHEREAS, suspending operations at these businesses is part of the State's mitigation strategy to combat COVID-19 and reduce the rate of community spread; and

WHEREAS, even on casino floors, where slot machines or other casino games may be several feet apart, many individuals come into contact with common surfaces; and

WHEREAS, in contrast to gaming at brick-and-mortar facilities, online gaming provides a safe mode of entertainment during a time when physical proximity to other individuals can be dangerous; and

WHEREAS, the CDC has advised that COVID-19 spreads most frequently through person-to-person contact when individuals are within six feet or less of one another; and

WHEREAS, as a result, the CDC has recommended that individuals practice "social distancing" to prevent community spread of the virus; and

WHEREAS, the CDC has defined social distancing as the practice of "remaining out of congregate settings, avoiding mass gatherings, and maintaining distance (approximately 6 feet or 2 meters) from others when possible"; and

4

WHEREAS, bars and restaurants are locations where significant numbers of individuals gather in close proximity, making adherence to social distancing protocols impossible or impracticable; and

WHEREAS, to mitigate community spread of COVID-19, it is necessary to limit the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance; and

WHEREAS, on March 15, 2020, the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, called for "a dramatic diminution of the personal interaction that we see in restaurants and in bars," and recommended pursuing "[w]hatever it takes to do that"; and

WHEREAS, the provision of take-out and delivery services do not pose the same danger of widespread person-to-person contact while still preserving necessary food delivery services for New Jersey residents; and

WHEREAS, narrowing scope of service or hours of operation for restaurants and certain retail establishments permits individuals to access food, clothing, and other essential materials while also limiting unnecessary person-to-person contact; and

WHEREAS, it is critical to ensure that law enforcement resources, particularly those that might otherwise be required to respond to late-night incidents, not be unnecessarily diverted from responding to COVID-19 related issues and maintaining public safety; and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers, which I have invoked;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby ORDER and DIRECT:

1.   All gatherings of persons in the State of New Jersey shall be limited to 50 persons or fewer, excluding normal operations at airports, bus and train stations, medical facilities, office environments, factories, assemblages for the purpose of industrial or manufacturing work, construction sites, mass transit, or the purchase of groceries or consumer goods.

2.   All public, private, and parochial preschool program premises, and elementary and secondary schools, including charter and renaissance schools, shall be closed to students beginning on Wednesday, March 18, 2020, and shall remain closed as long as this Order remains in effect.

3.   All institutions of higher education shall cease in-person instruction beginning on Wednesday, March 18, 2020, and shall cease such in-person instruction as long as this Order remains in effect. The Secretary of the Office of Higher Education shall have the authority to grant a waiver to allow in-person instruction to students on a case-by-case basis where a compelling rationale to allow such access exists.  The Secretary of the Office of Higher Education shall coordinate with institutions of higher education to determine appropriate student housing conditions for those students who reside in on-campus housing as their primary residence.

4.   The Commissioner of the Department of Education ("DOE"), in consultation with the Commissioner of DOH, shall be authorized to permit schools to remain open on a limited basis for the provision of food or other essential, non-educational services, or for educational or child care services if needed in emergency situations after consultation with the Commissioner of DOH.  The Commissioner of DOE shall also have the authority to close any other career or

6

training facilities over which he has oversight, after consultation with the Commissioner of DOH.

5.   The Commissioner of DOE shall continue working with each public school district, and private and parochial schools as appropriate, to ensure that students are able to continue their educations during this time period through appropriate home instruction.   Local school districts, charter schools, and renaissance schools, in consultation with the Commissioner of DOE, shall have the authority and discretion to determine home instruction arrangements as appropriate on a case-by-case basis to ensure all students are provided with appropriate home instruction, taking into account all relevant constitutional and statutory obligations.

6.   The Secretary of the Department of Agriculture, in conjunction with the Commissioner of DOE, shall take all necessary actions to ensure that all students eligible for free or reduced meals shall continue to receive the services or supports necessary to meet nutritional needs during closures.

7.   The following facilities are ordered closed to members of the public, effective 8:00 p.m. on Monday, March 16, 2020.  These facilities are to remain closed to the public for as long as this Order remains in effect.  The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to this list:

        a.   Casino gaming floors, including retail sports wagering lounges, and casino concert and entertainment venues.  Online and mobile sports and casino gaming services may continue to be offered notwithstanding the closure of the physical facility.

        b.   Racetracks, including stabling facilities and retail sports wagering lounges.   Mobile sports wagering

services may continue to be offered notwithstanding
the closure of the physical facility.

c.   Gyms and fitness centers and classes.

d.   Entertainment centers, including but not limited to,
movie theaters, performing arts centers, other
concert venues, and nightclubs.

8.   Other non-essential retail, recreational, and
entertainment businesses must cease daily operations from 8:00 p.m.
until 5:00 a.m..  From 5:00 a.m. until 8:00 p.m., these businesses
may remain open if they limit their occupancy to no more than 50
persons and adhere to social distancing guidelines.  Examples of
essential businesses excluded from this directive include:
grocery/food stores, pharmacies, medical supply stores, gas stations,
healthcare facilities and ancillary stores within healthcare
facilities.  The State Director of Emergency Management, who is the
Superintendent of State Police, shall have the discretion to make
additions, amendments, clarifications, exceptions, and exclusions to
the list of essential businesses and to the timelines applicable to
operating hours.

9.   All restaurants, dining establishments, and food courts,
with or without a liquor license, all bars, and all other holders of
a liquor license with retail consumption privileges, are permitted
to operate their normal business hours, but are limited to offering
only food delivery and/or take-out services. If alcoholic beverages
are to be sold from a restaurant, dining establishment or bar with a
liquor license, such sales shall be limited to original containers
sold from the principal public barroom.  All retail sales of alcoholic
beverages by limited brewery licensees, restricted brewery licensees,
plenary and farm winery licensees (and associated salesrooms), craft
distillery licensees and cidery and meadery licensees must be in
original containers and must be delivered by licensed entities and/or
by customer pick up.

8

10.   In accordance with N.J.S.A. App. A:9-33, et seq., as
supplemented and amended, the State Director of Emergency
Management, who is the   Superintendent of State Police, through
the police agencies under his control, to determine and control the
direction of the flow of vehicular traffic on any State or
interstate highway, municipal or county road, and any access road,
including the right to detour, reroute, or divert any or all traffic
and to prevent ingress or egress from any area that, in the State
Director's discretion, is deemed necessary for the protection of
the health, safety, and welfare of the public, and to remove parked
or abandoned vehicles from such roadways as conditions warrant.

11.   The Attorney General, pursuant to the provisions of
N.J.S.A. 39:4-213, shall act through the Superintendent of State
Police, to determine and control the direction of the flow of
vehicular traffic on any State or interstate highway, municipal or
county road, and any access road, including the right to detour,
reroute, or divert any or all traffic, to prevent ingress or egress,
and to determine the type of vehicle or vehicles to be operated on
such roadways. I further authorize all law enforcement officers to
enforce any such order of the Attorney General or Superintendent of
State Police within their respective municipalities.

12.   No municipality, county, or any other agency or political
subdivision of this State shall enact or enforce any order, rule,
regulation, ordinance, or resolution which will or might in any way
conflict with any of the provisions of this Executive Order, or which
will in any way interfere with or impede its achievement.

13.   It shall be the duty of every person or entity in this
State or doing business in this State and of the members of the
governing body and every official, employee, or agent of every
political subdivision in this State and of each member of all other
governmental bodies, agencies, and authorities in this State of any

9

nature whatsoever, to cooperate fully in all matters concerning this Executive Order.

14.   Penalties for violations of this Executive Order may be imposed under, among other statutes, <u>N.J.S.A.</u> App. A:9-49 and -50.

15.   This Order shall take effect immediately and shall remain in effect until revoked or modified by the Governor, who shall consult with the Commissioner of DOH as appropriate.

> GIVEN, under my hand and seal this 16th day of March, Two Thousand and Twenty, and of the Independence of the United States, the Two Hundred and Forty-Fourth.

[seal]                       /s/ Philip D. Murphy

                             Governor

Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

EXECUTIVE ORDER NO. 107

WHEREAS, through Executive Order No. 102 (2020), which I signed on February 3, 2020, I created the State's Coronavirus Task Force, chaired by the Commissioner of the New Jersey Department of Health ("DOH"), in order to coordinate the State's efforts to appropriately prepare for and respond to the public health hazard posed by Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, in light of the dangers posed by COVID-19, I issued Executive Order No. 103 (2020) on March 9, 2020, the facts and circumstances of which are adopted by reference herein, which declared both a Public Health Emergency and State of Emergency; and

WHEREAS, in accordance with N.J.S.A. App. A:9-34 and -51, I reserved the right to utilize and employ all available resources of State government to protect against the emergency created by COVID-19; and

WHEREAS, in accordance with N.J.S.A App. A:9-40, I declared that, due to the State of Emergency, no municipality, county, or any agency or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance, or resolution which will or might in any way conflict with any of the provisions of my Executive Orders, or which will in any way interfere with or impede their achievement; and

WHEREAS, to further protect the health, safety, and welfare of New Jersey residents by, among other things, reducing the rate of community spread of COVID-19, I issued Executive Order No. 104 (2020) on March 16, 2020, the facts and circumstances of which are also adopted by reference herein, which established statewide social mitigation strategies for combatting COVID-19; and

145

2

WHEREAS, Executive Order No. 104 (2020) limited the scope of service and hours of operation for restaurants and certain retail establishments to balance the need to allow individuals to access food and other essential materials with the need to limit unnecessary person-to-person contact; and

WHEREAS, Executive Order No. 104 (2020) deemed a subset of businesses as "essential," including grocery/food stores, pharmacies, medical supply stores, gas stations, healthcare facilities, and ancillary stores within healthcare facilities, and it authorized the State Director of Emergency Management, who is the Superintendent of State Police, to make additions, amendments, clarifications, exceptions, and exclusions to that list; and

WHEREAS, Executive Order No. 104 (2020) made clear that such essential businesses may continue operating without limits on their scope of service or hours of operation, absent further amendments by the State Director of Emergency Management; and

WHEREAS, Executive Order No. 104 (2020) and subsequent Administrative Orders issued by the State Director of Emergency Management also placed restrictions on other businesses' scope of service and hours of operation, and also placed restrictions on the size of gatherings in the State; and

WHEREAS, as of March 20, 2020, according to the Centers for Disease Control and Prevention ("CDC"), there were more than 234,000 confirmed cases of COVID-19 worldwide, with over 9,800 of those cases having resulted in death; and

WHEREAS, as of March 20, 2020, there were more than 15,000 confirmed cases of COVID-19 in the United States, with at least 201 of those cases having resulted in death; and

WHEREAS, as of March 20, 2020, there were at least 890 positive cases of COVID-19 in New Jersey, with at least 11 of those cases having resulted in death; and

3

WHEREAS, social mitigation strategies for combatting COVID-19 require every effort to reduce the rate of community spread of the disease; and

WHEREAS, the CDC has advised that COVID-19 spreads most frequently through person-to-person contact when individuals are within six feet or less of one another; and

WHEREAS, as a result, the CDC has recommended that individuals practice "social distancing" to prevent community spread of the virus; and

WHEREAS, the CDC has defined social distancing as the practice of "remaining out of congregate settings, avoiding mass gatherings, and maintaining distance (approximately 6 feet or 2 meters) from others when possible"; and

WHEREAS, to mitigate community spread of COVID-19, it is necessary to limit the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance; and

WHEREAS, the best way for New Jersey residents to keep themselves, their families, and their communities safe during the COVID-19 outbreak is to stay at home as much as possible; and

WHEREAS, as of March 15, 2020, the CDC recommends that for the next eight weeks, gatherings of 50 or more people be canceled or postponed throughout the United States; and

WHEREAS, as of March 16, 2020, the White House went further than the CDC had and recommended that Americans avoid social gatherings in groups of more than 10 people; and

WHEREAS, restricting the physical presence of individuals in office environments and work sites is critical to preventing future spread of COVID-19; and

4

WHEREAS, accommodating work-from-home arrangements is an effective means to ensure continuity of operations while also limiting person-to-person contact; and

WHEREAS, the CDC has recommended employers to establish policies and practices to increase the physical distance among employees and between employees; and

WHEREAS, permitting the workforce to work from home may reduce stress on the State's child care system; and

WHEREAS, as of March 19, 2020, I have instructed all State departments and agencies to utilize work-from-home arrangements for both essential and non-essential employees wherever feasible; and

WHEREAS, given the rapidly rising incidence of COVID-19, temporarily closing non-essential retail businesses will strengthen New Jersey's efforts to slow the spread of COVID-19; and

WHEREAS, even as we institute social distancing measures, the number of COVID-19 cases in New Jersey is likely to increase for the immediate future, meaning we must take all possible steps to preserve our health care system's capacity to treat those who require emergency or intensive care; and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers, which I have invoked;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby ORDER and DIRECT:

5

1.   The operative paragraphs of Executive Order No. 104
(2020) are hereby superseded in full.  The factual findings of
Executive Order No. 104 (2020) remain applicable except to the
extent they are in conflict with the factual findings in this or
any intervening Executive Order.

2.   All New Jersey residents shall remain home or at their
place of residence unless they are 1) obtaining goods or services
from essential retail businesses, as described in Paragraph 6; 2)
obtaining takeout food or beverages from restaurants, other dining
establishments, or food courts, pursuant to Paragraph 8; 3) seeking
medical attention, essential social services, or assistance from
law enforcement or emergency services; 4) visiting family or other
individuals with whom the resident has a close personal
relationship, such as those for whom the individual is a caretaker
or romantic partner; 5) reporting to, or performing, their job; 6)
walking, running, operating a wheelchair, or engaging in outdoor
activities with immediate family members, caretakers, household
members, or romantic partners while following best social
distancing practices with other individuals, including staying six
feet apart; 7) leaving the home for an educational, religious, or
political reason; 8) leaving because of a reasonable fear for his
or her health or safety; or 9) leaving at the direction of law
enforcement or other government agency.

3.   When in public, individuals must practice social
distancing and stay six feet apart whenever practicable, excluding
immediate family members, caretakers, household members, or
romantic partners.

4.   Individuals who have to travel pursuant to Paragraph 2
should only use public transportation only if they have no other
feasible choice.  Individuals who ride public transportation
should abide by best social distancing practices, including making

6

all efforts to stand or sit six feet away from other riders and frequently use sanitizing products.

5.  Gatherings of individuals, such as parties, celebrations, or other social events, are cancelled, unless otherwise authorized by any part of this Order. The State Director of Emergency Management, who is the Superintendent of the State Police, shall have the discretion to make clarifications and issue orders related to this provision.

6.  The brick-and-mortar premises of all non-essential retail businesses must close to the public as long as this Order remains in effect. Essential retail businesses, listed below, are excluded from this directive and may remain open during their normal business hours. Essential retail businesses must, wherever practicable, provide pickup services outside or adjacent to their stores for goods ordered in advance online or by phone. Additionally, online and telephonic delivery services are permitted to the extent the retail business is authorized to operate an online or telephonic delivery service under existing law. The State Director of Emergency Management, who is the Superintendent of the State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to this list:

a.  Grocery stores, farmer's markets and farms that sell directly to customers, and other food stores, including retailers that offer a varied assortment of foods comparable to what exists at a grocery store;

b.  Pharmacies and alternative treatment centers that dispense medicinal marijuana;

c.  Medical supply stores;

d.  Retail functions of gas stations;

    e.   Convenience stores;

    f.   Ancillary stores within healthcare facilities;

    g.   Hardware and home improvement stores;

    h.   Retail functions of banks and other financial institutions;

    i.   Retail functions of laundromats and dry-cleaning services;

    j.   Stores that principally sell supplies for children under five years old;

    k.   Pet stores;

    l.   Liquor stores;

    m.   Car dealerships, but only to provide auto maintenance and repair services, and auto mechanics;

    n.   Retail functions of printing and office supply shops; and

    o.   Retail functions of mail and delivery stores.

7.   Any essential retail business whose brick-and-mortar premises remain open to the public shall abide by social distancing practices to the extent practicable while providing essential services.  These include all reasonable efforts to keep customers six feet apart and frequent use of sanitizing products on common surfaces.

8.   All restaurants, cafeterias, dining establishments, and food courts, with or without a liquor license, all bars, and all other holders of a liquor license with retail consumption privileges, are permitted to operate their normal business hours, but are limited to offering only food delivery and/or take-out services in accordance with their existing liquor licenses.  If alcoholic beverages are to be sold from a restaurant, dining establishment or bar with a liquor license, such sales shall be

8

limited to original containers sold from the principal public barroom.  The on-premises consumption of alcohol is prohibited. All retail sales of alcoholic beverages by limited brewery licensees, restricted brewery licensees, plenary and farm winery licensees (and associated salesrooms), craft distillery licensees and cidery and meadery licensees must be in original containers and must be sold through customer pick up and/or delivered by licensees in accordance with their existing licenses.

9.   All recreational and entertainment businesses, including but not limited to the following list, must close to the public as long as this Order remains in effect.  The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to this list:

       a.   Casino gaming floors, including retail sports wagering lounges, and casino concert and entertainment venues. Online and mobile sports and casino gaming services may continue to be offered notwithstanding the closure of the physical facility.

       b.   Racetracks, including stabling facilities and retail sports wagering lounges. Mobile sports wagering services may continue to be offered notwithstanding the closure of the physical facility.

       c.   Gyms and fitness centers and classes.

       d.   Entertainment centers, including but not limited to, movie theaters, performing arts centers, other concert venues, and nightclubs.

       e.   All indoor portions of retail shopping malls. Restaurants and other stores located within

9

shopping malls that have their own external entrances open to the public, separate from the general mall entrance, may remain open pursuant to the terms and directives of this Order for operating hours and takeout or food delivery services. All entrances and exits to the common area portions of retail shopping malls must remain closed.

f.   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement parks, water parks, aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions.

g.   Facilities where personal care services are performed that, by their very nature, result in noncompliance with social distancing guidelines, including but not limited to cosmetology shops; barber shops; beauty salons; hair braiding shops; nail salons; electrology facilities; spas, including day spas and medical spas, at which solely elective and cosmetic medical procedures are performed; massage parlors, tanning salons, tattoo parlors, and public and private social clubs, whether or not they serve alcohol, including but not limited to facilities owned or operated by the American Legion, Veterans of Foreign Wars, Knights of Columbus, and any other social clubs associated with community service organizations. This excludes any health facilities that provide medically necessary or therapeutic services.

10

       h.    All municipal, county, and State public libraries, and all libraries and computer labs at public and private colleges and universities.

10. All businesses or non-profits in the State, whether closed or open to the public, must accommodate their workforce, wherever practicable, for telework or work-from-home arrangements. For purposes of this order, "telework" means the practice of working from home or alternative locations closer to home through the use of technology that equips the individual to access necessary materials.

11. To the extent a business or non-profit has employees that cannot perform their functions via telework or work-from-home arrangements, the business or non-profit should make best efforts to reduce staff on site to the minimal number necessary to ensure that essential operations can continue. Examples of employees who need to be physically present at their work site in order to perform their duties include, but are not limited to, law enforcement officers, fire fighters, and other first responders, cashiers or store clerks, construction workers, utility workers, repair workers, warehouse workers, lab researchers, information technology maintenance workers, janitorial and custodial staff, and certain administrative staff.

12. All public, private, and parochial preschool program premises, and elementary and secondary schools, including charter and renaissance schools, shall remain closed to students as long as this Order remains in effect.

13. All institutions of higher education shall continue to cease such in-person instruction as long as this Order remains in effect. The Secretary of the Office of Higher Education shall have the authority to grant a waiver to allow in-person instruction to students on a case-by-case basis where a compelling rationale to

11

allow such access exists. The Secretary of the Office of Higher Education shall coordinate with institutions of higher education to determine appropriate student housing conditions for those students who reside in on-campus housing as their primary residence.

14.  The Commissioner of the Department of Education ("DOE"), in consultation with the Commissioner of DOH, shall be authorized to permit schools to remain open on a limited basis for the provision of food or other essential, non-educational services, or for educational or child care services if needed in emergency situations after consultation with the Commissioner of DOH. The Commissioner of DOE shall also have the authority to close any other career or training facilities over which he has oversight, after consultation with the Commissioner of DOH.

15.  The Commissioner of DOE shall continue working with each public school district, and private and parochial schools as appropriate, to ensure that students are able to continue their educations during this time period through appropriate home instruction. Local school districts, charter schools, and renaissance schools, in consultation with the Commissioner of DOE, shall have the authority and discretion to determine home instruction arrangements as appropriate on a case-by-case basis to ensure all students are provided with appropriate home instruction, taking into account all relevant constitutional and statutory obligations.

16.  The Secretary of the Department of Agriculture, in conjunction with the Commissioner of DOE, shall take all necessary actions to ensure that all students eligible for free or reduced meals shall continue to receive the services or supports necessary to meet nutritional needs during closures.

12

17.  Nothing in this Order shall be construed to limit, prohibit, or restrict in any way the provision of health care or medical services to members of the public.

18.  Nothing in this Order shall be construed to limit, prohibit, or restrict in any way access to essential services for low-income residents, including but not limited to food banks.

19.  Nothing in this Order shall be construed to limit, prohibit, or restrict in any way the operations of newspapers, television, radio, and other media services.

20.  Nothing in this Order shall be construed to limit, prohibit, or restrict in any way the operations of law enforcement agencies.

21.  Nothing in this Order shall be construed to limit, prohibit, or restrict in any way the operations of the federal government, or the movement of federal officials in New Jersey while acting in their official capacity.

22.  In accordance with N.J.S.A. App. A:9-33, et seq., as supplemented and amended, the State Director of Emergency Management, who is the Superintendent of State Police, through the police agencies under his control, to determine and control the direction of the flow of vehicular traffic on any State or interstate highway, municipal or county road, and any access road, including the right to detour, reroute, or divert any or all traffic and to prevent ingress or egress from any area that, in the State Director's discretion, is deemed necessary for the protection of the health, safety, and welfare of the public, and to remove parked or abandoned vehicles from such roadways as conditions warrant.

23.  The Attorney General, pursuant to the provisions of N.J.S.A. 39:4-213, shall act through the Superintendent of State Police, to determine and control the direction of the flow of

13

vehicular traffic on any State or interstate highway, municipal or county road, and any access road, including the right to detour, reroute, or divert any or all traffic, to prevent ingress or egress, and to determine the type of vehicle or vehicles to be operated on such roadways. I further authorize all law enforcement officers to enforce any such order of the Attorney General or Superintendent of State Police within their respective municipalities.

24.  It shall be the duty of every person or entity in this State or doing business in this State and of the members of the governing body and every official, employee, or agent of every political subdivision in this State and of each member of all other governmental bodies, agencies, and authorities in this State of any nature whatsoever, to cooperate fully in all matters concerning this Executive Order.

25.  Penalties for violations of this Executive Order may be imposed under, among other statutes, N.J.S.A. App. A:9-49 and -50.

26.  This Order shall take effect on Saturday, March 21, 2020, at 9:00 p.m., and shall remain in effect until revoked or modified by the Governor, who shall consult with the Commissioner of DOH as appropriate.

GIVEN, under my hand and seal this 21st day of March, Two Thousand and Twenty, and of the Independence of the United States, the Two Hundred and Forty-Fourth.

[seal]                      /s/ Philip D. Murphy

Governor


Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

**EXECUTIVE ORDER NO. 118**

WHEREAS, through Executive Order No. 102 (2020), which I signed on February 3, 2020, I created the State's Coronavirus Task Force, chaired by the Commissioner of the New Jersey Department of Health ("DOH"), in order to coordinate the State's efforts to appropriately prepare for and respond to the public health hazard posed by Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, on March 9, 2020, through Executive Order No. 103 (2020), the facts and circumstances of which are adopted by reference herein, I declared both a Public Health Emergency and State of Emergency due to the public health hazard created by COVID-19; and

WHEREAS, on March 16, 2020, through Executive Order No. 104 (2020), the facts and circumstances of which are adopted by reference herein, I adopted statewide social mitigation strategies for combatting COVID-19; and

WHEREAS, in recognition that the Centers for Disease Control ("CDC") has advised that social mitigation strategies for combatting COVID-19 require every effort to reduce the rate of community spread of the disease and that COVID-19 spreads most frequently through person-to-person contact when individuals are within six feet or less of one another, I issued Executive Order No. 107 (2020) on March 21, 2020, the facts and circumstances of which are adopted by reference herein, which ordered additional steps to mitigate community spread of COVID-19 and superseded Executive Order No. 104 (2020); and

WHEREAS, Executive Order No. 107 (2020) clarified that it is necessary to limit the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance; and

2

WHEREAS, to further limit community spread from person-to-person contact through social distancing, Executive Order No. 107 (2020) required, with limited exceptions, New Jersey residents to remain in their place of residence and cancelled all public and social gatherings; and

WHEREAS, Executive Order No. 108 (2020) invalidated any county or municipal restrictions imposed in response to COVID-19 that in any way conflict with Executive Order No. 107 (2020), but contained an exception allowing municipalities and counties to, among other things, impose additional restrictions at municipal or county parks; and

WHEREAS, since the issuance of Executive Order No. 107 (2020), public interaction and gatherings at county and state parks throughout the State, including lands under the Department of Environmental Protection's ("DEP") jurisdiction, have been observed in a manner that is inconsistent with and threatens to undermine the social mitigation strategies necessary to limit the spread of COVID-19, creating risks to public health; and

WHEREAS, lands under DEP's jurisdiction include all State parks, forests, recreation areas, historic sites, marinas, golf courses, botanical gardens, and other lands, waters, and facilities assigned to the State Park Service in DEP's Division of Parks and Forestry ("State Parks and Forests"); and

WHEREAS, recent instances of non-compliance with Executive Order No. 107 have continued in the State Parks and Forests despite verbal warnings and orders to disperse gatherings, ejections from the parks, and the issuance of citations by law enforcement; and

WHEREAS, public usage of State Parks and Forests, as well as county parks, is anticipated to increase during the upcoming spring holiday season and beyond as the weather continually improves outdoors; and

3

WHEREAS, such increased public usage is likely to encourage additional public interactions and gatherings at State Parks and Forests, as well as county parks, that are inconsistent with and threaten to undermine the State's current social mitigation strategies required by Executive Order No. 107 (2020); and

WHEREAS, it is in the public interest to take decisive action to protect public health by further discouraging uses of public lands that are inconsistent with Executive Order No. 107 (2020); and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers, which I have invoked;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby ORDER and DIRECT:

1.   Paragraph 3 of Executive Order No. 108 (2020) is hereby superseded to the extent that it allows counties to impose additional restrictions at county parks in response to COVID-19.

2.   All State Parks and Forests and county parks must close to the public as long as this Order remains in effect.  The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions and exclusions to the categories of parks subject to this Order.

3.   It shall be the duty of every person or entity in this State or doing business in this State and of the members of the governing body and every official, employee, or agent of every

160

4

political subdivision in this State and of each member of all other governmental bodies, agencies, and authorities in this State of any nature whatsoever, to cooperate fully in all matters concerning this Executive Order.

4.   Penalties for violations of this Executive Order may be imposed under, among other statutes, N.J.S.A. App. A:9-49 and -50.

5.   This Order shall take effect on Tuesday, April 7, 2020, at 8:00 p.m., and shall remain in effect until revoked or modified by the Governor, who shall consult with the Commissioner of DOH as appropriate.

GIVEN,  under  my  hand  and  seal  this
7th day of April,
Two Thousand and Twenty, and of
the Independence of the United
States,  the  Two  Hundred  and
Forty-Fourth.

[seal]                              /s/ Philip D. Murphy

                                    Governor

Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

EXECUTIVE ORDER NO. 119

WHEREAS, on March 9, 2020, through Executive Order No. 103 (2020), the facts and circumstances of which are adopted by reference herein, I declared both a Public Health Emergency and a State of Emergency throughout the State due to the public health hazard created by Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, Executive Order No. 103 (2020) described both the symptoms and dangers presented by COVID-19 and the likelihood of community spread across the State, and it recognized the need to use all available statewide authorities to prepare for and respond to COVID-19 cases in New Jersey, to implement appropriate measures to mitigate the spread of COVID-19, and to prepare in the event of an increasing number of individuals requiring medical care or hospitalization; and

WHEREAS, as COVID-19 continued to spread across New Jersey and an increasing number of individuals required medical care or hospitalization, I issued a series of Executive Orders pursuant to my authority under the New Jersey Civilian Defense and Disaster Control Act (the "Disaster Control Act") and the Emergency Health Powers Act ("EHPA"), to protect the public health, safety, and welfare against the emergency created by COVID-19, including Executive Order Nos. 104-118 (2020), the facts and circumstances of which are all adopted by reference herein; and

WHEREAS, N.J.S.A. 26:13-3(b) establishes that a Public Health Emergency declared by the Governor shall automatically terminate after 30 days, which means the Public Health Emergency declared in Executive Order No. 103 (2020) on March 9, 2020, shall terminate on April 8, 2020, unless renewed for an additional 30 days through a declaration of the Governor; and

WHEREAS, since the Public Health Emergency was declared on March 9, 2020 — at which time there were 11 presumed positive cases of COVID-19 in New Jersey — the public health hazard presented by the

2

COVID-19 outbreak has only grown in scope in New Jersey, in the region, and across the United States; and

WHEREAS, on January 31, 2020, the United States Department of Health and Human Services ("HHS") Secretary declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19; and

WHEREAS, on March 13, 2020, the President of the United States declared a national emergency pursuant to his constitutional and statutory powers, including those granted by Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. § 1601, et seq., and consistent with Section 1135 of the Social Security Act, as amended, 42 U.S.C. § 1320b-5; and

WHEREAS, the emergency declarations by the President and the HHS Secretary remain in effect today; and

WHEREAS, also on March 13, 2020, the President determined that the COVID-19 pandemic was of sufficient severity and magnitude to warrant an emergency declaration under Section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. § 5121-5207, which remains in effect today; and

WHEREAS, on March 25, 2020, the President determined that the COVID-19 pandemic was of sufficient severity and magnitude to warrant a major disaster declaration under Section 401 of the Stafford Act, 42 U.S.C. § 5121-5207, which remains in effect today; and

WHEREAS, as of April 7, 2020, the governments of 41 states, the District of Columbia, and Puerto Rico have ordered residents to stay at home in order to reduce the transmission of COVID-19 in their states and across the United States; and

WHEREAS, as of April 6, 2020, according to the World Health Organization, there were more than 1,210,000 confirmed cases of COVID-19 worldwide, with over 67,000 of those cases having resulted in death; and

3

WHEREAS, as of April 6, 2020, according to the Centers for Disease Control, there were more than 330,000 confirmed cases of COVID-19 in the United States, with over 8,900 of those cases having resulted in death; and

WHEREAS, as of April 6, 2020, there were over 41,000 positive cases of COVID-19 in New Jersey, with at least 1,003 of those cases having resulted in death; and

WHEREAS, as of April 6, 2020, there were positive cases of COVID-19 in every county in New Jersey, and there have been deaths relating to COVID-19 in every county in New Jersey; and

WHEREAS, even as we institute social distancing measures, the number of COVID-19 cases in New Jersey is anticipated to continue to increase for the immediate future; and

WHEREAS, although the State has made all reasonable efforts to procure medical resources from the federal government, existing State supplies, donations, and private sector purchasing, there is a critical shortage of medical resources in the State, particularly in hospitals, healthcare facilities, and emergency response agencies in the northern region of the State where the spread of COVID-19 is particularly acute and where there has been a particularly high volume of COVID-19 hospitalizations; and

WHEREAS, the Commissioner of the Department of Health ("DOH") has also determined that the State needs the help of additional qualified health, mental health, and related professionals to supplement our healthcare capacity on a temporary basis to address the health care needs relating to the COVID-19 outbreak; and

WHEREAS, there are also thousands of law enforcement officers in New Jersey currently unable to report to duty, the vast majority of which because they tested positive for COVID-19 or are currently in quarantine; and

4

WHEREAS, the spread of COVID-19 has greatly strained the resources and capabilities of county and municipal governments, including public health agencies, that provide essential services for containing and mitigating the spread of contagious diseases, and the situation is too large in scope to be handled entirely by the normal county and municipal operating services; and

WHEREAS, the facts as set forth above and consultation with the Commissioner of DOH confirm that the spread of COVID-19 in New Jersey constitutes an ongoing public health hazard that threatens and presently endangers the health, safety, and welfare of the residents of one or more municipalities or counties of the State, and it is necessary and appropriate to take action against this public health hazard to protect and maintain the health, safety, and welfare of New Jersey residents and visitors; and

WHEREAS, the facts as set forth above and consultation with the Commissioner of DOH confirms that there exists a public health emergency in the State; and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers, which I have invoked;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby DECLARE and PROCLAIM that the Public Health Emergency declared in Executive Order No. 103 (2020) pursuant to the EHPA, N.J.S.A. 26:13-1, et seq., continues to exist throughout the State of New Jersey, and I hereby ORDER and DIRECT:

5

    1.   All Executive Orders adopted in whole or in part based on the authority under the EHPA to respond to the Public Health Emergency presented by the COVID-19 outbreak remain in full force and effect.

    2.   All actions taken by any Executive Branch departments and agencies in whole or in part based on the authority under the EHPA to respond to the Public Health Emergency presented by the COVID-19 outbreak, or in whole or in part based on authority delegated by any Executive Orders described in Paragraph 1 of this Order, including but not limited to any Administrative Orders, remain in full force and effect.

    3.   For purposes of this Order, "Executive Branch departments and agencies" shall mean any of the principal departments in the Executive Branch of State government and any agency, authority, board, bureau, commission, division, institution, office, or other instrumentality within or created by any such department, and any independent State authority, commission, instrumentality, or agency over which the Governor exercises executive authority, as determined by the Attorney General.

    4.   This Order shall take effect immediately.

                      GIVEN, under my hand and seal this 7th day of April, Two Thousand and Twenty, and of the Independence of the United States, the Two Hundred and Forty-Fourth.

[seal]                  /s/ Philip D. Murphy

                      Governor

Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

166



State of New York

Executive Chamber

No. 202

E X E C U T I V E   O R D E R

**Declaring a Disaster Emergency in the State of New York**

**WHEREAS**, on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern;

**WHEREAS**, on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19;

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue; and

**WHEREAS**, New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors.

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, hereby find, pursuant to Section 28 of Article 2-B of the Executive Law, that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately, and I do hereby declare a State disaster emergency for the entire State of New York. This Executive Order shall be in effect until September 7, 2020; and

**IN ADDITION**, this declaration satisfies the requirements of 49 C.F.R. 390.23(a)(l)(A), which provides relief from Parts 390 through 399 of the Federal Motor Carrier Safety Regulations (FMCSR). Such relief from the FMCSR is necessary to ensure that crews are available as needed.

**FURTHER**, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 6, 2020 the following:

Section 112 of the State Finance Law, to the extent consistent with Article V, Section 1 of the State Constitution, and to the extent necessary to add additional work, sites, and time to State contracts or to award emergency contracts, including but not limited to emergency contracts or leases for relocation and support of State operations under Section 3 of the Public Buildings Law; or emergency contracts under Section 9 of the Public Buildings Law; or emergency contracts for professional services under Section 136-a of the State Finance Law; or emergency contracts for commodities, services, and technology under Section 163 of the State Finance Law; or design-build or best value contracts under and Part F of Chapter 60 of the Laws of 2015 and Part RRR of Chapter 59 of the Laws of 2017; or emergency contracts for purchases of commodities, services, and technology through any federal GSA schedules, federal 1122 programs, or other state, regional, local, multi-jurisdictional, or cooperative contract vehicles;

Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, to the extent necessary to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes;

Section 97-G of the State Finance Law, to the extent necessary to purchase food, supplies, services, and equipment or furnish or provide various centralized services, including but not limited to, building design and construction services to assist affected local governments, individuals, and other non-State entities in responding to and recovering from the disaster emergency;

Section 359-a, Section 2879, and 2879-a of the Public Authorities Law to the extent necessary to purchase necessary goods and services without following the standard procurement processes;

Sections 375, 385 and 401 of the Vehicle and Traffic Law to the extent that exemption for vehicles validly registered in other jurisdictions from vehicle registration, equipment and dimension requirements is necessary to assist in preparedness and response to the COVID-19 outbreak;

Sections 6521 and 6902 of the Education Law, to the extent necessary to permit unlicensed individuals, upon completion of training deemed adequate by the Commissioner of Health, to collect throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and to the extent necessary to permit non-nursing staff, upon completion of training deemed adequate by the Commissioner of Health, to perform tasks, under the supervision of a nurse, otherwise limited to the scope of practice of a licensed or registered nurse;

Subdivision 6 of section 2510 and section 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

Section 224-b and subdivision 4 of section 225 of the Public Health Law, to the extent necessary to permit the Commissioner of Health to promulgate emergency regulations and to amend the State Sanitary Code;

Subdivision 2 of section 2803 of the Public Health Law, to the extent necessary to permit the Commissioner to promulgate emergency regulations concerning the facilities licensed pursuant to Article 28 of the Public Health Law, including but not limited to the operation of general hospitals;

Subdivision 3 of section 273 of the Public Health Law and subdivisions 25 and 25-a of section 364-j of the Social Services Law, to the extent necessary to allow patients to receive prescribed drugs without delay;

Section 400.9 and paragraph 7 of subdivision f of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

Section 400.11 of Title 10 of the NYCRR, to the extent necessary to permit Article 28 facilities receiving patients as a result of the disaster emergency to complete patient review instruments as soon as practicable;

Section 405 of Title 10 of the NYCRR, to the extent necessary to maintain the public health with respect to treatment or containment of individuals with or suspected to have COVID-19;

168

Subdivision d and u of section 800.3 of Title 10 of the NYCRR, to the extent necessary to permit emergency medical service personnel to provide community paramedicine, transportation to destinations other than hospitals or health care facilities, telemedicine to facilitate treatment of patients in place, and such other services as may be approved by the Commissioner of Health;

Paragraph 3 of subdivision f of section 505.14 of Title 18 of the NYCRR, to the extent necessary to permit nursing supervision visits for personal care services provided to individuals affected by the disaster emergency be made as soon as practicable;

Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals who meet the federal requirements for high complexity testing to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

Subdivision 4 of section 6909 of the Public Health Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

Section 596 of Title 14 of the NYCRR to the extent necessary to allow for rapid approval of the use of the telemental health services, including the requirements for in-person initial assessment prior to the delivery of telemental health services, limitations on who can deliver telemental health services, requirements for who must be present while telemental health services are delivered, and a recipient's right to refuse telemental health services;

Section 409-i of the Education Law, section 163-b of the State Finance Law with associated OGS guidance, and Executive Order No. 2 are suspended to the extent necessary to allow elementary and secondary schools to procure and use cleaning and maintenance products in schools; and sections 103 and 104-b of the General Municipal Law are suspended to the extent necessary to allow schools to do so without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

Article 7 of the Public Officers Law, section 41 of the General Construction Law, and section 3002 of the Public Health Law, to the extent necessary to permit the Public Health and Health Planning Council and the State Emergency Medical Services Council to meet and take such actions as authorized by law, as may be necessary to respond to the COVID-19 outbreak, without meeting quorum requirements or permitting the public in-person access to meetings, provided that any such meetings must be webcast and means for effective public comment must be made available; and

**FURTHER**, I hereby temporarily modify, for the period from the date of this Executive Order through April 6, 2020, the following laws:

Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law; Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations, to the extent necessary to provide the Governor with the authority to regulate traffic and the movement of vehicles on roads, highways, and streets.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

seventh day of March in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

169



State of New York

Executive Chamber

No. 202.8

## EXECUTIVE ORDER

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:

- In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis,   any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020;
- Subdivision 1 of Section 503 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a driver's license, in order to extend for the duration of this executive order the validity of driver's licenses that expire on or after March 1, 2020;
- Subdivision 1 of Section 491 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, in order to extend for the duration of this executive order the validity of non-driver identification cards that expire on or after March 1, 2020;
- Sections 401, 410, 2222, 2251, 2261, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all-terrain vehicle, respectively, in order to extend for the duration of this executive order the validity of such registration certificate or number plate that expires on or after March 1, 2020;
- Section 420-a of the vehicle and traffic law to the extent that it provides an expiration for temporary registration documents issued by auto dealers to extend the validity of such during the duration of this executive order.
- Subsection (a) of Section 602 and subsections (a) and (b) of Section 605 of the Business Corporation Law, to the extent they require meetings of shareholders to be noticed and held at a physical location.

170

**NOW, THEREFORE,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 19, 2020:

- The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.
- There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days.
- Effective at 8 p.m. March 20, any appointment that is in-person at any state or county department of motor vehicles is cancelled, and until further notice, only on-line transactions will be permitted.
- The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to also authorize abatement of interest, for a period of 60 days for a taxpayers who are required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.



G I V E N  under my hand and the Privy Seal of the

State in the City of Albany this

twentieth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor



# State of North Carolina

## ROY COOPER
### GOVERNOR

MARCH 10, 2020

EXECUTIVE ORDER NO. 116

**DECLARATION OF A STATE OF EMERGENCY TO COORDINATE RESPONSE
AND PROTECTIVE ACTIONS TO PREVENT THE SPREAD OF COVID-19**

**WHEREAS**, COVID-19 is a respiratory disease that can result in serious illness or death by the SARS-CoV-2 virus, which is a new strain of coronavirus previously unidentified in humans and which can spread from person to person; and

**WHEREAS,** the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020; and

**WHEREAS**, the Centers for Disease Control and Prevention ("CDC") has warned of the high public health threat posed by COVID-19 globally and in the United States and has deemed it necessary to prohibit or restrict travel to areas designated by the CDC; and

**WHEREAS**, on January 31, 2020, the United States Department of Health and Human Services Secretary declared a public health emergency in the United States for COVID-19 under Section 319 of the Public Health Service Act; and

**WHEREAS**, the North Carolina Department of Health and Human Services ("NCDHHS") confirmed multiple cases of COVID-19 in North Carolina as of March 10, 2020; and

**WHEREAS**, NCDHHS has organized a Public Health Incident Management Team to manage the public health impacts of COVID-19 in this state; and

**WHEREAS**, health insurance companies have begun to waive the costs for COVID-19 testing and are encouraged to continue to ensure ease of access to health care for diagnostics and treatment without regard to the issue of cost or a patient's ability to pay; and

**WHEREAS**, first responders and health care professionals remain integral to ensuring the state is best situated to respond to and mitigate the threat posed by COVID-19 and such first responders and health care professionals should have the availability of all necessary personal protective equipment and continue to follow all necessary response protocols; and

**WHEREAS**, N.C. Gen. Stat. §§ 166A-19.10 and 166A-19.20 authorize the undersigned to declare a state of emergency and exercise the powers and duties set forth therein to direct and aid in response to, recovery from, and mitigation against emergencies; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(b)(3), the undersigned, with the concurrence of the Council of State, may regulate and control the flow of vehicular traffic and the congregation of persons in public places or buildings; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(b)(4), the undersigned, with the concurrence of the Council of State, may waive a provision of any regulation or ordinance of a state agency which restricts the immediate relief of human suffering; and

172

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(b)(5), the undersigned, with the concurrence of the Council of State, may perform and exercise other such functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.10(b)(7), the undersigned has authority to requisition state property and state resources to utilize state services, equipment, supplies and facilities in response to a state of emergency; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.70, the undersigned may declare that the health, safety, or economic well-being of persons or property requires that the maximum hours of service for drivers prescribed by N.C. Gen. Stat. § 20-381 and similar rules should be waived for essentials, as defined in N.C. Gen. Stat. § 166A-19.70(f)(3), for assisting in the restoration of utility services; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.70(g), upon the recommendation of the North Carolina Commissioner of Agriculture and the existence of an imminent threat of severe economic loss of livestock, poultry or crops ready to be harvested, the Governor shall direct the North Carolina Department of Public Safety ("DPS") to temporarily suspend weighing vehicles used to transport livestock, poultry or crops to include timber ready to be harvested; and

**WHEREAS**, 49 C.F.R. § 390.23 allows the governor of a state to suspend the rules and regulations under 49 C.F.R. §§ 390-399 for up to thirty (30) days if the governor determines that an emergency condition exists; and

**WHEREAS**, the undersigned, in consultation with the Secretary of NCDHHS, has determined it is necessary and appropriate to act to ensure that COVID-19 remains controlled and that residents and visitors in North Carolina remain safe and secure; and

**WHEREAS**, the undersigned has sought and obtained concurrence from the Council of State consistent with the Governor's emergency powers authority in N.C. Gen. Stat. § 166A-19.30.

**NOW, THEREFORE**, by the authority vested in me as Governor by the Constitution and the laws of the State of North Carolina, **IT IS ORDERED**:

### Section 1. State of Emergency

I hereby declare a State of Emergency, as defined in N.C. Gen. Stat. §§ 166A-19.3(6) and 166A-19.3(19) for the State of North Carolina based on the public health emergency posed by COVID-19.

The emergency area, as defined in N.C. Gen. Stat. §§ 166A-19.3(7) and 166A-19.20(b) is the State of North Carolina (the "Emergency Area").

### Section 2. Application

All state and local government entities and agencies are ordered to cooperate in the implementation of the provisions of this declaration and the provisions of the North Carolina Emergency Operations Plan (the "Plan").

### Section 3. Delegation of Authority

I delegate to Erik A. Hooks, the Secretary of the North Carolina Department of Public Safety ("DPS"), or his designee, the power and authority granted to and required of me by Article 1A of Chapter 166A of the North Carolina General Statutes for the purpose of implementing the Plan and deploying the State Emergency Response Team to take the appropriate actions necessary to promote and secure the safety and protection of the populace in North Carolina.

Secretary Hooks, or his designee, shall implement the Plan in coordination with the Secretary of the Department of Health and Human Services, Dr. Mandy Cohen, and the State Health Director, Dr. Elizabeth Tilson.

### Section 4. Exercise of Powers

Further, Secretary Hooks, as Chief Coordinating Officer for the State of North Carolina, shall exercise the powers prescribed in N.C. Gen. Stat. §§ 143B-602 and 166A-19.11.

### Section 5.  Maximum Hours of Service

In order to ensure adequacy and location of supplies and resources to respond to COVID-19, DPS, in conjunction with the North Carolina Department of Transportation ("DOT"), shall waive the maximum hours of service for drivers prescribed by DPS pursuant to N.C. Gen. Stat. § 20-381, if the driver is transporting medical supplies and other equipment in support of the Plan or other efforts to address the public health threat posed by COVID-19, through the duration of the State of Emergency or until further notice.

### Section 6.  Height and Weight Restrictions

DPS, in conjunction with DOT, shall waive certain size and weight restrictions and penalties arising under N.C. Gen. Stat. §§ 20-116, 20-118, and 20-119, certain registration requirements and penalties arising under N.C. Gen. Stat. §§ 105-449.45, 105-449.47, and 105-449.49 for vehicles throughout the Emergency Area involved in transporting medical supplies and other equipment in support of the Plan or other efforts to address the public health threat posed by COVID-19. Furthermore, pursuant to N.C. Gen. Stat. § 20-118.1, DPS shall temporarily suspend weighing vehicles throughout the Emergency Area used to transport medical supplies and other equipment in support of the Plan or other efforts to address the public health threat posed by COVID-19.  Furthermore, pursuant to N.C. Gen. Stat. § 20-118.1, DPS shall temporarily suspend weighing vehicles used to transport livestock, poultry, or crops to include timber ready to be harvested and feed to livestock and poultry in the Emergency Area.

### Section 7.  Unwaived Size and Weight Restrictions

I.   Notwithstanding the waivers set forth above in Section 6, size and weight restrictions and penalties have not been waived under the following conditions:

   a.  When the vehicle weight exceeds the maximum gross weight criteria established by the manufacturer (GVWR) or 90,000 pounds gross weight, whichever is less.
   b.  When the tandem axle weight exceeds 42,000 pounds and the single axle weight exceeds 22,000 pounds.
   c.  When a vehicle and vehicle combination exceed twelve (12) feet in width and the total overall vehicle combination's length exceeds seventy-five (75) feet from bumper to bumper.
   d.  Vehicles and vehicle combinations subject to exemptions or permits by authority of this Executive Order shall not be exempt from the requirement of having (i) a yellow banner on the front and rear that is seven (7) feet long and eighteen (18) inches wide and bears the legend "Oversized Load" in ten (10) inch black letters, 1.5 inches wide and (ii) red flags measuring eighteen (18) inches square on all sides at the widest point of the load. When operating between sunset and sunrise, a certified escort shall be required for loads exceeding eight (8) feet 6 inches in width.

II.  Vehicles subject to this Executive Order shall adhere to the following conditions:

   a.  The size and weight exemption for vehicles will be allowed on all DOT designated routes, except those routes designated as light traffic roads under N.C. Gen. Stat. § 20-118. This Order shall not be in effect on bridges posted pursuant to N.C. Gen. Stat. § 136-72.
   b.  The waiver of regulations under Title 49 of the Code of Federal Regulations ("Federal Motor Carrier Safety Regulations") does not apply to the Commercial Drivers' License and Insurance Requirements. This waiver shall be in effect for thirty (30) days or the duration of the emergency, whichever is less.
   c.  Upon request by law enforcement officers, exempted vehicles must produce documentation sufficient to establish that their loads are limited to  medical supplies and other equipment to be used in support of the Plan or other efforts to address the public health threat posed by COVID-19.

III. The North Carolina State Highway Patrol shall enforce the conditions set forth in Sections 5 through 8 of this Executive Order in a manner that does not endanger North Carolina motorists.

### Section 8.  Additional Transportation Waivers

Vehicles subject to this Executive Order shall be exempt from the following registration requirements:

a.  The requirement to obtain a temporary trip permit and pay the associated $50.00 fee listed in N.C. Gen. Stat.§ 105-449.49.
b.  The requirement of filing a quarterly fuel tax return as the exemption in N.C. Gen. Stat.§ 105-449.45(b)(1) applies.
c.  The registration requirements under N.C. Gen. Stat.§ 20-382.1 concerning intrastate for hire authority and N.C. Gen. Stat.§ 20-382 concerning interstate for-hire authority; however, vehicles shall maintain insurance as required by law.
d.  Non-participants in North Carolina's International Registration Plan and International Fuel Tax Agreement will be permitted to enter North Carolina in accordance with the exemptions identified by this Executive Order.

### Section 9. Consumer Protection

Pursuant to N.C. Gen. Stat. § 166A-19.23, this declaration triggers the prohibition against excessive pricing as provided in N.C. Gen. Stat. §§ 75-37 and 75-38.

I further hereby encourage the North Carolina Attorney General to use all resources available to monitor reports of abusive trade practices towards consumers and make readily available opportunities to report price gouging as well as unfair and deceptive trade practice under Chapter 75 of the North Carolina General Statutes to the public.

### Section 10.  Task Force

I hereby memorialize the establishment of the Governor's Novel Coronavirus Task Force on COVID-19 ("Task Force").  The Director of Emergency Management and the State Health Director shall continue to serve as co-chairs of the Task Force.  The Task Force shall continue to work with state, local, and federal partners in responding to challenges posed by COVID-19.

### Section 11.  State Employee Policy Guidance

a.  I hereby authorize hiring of temporary employees and contractors to support NCDHHS and local health departments in responding to the threats posed by COVID-19.

b.  I hereby authorize the State Health Director to monitor areas of concentration of COVID-19 and make recommendations regarding travel restrictions for travel of state employees conducting state business. Agencies shall have the authority to cancel, restrict or postpone travel of state employees as needed to protect the wellbeing of others.  Agencies are urged to cancel travel to restricted areas (as defined by the Division of Public Health of NCDHHS and the CDC).  Exceptions to travel restrictions may be needed based on the unique circumstances or job duties of state employees.

### Section 12. Public Health Surveillance and Control Measures

Notwithstanding the public health authorities in place under Chapter 130A of the North Carolina General Statutes, I hereby order the State Health Director to work with local health directors to implement public health surveillance and control measures where appropriate for individuals who have been diagnosed with or are at risk of contracting COVID-19 in order to control or mitigate spread of the disease. I hereby order the State Health Director to utilize all authorities under N.C. Gen. Stat. Chapter 130A to obtain information and records necessary to prevent, control, or investigate COVID-19.

### Section 13.  Laboratory Testing

I hereby order the State Health Director to work with the State Laboratory of Public Health to maximize the availability of laboratory testing for COVID-19.

I further encourage private laboratories and universities to take all reasonable steps to expand COVID-19 testing capacity.

## Section 14. Right of Entry and Disinfection for Local Health Departments and NCDHHS Secretary

With the concurrence of the Council of State and notwithstanding the public health authorities in place under Chapter 130A of the North Carolina General Statutes, I hereby grant local health departments, the Secretary of NCDHHS, and Division of Public Health employees serving the Secretary of NCDHHS' agents, and on her direction, a right of entry into public places for the purposes of assisting with or investigating potential COVID-19 cases or exposure and requiring cleaning and disinfecting measures to help control transmission of COVID-19.

## Section 15. Cleaning of Regulated Facilities

With the concurrence of the Council of State, I hereby waive restrictions related to the type of product or chemical concentration used to control COVID-19 at facilities whose sanitation is regulated by NCDHHS, if conducted and handled in a safe manner and approved by the local health department in consultation with the Division of Public Health of NCDHHS. The State Health Director may issue additional orders or regulations consistent with the state's Public Health Law to regulate the sanitation of public facilities regulated by NCDHHS or local health departments.

## Section 16. Out of State Health Care Licensure and Additional Testing Resources

With the concurrence of the Council of State, I hereby temporarily waive North Carolina licensure requirements for health care and behavioral health care personnel who are licensed in another state, territory, or the District of Columbia to provide health care services within the Emergency Area.

With the concurrence of the Council of State, and in the interest of alleviating immediate human suffering, nothing in Subchapters 32B, 32M, or 32S of the North Carolina Administrative Code shall be interpreted to prevent physicians, nurse practitioners, and physician assistants from issuing a standing order for qualified agents or employees who are working under the direct supervision of a physician, physician assistant or nurse practitioner to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing.

## Section 17. Federal Support

I further direct Secretary Hooks, or his designee, to seek assistance from any and all agencies of the United States Government as may be needed to address the emergency and seek reimbursement for costs incurred by the state in responding to this emergency.

## Section 18. Local County Public Health Aid Funding Formula

With the concurrence of the Council of State, I hereby grant the Secretary of NCDHHS, or her designee, the authority to waive the formula requirements of 15A NCAC 18A .2901 and adjust aid-to-county funding, if a local health department's resources are diverted in response to COVID-19.

## Section 19. Access to State Funds

I hereby order access to the State Emergency Response and Disaster Relief Fund to the extent necessary to cover costs associated with responding to this State of Emergency as provided in N.C. Gen. Stat. § 166A-19.42, including but not limited to the substance of this Executive Order.

## Section 20. Purchase and Contract Regulation Waivers

With the concurrence of the Council of State, I hereby temporarily waive Sections .0301 through .0317 of Chapter 5B in Title 1 in the North Carolina Administrative Code to the extent necessary to permit NCDHHS, DPS, and local governmental entities to enter into contracts to secure resources and equipment needed to respond to COVID-19.

In addition to the provisions in Section 11, I further order all components of state government to expedite and prioritize the leasing of real property, including but not limited to, laboratories and health care facilities in order to provide the state with the resources needed to address COVID-19.

176

### Section 21. Cost Sharing Reduction

Pursuant to N.C. Gen. Stat. § 166A-19.30(a)(1), I hereby direct NCDHHS and the North Carolina Department of Insurance to immediately work with health insurance plans operating in the state to identify any burdens for testing for COVID-19 as well as access to prescription drugs and telehealth services, as needed, in order to reduce cost-sharing (including, but not limited to, co-pays, deductibles, or coinsurance) to zero for all medically necessary screening and testing for COVID-19.

### Section 22. Clinical Coverage Policy

With the concurrence of the Council of State, and in order to provide the immediate relief of human suffering, I hereby temporarily waive the regulatory requirements and suspend the enforcement of the statutory requirements under N.C. Gen. Stat. § 108A-54.2 for modifications of Medicaid Clinical Coverage Policy.

I order the NCDHHS, Division of Health Benefits to create coverage policies necessary for Medicaid and Health Choice Beneficiaries to receive medically necessary services for testing and treatment of COVID-19 and to create coverage policies or modify existing policies that will allow beneficiaries to continue to receive necessary services without disruption during the State of Emergency.

### Section 23.  Inapplicability of Section 166A-19.30(c)

This Executive Order does not prohibit or restrict lawfully possessed firearms or ammunition or impose any limitation on the consumption, transportation, sale or purchase of alcoholic beverages as provided in N.C. Gen. Stat. § 166A-19.30(c).

### Section 24.  Distribution

I hereby order that this Executive Order be: (1) distributed to the news media and other organizations calculated to bring its contents to the attention of the general public; (2) promptly filed with the Secretary of DPS, the Secretary of State, and the superior court clerks in the counties to which it applies, unless the circumstances of the State of Emergency would prevent or impede such filing; and (3) distributed to others as necessary to ensure proper implementation of this Executive Order.

### Section 25.  Effective Date

This Executive Order is effective immediately and shall remain in effect until rescinded.

**IN WITNESS WHEREOF**, I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 10th day of March in the year of our Lord two thousand and twenty.

Roy Cooper
Governor

**ATTEST:**

Elaine F. Marshall
Secretary of State

177



# State of North Carolina

## ROY COOPER
GOVERNOR

MARCH 17, 2020

EXECUTIVE ORDER NO. 118

### LIMITING OPERATIONS OF RESTAURANTS AND BARS AND BROADENING UNEMPLOYMENT INSURANCE BENEFITS IN RESPONSE TO COVID-19

**WHEREAS**, the undersigned issued Executive Order No. 116 on March 10, 2020 which declared a State of Emergency to coordinate the State's response and protective actions to address the Coronavirus Disease 2019 (COVID-19) public health emergency and to provide for the health, safety, and welfare of residents and visitors located in North Carolina ("Declaration of a State of Emergency"); and

**WHEREAS**, the World Health Organization declared COVID-19 a global pandemic on March 11, 2020; and

**WHEREAS**, on March 13, 2020, the President of the United States declared the ongoing COVID-19 outbreak a pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS**, on March 13, 2020, the President of the United States pursuant to Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. § 1601, *et seq*. and consistent with Section 1135 of the Social Security Act, as amended (42 U.S.C. § 1320b-5), declared that the COVID-19 outbreak in the United States constitutes a national emergency, retroactive to March 1, 2020; and

**WHEREAS**, on March 14, 2020, the undersigned issued Executive Order No. 117 which prohibited mass gatherings of more than one hundred (100) people in the State of North Carolina and closed K-12 public schools to limit the spread of COVID-19; and

**WHEREAS**, on March 15, 2020, the Centers for Disease Control ("CDC") updated their guidance for large events and mass gatherings, and recommended that for the next eight (8) weeks, organizers (whether groups or individuals) cancel or postpone in-person events that consist of fifty (50) people or more throughout the United States; and

**WHEREAS**, on March 16, 2020, the White House issued new guidelines called The President's Coronavirus Guidelines for America -- 15 Days to Slow the Spread of Coronavirus (COVID-19), calling on people to "avoid social gatherings in groups of more than ten (10) people"; and

**WHEREAS**, the undersigned, pursuant to Section 401 of the Stafford Act is requesting a major disaster declaration from the United States Federal Government; and

178

**WHEREAS**, the North Carolina Department of Health and Human Services("NCDHHS") confirmed that the number of cases of COVID-19 in North Carolina continues to rise; and

**WHEREAS**, Executive Order No. 116 invoked the Emergency Management Act, and authorizes the Governor to exercise the powers and duties set forth therein to direct and aid in the response to, recovery from, and mitigation against emergencies; and

**WHEREAS**, the Governor has established the Novel Coronavirus Task Force on COVID-19 to work with state, local, and federal partners in responding to challenges posed by COVID-19; and

**WHEREAS**, NCDHHS has organized a Public Health Incident Management Team to manage the public health impacts of COVID-19 in this state; and

**WHEREAS**, COVID-19 has caused and will continue to cause substantial economic disruption in North Carolina, including disruptions to employees and employers; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(1), the undersigned may utilize all available State resources as reasonably necessary to cope with an emergency, including the transfer and direction of personnel or functions of State agencies or units thereof for the purpose of performing or facilitating emergency services; and

**WHEREAS**, the Governor, Secretary of Public Safety, and Director of Emergency Management have the authority to act under N.C. Gen. Stat. §§ 166A-19.10, 166A-19.12, and 166A-19.30(a)-(b); and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.10(b)(4) gives the Governor the authority to "cooperate and coordinate" with the President of the United States; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.12(3)(e), the Division of Emergency Management must coordinate with the State Health Director to revise the North Carolina Emergency Operations Plan as conditions change, including making revisions to set "the appropriate conditions for quarantine and isolation in order to prevent the further transmission of disease; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), during a Gubernatorially declared State of Emergency, the Governor has the power to "give such direction to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this article; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 130A-145(a), the State Health Director has the power to exercise quarantine and isolation authority when the public health is endangered; and

**WHEREAS**, quarantine authority is defined by N.C. Gen. Stat. § 130A-2(7a) to mean the authority to issue an order to limit the freedom of movement or action of persons or animals which been exposed to or are reasonably suspected of having been exposed to a communicable disease or communicable condition for a period of time as may be necessary to prevent the spread of that disease; and

**WHEREAS**, under N.C. Gen. Stat. § 130A-2(3), an "imminent hazard" is defined as a situation that is likely to cause an immediate threat to human life, an immediate threat of serious physical injury, an immediate threat of serious adverse health effects, or a serious risk of irreparable damage to the environment if no immediate action is taken; and

**WHEREAS**, under N.C. Gen. Stat. § 130A-20(a), if the Secretary of Health and Human Service determines that an imminent hazard exists, the Secretary may order the owner, lessee, operator, or other person in control of the property to abate the imminent hazard; and

**WHEREAS**, quarantine authority is defined by N.C. Gen. Stat. § 130A-2(7a) to also mean the authority to issue an order to limit access by any person or animal to an area of facility that may be contaminated with an infection agent; and

**WHEREAS**, further action is necessary to protect the health and safety of the residents of North Carolina, slow the spread of the COVID-19 outbreak, protect our most vulnerable citizens, and avoid strain on our health care system; and

**WHEREAS**, the undersigned has sought and obtained the necessary concurrence from the Council of State consistent with the Governor's emergency powers authority in N.C. Gen. Stat. § 166A-19.30(b) for Sections 2 and 3 of this Order, and reserves the right to act under N.C. Stat. §§ 166A-19.10 and 166A-19.30(a).

**NOW, THEREFORE**, by the authority vested in me as Governor by the Constitution and the laws of the State of North Carolina, **IT IS ORDERED**:

### Section 1.  Limiting the Sale of Food and Beverages, to Carry-Out, Drive-Through, and Delivery Only.

   (a) Pursuant to the following authorities, the Governor, in consultation and at the recommendation of the state Secretary of Health and Human Services, the State Emergency Management Director, and the State Health Director, orders the following limitations on the sale of food and beverages to carry-out, drive-through, and delivery only:

      (i) Per N.C. Gen. Stat. §§ 166A-19.30(c),-19.31(b)(2), the Governor has authority to restrict or prohibit the operation of business establishments and other place to or from which people may travel or at which they may congregate;

      (ii) Per N.C. Gen. Stat. § 166A-19.10(b)(4), giving the Governor authority to "cooperate and coordinate" with the President of the United States, who issued guidelines directing the reduction of the congregating of persons to no more than ten (10) people the President's Coronavirus Guidelines for America, March 16, 2020, and this Order is cooperating therewith;

      (iii) Per N.C. Gen. Stat. § 166A-19.12(3)(e), the Division of Emergency Management must coordinate with the State Health Director to revise the North Carolina Emergency Operations Plan as conditions change, including making revisions to set "the appropriate conditions for quarantine and isolation in order to prevent the further transmission of disease," and the Emergency Management Director and State Health Director having done so, have recommended the Governor order the actions identified in this Section;

      (iv) Per N.C. Gen. Stat. § 130A-20(a), the Secretary has determined an imminent hazard exists and that entities subject to this Section must limit the sale of food and beverages to carry-out, drive-through, and delivery only in order to abate the hazard, and has issued an order of abatement dated March 17, 2020;

      (v) Per N.C. Gen. Stat. § 130A-145(a), the State Health Director is exercising quarantine and isolation authority to limit access to facilities that sell food and beverage to carry-out, drive-through and delivery services only.

      (vi) Per N.C. Gen. Stat. § 166A-19.30(a)(2), during a Gubernatorially declared State of Emergency, the Governor has the power to "give such direction to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this article that restaurants are restricted to carry-out, drive-through, delivery, and onsite consumption in outdoor seating areas, subject to mass gathering restrictions to create an environment where staff and patrons maintain social distancing (at least 6 feet from other people) whenever possible. Bars are directed to close. These restrictions are effective as of 5:00pm, Tuesday, March 17, 2020 until March 31, 2020, or until this Order is rescinded or replaced.

   (b) For the purposes of this Order, restaurants are defined as permitted food establishments, under N.C. Gen. Stat. § 130A-248, and other establishments that both prepare and serve food, including but not limited to, restaurants, cafeterias, food halls, dining halls, food kiosks at airports and shopping centers, or educational institutions, ("food courts"), as well as private or members-only clubs where food and beverages are permitted to be consumed on premises.

(c) For purposes of this Order, bars are defined as establishments that are not restaurants and that have a permit to sell alcoholic beverages for onsite consumption, under N.C. Gen. Stat. § 18B-1001.

(d) This Order does not direct the closure of retail beverage venues that currently provide for the sale of beer, wine, and liquor for off-site consumption only. It also does not require the closure of production operations at breweries, wineries, or distilleries.

(e) This Order does not affect grocery stores, pharmacies, convenience stores, gas stations and charitable food distribution sites to the extent they sell or distribute prepared food. However, sit-down food or beverage service within these facilities is prohibited.

(f) If the Alcoholic Beverage Control Commission "ABC Commission" identifies other state laws, regulations, and policies that may affect bars, restaurants, and other dining establishments identified in this Section, it is directed to inform the Office of the Governor in writing. Upon written authorization from the Office of the Governor, the ABC Commission may interpret flexibly, modify, or waive those state laws, regulations and policies, as appropriate, and to the maximum extent permitted under applicable state and federal law, to effectuate the purposes of this Order.

(g) In light of this Executive Order, Executive Order No. 117 Section 1(b) (March 14, 2020) is revised as follows:

"A mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers. It also does not include office environments, factories, grocery stores, and child care centers."

These locations or facilities, however, are subject to the dine-in food and beverage restrictions listed in this Order.

## Section 2.  Unemployment Insurance Policy Related to COVID-19

The undersigned has sought and obtained the necessary concurrence from the Council of State consistent with the Governor's emergency powers authority in N.C. Gen. Stat. § 166A-19.30 (b), and reserves the right to act under N.C. Stat. §§ 166A-19.10 and 166A-19.30(a).

The Department of Commerce, through the Secretary of Commerce and Assistant Secretary of the Division of Employment Security, is directed to ensure that individuals who, as a result of COVID-19, are separated from employment, have had their hours of employment reduced, or are prevented from working due to a medical condition caused by COVID-19 or due to communicable disease control measures, shall be eligible for unemployment benefits to the maximum extent permitted by federal law. For purposes of this Executive Order, communicable disease control measures shall include quarantine or isolation directives or orders related to COVID-19 issued by the State of North Carolina, the federal government, a local governmental entity, or a medical or public health professional.

## Section 3.  Unemployment Insurance Changes

(a) To provide the necessary unemployment benefits to those affected by COVID-19, the Department of Commerce is authorized, to the maximum extent permitted under federal law, and for so long as the Declaration of a State of Emergency regarding COVID-19, dated March 10, 2020, remains in place, to interpret flexibly or waive, as appropriate, the following:

i.    the one-week waiting period for benefits (N.C. Gen. Stat. § 96-14.1(b));

ii.   the able to work and available to work requirements (N.C. Gen. Stat. § 96-14.9(b));

iii.  the work search requirements (N.C. Gen. Stat. § 96-14.9(b));

iv.   the actively seeking work requirements (N.C. Gen. Stat. § 96-14.9(e)); and

v.    the "lack of work" requirement of the unemployed provisions of N.C. Gen. Stat. § 96-15.01(b)(2)(a).

181

(b) The Department of Commerce is further directed not to allocate charges to employers' accounts for individuals who are paid benefits for reasons related to COVID-19 (N.C. Gen. Stat. § 96-11.2 and 96-11.3(b)). The Department of Commerce shall separately account for these expenditures so that the State of North Carolina can seek reimbursement from the federal government.

(c) If the Department of Commerce identifies other state laws, regulations, and policies that may inhibit the fair and timely distribution of unemployment benefits to those affected by COVID-19, it is directed to inform the Office of the Governor in writing. Upon written authorization from the Office of the Governor, the Department of Commerce may interpret flexibly, modify, or waive those state laws, regulations, and policies, as appropriate, to the maximum extent permitted under applicable federal law to effectuate the purposes of this Order.

(d) The Department of Commerce is ordered to postpone all mandatory in-person contact with individuals seeking unemployment benefits, including but not limited to the Employability Assessment Interview, as long as the State of Emergency for COVID-19 remains in effect. The Department of Commerce is further ordered to provide reasonable means for the filing of initial claims and weekly certifications, including both telephone and internet access.

### Section 4. Enforcement

(a) Pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the provisions of this Order shall be enforced by state and local law enforcement officers.

(b) Violations of this Order may be subject to prosecution pursuant to N.C. Gen. Stat. § 166A-19.30(d) and is punishable as a Class 2 misdemeanor in accordance with N.C. Gen. Stat. § 14-288.20A.

### Section 5.  Effective Date

Section 1 of this Executive Order is effective as of 5:00 pm, Tuesday, March 17, 2020 through March 31, 2020.  The remainder of this Executive Order is effective immediately and shall remain in effect until rescinded or superseded by another applicable Executive Order. An Executive Order rescinding the Declaration of a State of Emergency will automatically rescind this Executive Order.

**IN WITNESS WHEREOF,** I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 17th day of March in the year of our Lord two thousand and twenty.

_____
Roy Cooper
Governor

**ATTEST:**

_____
Rodney S. Maddox
Chief Deputy Secretary of State

MARCH 27, 2020

EXECUTIVE ORDER NO. 121

**STAY AT HOME ORDER AND STRATEGIC DIRECTIONS FOR NORTH CAROLINA IN RESPONSE TO INCREASING COVID-19 CASES**

**WHEREAS**, on March 10, 2020, the undersigned issued Executive Order No. 116 which declared a State of Emergency to coordinate the State's response and protective actions to address the Coronavirus Disease 2019 (COVID-19) public health emergency and to provide for the health, safety, and welfare of residents and visitors located in North Carolina ("Declaration of a State of Emergency"); and

**WHEREAS**, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic; and

**WHEREAS**, on March 13, 2020, the President of the United States declared the ongoing COVID-19 outbreak a pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS**, on March 13, 2020, the President of the United States pursuant to Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. § 1601, *et seq*. and consistent with Section 1135 of the Social Security Act, as amended (42 U.S.C. § 1320b-5), declared that the COVID-19 pandemic in the United States constitutes a national emergency, retroactive to March 1, 2020; and

**WHEREAS**, the undersigned has issued Executive Order Nos. 117 – 120 for the purposes of protecting the health, safety and welfare of the people of North Carolina; and

**WHEREAS**, on March 25, 2020, the President of the United States, pursuant to Section 401 of the Stafford Act, approved a Major Disaster Declaration, FEMA-4487-DR, for the State of North Carolina; and

**WHEREAS**, on March 27, 2020, the North Carolina Department of Health and Human Services ("NCDHHS") has documented 763 cases of COVID-19 across 60 counties, and has identified the occurrence of widespread community transmission of the virus; and

**WHEREAS**, hospital administrators and health care providers have expressed concerns that unless the spread of COVID-19 is limited, existing health care facilities may be insufficient to care for those who become sick; and

**WHEREAS**, to mitigate community spread of COVID-19 and to reduce the burden on the state's health care providers and facilities, it is necessary to limit unnecessary person-to-person contact in workplaces and communities; and

**WHEREAS**, such limitations on person-to-person contact are reasonably necessary to address the public health risk posed by COVID-19; and

**WHEREAS**, some areas of the state have seen more rapid and significant spread of COVID-19 than others, and some but not all local authorities have taken steps to address community spread of the illness in their communities; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(i), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because needed control cannot be imposed locally because not all local authorities have enacted such appropriate ordinances or issued such appropriate declarations restricting the operation of businesses and limiting person-to-person contact in workplaces and communities; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(ii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because some but not all local authorities have taken implementing steps under such ordinances or declarations, if issued, in order to effectuate  control over the emergency that has arisen; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because the area in which the emergency exists spreads across local jurisdictional boundaries and the legal control measures of the jurisdictions are conflicting or uncoordinated to the extent that efforts to protect life and property are, or unquestionably will be, severely hampered; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iv), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection of lives and property of North Carolinians because the scale of the emergency is so great that it exceeds the capability of local authorities to cope with it; and

**WHEREAS**, Executive Order No. 116 invoked the Emergency Management Act, and authorizes the undersigned to exercise the powers and duties set forth therein to direct and aid in the response to, recovery from, and mitigation against emergencies; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.10(b)(3) authorizes and empowers the undersigned to delegate any Gubernatorial vested authority under the Emergency Management Act and to provide for the subdelegation of any authority; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(1) authorizes the undersigned to prohibit and restrict the movement of people in public

places, including by: (a) imposing a curfew; (b) directing and compelling the voluntary or mandatory evacuation of people from an area; (c) prescribing routes, modes of transportation and destinations in connection with evacuation; (d) controlling the movement of persons within an emergency area; and (e) closing streets, roads, highways, and other areas ordinarily used for vehicular travel, except to the movement of persons necessary for recovery from the emergency; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(2) authorizes the undersigned to prohibit and restrict the operation of offices, business establishments and other places to and from which people may travel or at which they may congregate; and

**WHEREAS**, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(5) authorizes the undersigned to prohibit and restrict activities which may be reasonably necessary to maintain order and protect lives and property during a state of emergency; and

**WHEREAS**, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), during a Gubernatorially declared State of Emergency, the undersigned has the power to "give such directions to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this Article".

**NOW, THEREFORE**, by the authority vested in me as Governor by the Constitution and the laws of the State of North Carolina, **IT IS ORDERED**:

## Section 1. Stay at Home

1. **Stay at home or place of residence**.  All individuals currently in the State of North Carolina are ordered to stay at home, their place of residence, or current place of abode, (hereinafter "residence") except as allowed in this Executive Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible, maintain social distancing of at least six (6) feet from any other person, with the exception of family or household members, consistent with the Social Distancing Requirements set forth in this Executive Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Operations, or to participate in or access COVID-19 Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this Executive Order, but are strongly urged to obtain shelter that meets Social Distancing Requirements.  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.

2. **Prohibited and permitted travel**. Only travel for Essential Activities as defined herein is permitted. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into,

within, or out of the State to maintain COVID-19 Essential Businesses and Operations and Minimum Basic Operations.

3. **Leaving the home and travel for Essential Activities is permitted**. For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

    i. **For health and safety**. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members or persons who are unable to or should not leave their home (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional or veterinarian.

    ii. **For necessary supplies and services**. To obtain necessary services or supplies for themselves and their family or household members or persons who are unable or should not leave their home, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, automobile supplies (including sales, parts, supplies, repair and maintenance), and products necessary to maintain the safety, sanitation, and essential operation of residences or places of employment.

    iii. **For outdoor activity**. To engage in outdoor activity, provided individuals comply with Social Distancing Requirements and Mass Gatherings, as defined below, such as, by way of example and without limitation, walking, hiking, running, golfing, or biking. Individuals may go to public parks and open outdoor recreation areas. However, public playground equipment may increase spread of COVID-19, and therefore shall be closed.  These activities are subject to the limitations on events or convenings  in Section 3 of this Executive Order.

    iv. **For certain types of work**. To perform work at businesses authorized to remain open under Section 2 of this Executive Order (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Operations, and Essential Infrastructure Operations) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

    v. **To take care of others**. To care for or assist a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order. This includes attending weddings and funerals provided individuals comply with Social Distancing Requirements and Mass Gatherings as set forth below.

vi.   **Place of worship**.  Travel to and from a place of worship.

vii.  **To receive goods and services**.  To receive goods and services provided by a COVID-19 Essential Business or Operation.

viii. **Place of residence**.  To return to or travel between one's place or places of residence for purposes including, but not limited to, child custody or visitation arrangements.

ix.   **Volunteering**.  To volunteer with organizations that provide charitable and social services.

## Section 2.  COVID-19 Essential Businesses and Operations

In order to slow the spread of COVID-19, it is necessary to reduce the instances where individuals interact with one another in a manner inconsistent with the Social Distancing Requirements set forth below.  Many of those interactions occur at work.  At the same time, it is necessary that certain businesses, essential to the response to COVID-19, to the infrastructure of the State and nation, and to the day-to-day life of North Carolinians, remain open.

A. In light of the above considerations, non-essential business and operations must cease. All businesses and operations in the State, except COVID-19 Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses, including home-based businesses, may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

B. All COVID-19 Essential Businesses and Operations are directed, to the maximum extent possible, to direct employees to work from home or telework.

C. For purposes of this Executive Order, a COVID-19 Essential Business and Operation includes the following businesses, not-for-profit organizations and educational institutions.

1. **Businesses that meet Social Distancing Requirements.**  Businesses, not-for-profit organizations or educational institutions that conduct operations while maintaining Social Distancing Requirements:

   a.  Between and among its employees; and

   b.  Between and among employees and customers except at the point of sale or purchase.

187

2. **Businesses operating in CISA identified sectors.**   Businesses, not-for-profit organizations or educational institutions operating in the federal critical infrastructure sectors as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19 or any subsequent guidance issued by the U.S. Department of Homeland Security that amends or replaces said guidance.

3. **Healthcare and Public Health Operations.**  Healthcare and Public Health Operations includes, but is not limited to:  hospitals; clinics; dental offices; pharmacies; laboratories and laboratory service providers; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology and agricultural biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; obstetricians and gynecologists; eye care centers, including those that sell glasses and contact lenses; dietary supplement retailers; naturopathic healthcare providers; home healthcare services providers; local management entities/managed care organizations (LME/MCO); mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, or public health operations broadly defined.  Healthcare and Public Health Operations does not include those businesses ordered to close by Executive Order No. 120.

4. **Human Services Operations.**  Human Services Operations includes, but is not limited to: long-term care facilities; child care centers, family child care homes; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs, including food, cash assistance, medical coverage, child care, child support services, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, social services, transportation and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

5. **Essential Infrastructure Operations.**  Essential Infrastructure Operations includes, but is not limited to:  food and beverage production, distribution, fulfillment centers, storage facilities; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long term care facilities, public works construction, school construction, and essential commercial and housing construction); building and grounds management and maintenance including landscaping; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video and telecommunications systems (including the provision of essential global, national and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure Operations shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

6. **Essential Governmental Operations.**  Essential Governmental Operations means all services provided by the State or any municipality, township, county, political subdivision, board, commission or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Governmental Operations.  Each government body shall determine its Essential Governmental Operations and identify employees and/or contractors necessary to the performance of those functions.

For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, legislators, judges, court personnel, jurors and grand jurors, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support COVID-19 Essential Businesses and Operations are categorically exempt from this Executive Order.

This Executive Order does not apply to the United States government.  Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Operations.  Nothing in this Executive Order rescinds, amends, or otherwise modifies Section 2 of Executive Order No. 120.

7. **Stores that sell groceries and medicine**. Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, prepared food, alcoholic and nonalcoholic beverages, any other household consumer products (such as

189

cleaning and personal care products), and specifically includes their supply chain and administrative support operations. This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and COVID-19 Essential Businesses and Operations.

8. **Food, beverage production and agriculture.**   Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, forestry, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; and businesses that provide food, shelter, services and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities.

9. **Organizations that provide charitable and social services.**   Businesses as well as religious and secular not-for-profit organizations, including food banks, when providing food, shelter, social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities.

10. **Religious entities.**   Religious facilities, entities, groups, gatherings, including funerals. Also, services, counseling, pastoral care, and other activities provided by religious organizations to the members of their faith community.  All of these functions are subject to the  limitations on events or convenings in Section 3 of this Executive Order.

11. **Media.**   Newspapers, television, radio, film, and other media services.

12. **Gas stations and businesses needed for transportation.**   Gas stations and auto supply, sales, tire, auto-repair, roadside assistance and towing services, farm equipment, construction equipment, boat repair, and related facilities and bicycle shops and related facilities.

13. **Financial and insurance institutions.**   Bank, currency exchanges, consumer lenders, including but not limited to, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products. Also insurance companies, underwriters, agents, brokers, and related insurance claims and agency services.

14. **Home improvement, hardware and supply stores**.   Home improvement, building supply, hardware stores, and businesses that sell building materials and supplies, electrical, plumbing, and heating materials.

15. **Critical trades**.   Building and construction tradesmen and tradeswomen, and other trades, including but not limited to, plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, cleaning services, moving and relocation services, landscaping and other service providers who provide services that are necessary to maintaining the safety,

190

sanitation, and essential operation of residences and COVID-19 Essential Businesses and Operations. This includes organizations that represent employees.

16. **Mail, post, shipping, logistics, delivery, and pick-up services.**  Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods, vehicles or services to end users or through commercial channels.

17. **Educational institutions.**  Educational institutions including public and private pre-K-12 schools, colleges, and universities for purposes of facilitating remote learning, performing critical research, or performing essential functions, provided that  the Social Distancing Requirements set forth below of this Executive Order are maintained to the greatest extent possible.  This Executive Order is consistent with and does not amend or supersede prior Executive Orders regarding the closure of public schools.

18. **Laundry services.**  Laundromats, dry cleaners, industrial laundry services, and laundry service providers.

19. **Restaurants for consumption off-premises.**  Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that provide free food services to students or members of the public may continue to do so under this Executive Order when the food is provided for carry-out, drive-through or delivery. This Executive Order is consistent with and does not amend or supersede prior COVID-19 related Executive Orders restricting the operations of restaurants and temporarily closing bars.

20. **Supplies to work from home.**  Businesses that sell, manufacture, or supply office supply products or other products needed for people to work from home.

21. **Supplies for COVID-19 Essential Businesses and Operations.**  Businesses that sell, manufacture, support, or supply other COVID-19 Essential Businesses and Operations with the service or materials necessary to operate, including computers, audio and video electronics, household appliances; payroll processing and related services; IT and telecommunication equipment; elections personnel and election-related equipment supplies; hardware, paint, flat glass, electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; and diagnostics, food and beverages, chemicals, soaps and detergent.

22. **Transportation.**  Airlines, taxis, automobile dealers, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, trains, marinas, docks, boat storage, and other private, public, and commercial transportation and logistics providers, and public transportation necessary to access COVID-19 Essential Businesses and Operations.

23. **Home-based care and services.**  Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders,

and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery.

24. **Residential facilities and shelters.**  Residential facilities and shelters for adults, seniors, children, pets, and/or people with developmental disabilities, intellectual disabilities, victims of domestic violence, people experiencing homelessness, substance use disorders, and/or mental illness.

25. **Professional services.**  Professional services, such as legal services, accounting services, insurance services, professional engineering and architectural services, land surveying services, real estate services (including brokerage, appraisal and title services) and tax preparation services.

26. **Manufacture, distribution, and supply chain for critical products and industries.** Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, communications, as well as products used or commonly sold by other COVID-19 Essential Businesses and Operations.

27. **Defense and military contractors.** Defense and military contractors that develop products, processes, equipment, technology, and related services that serve the United States military, national defense, and national security interests.

28. **Hotels and motels.**  Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

29. **Funeral Services.**  Funeral, mortuary, cremation, burial, cemetery, and related services. These services are subject to the limitations on events or convenings in Section 3 of this Executive Order.

30. **Additional COVID-19 Essential Retail Businesses.**  Additional COVID-19 Essential Retail Businesses are:

   - Electronic retailers that sell or service cell phones, computers, tablets, and other communications technology;
   - Lawn and garden equipment retailers;
   - Book stores that sell educational material;
   - Beer, wine, and liquor stores;
   - Retail functions of gas stations and convenience stores;
   - Retail located within healthcare facilities;
   - Pet and feed stores.

D. All COVID-19 Essential Businesses and Operations shall, to the extent practicable, maintain the Social Distancing Requirements set forth in this Executive Order.

E.   "Social Distancing Requirements" as used in this Executive Order means:

    a.   maintaining at least six (6) feet distancing from other individuals;

    b.   washing hands using soap and water for at least twenty (20) seconds as frequently as possible or the use of hand sanitizer;

    c.   regularly cleaning high-touch surfaces;

    d.   facilitating online or remote access by customers if possible.

F.   Businesses excluded from the list of COVID-19 Essential Businesses and Operations set forth in this Executive Order who believe that they may be essential may direct requests to be included to the North Carolina Department of Revenue (the "Department"). The Department may grant such request if it determines that it is in the best interest of the State to have the business continue operations in order to properly respond to this COVID-19 pandemic. The Department shall post on its website a point of contact and procedure for businesses seeking to be designated as essential.  A business that has made a request to the Department to be included as a COVID-19 Essential Business or Operation may continue to operate until that request is acted upon.

G.   Businesses that are not COVID-19 Essential Businesses and Operations are required to cease all activities within the State except Minimum Basic Operations, as defined below.  Businesses that are not COVID-19 Essential Businesses and Operations should comply with Social Distancing Requirements, to the maximum extent possible, when carrying out their Minimum Basic Operations.

    As used in this Executive Order, "Minimum Basic Operations" include the following:

    i)   The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or related functions.

    ii)   The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

H.   Notwithstanding any other provision of this Executive Order, the businesses, not-for-profit organizations and educational institutions that were ordered closed by Executive Order Nos. 118 and 120 shall remain closed.

## Section 3.  Mass Gatherings

For the reasons and pursuant to the authority set forth above:

A.   Section 1(a) of Executive Order Nos. 117 and 120 is rescinded and replaced as follows:

193

1. A mass gathering is defined as any event or convening that brings together more than ten (10) persons in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, or any other confined indoor or outdoor space. This includes parades, fairs and festivals.

2. A mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers.  It also does not include any COVID-19 Essential Business or Operation as defined in this Executive Order.

3. Notwithstanding the above, and in an effort to promote human dignity and limit suffering, funerals are permitted to include no more than fifty (50) persons, while observing Social Distancing Requirements to the extent practicable.

4. Pursuant to N.C. Gen. Stat. §§ 166A-19.30(a)(2), -19.30(c) the provisions of this section shall be enforced by state and local law enforcement officers.

The remainder of Executive Order Nos. 117 and 120 continue to be in effect.

## Section 4. Local Orders

A. The undersigned recognizes that the impact of COVID-19 has been and will likely continue to be different in different parts of North Carolina.  Urban areas have seen more rapid and significant spread than most rural areas of the state.  As such, the undersigned acknowledges that counties and cities may deem it necessary to adopt ordinances and issue state of emergency declarations which impose restrictions or prohibitions to the extent authorized under North Carolina law, such as on the activity of people and businesses, to a greater degree than in this Executive Order.  To that end, nothing herein is intended to limit or prohibit counties and cities in North Carolina from enacting ordinances and issuing state of emergency declarations which impose greater restrictions or prohibitions to the extent authorized under North Carolina law.

B. Notwithstanding the language in paragraph (A) of this Section, no county or city ordinance or declaration shall have the effect of restricting or prohibiting COVID-19 Essential Governmental Operations of the State as determined by the State.

C. Nothing in this Executive Order rescinds, amends, or otherwise modifies Section 2 of Executive Order No. 120.

## Section 5.  Savings Clause

If any provision of this Executive Order or its application to any person or circumstances is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application.  To achieve this purpose, the provisions of this Executive Order are declared to be severable.

194

**Section 6.  Enforcement**

A.  Pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the provisions of this Executive Order shall be enforced by state and local law enforcement officers.

B.  A violation of this Executive Order may be subject to prosecution pursuant to N.C. Gen. Stat. § 166A-19.30(d), and is punishable as a Class 2 misdemeanor in accordance with N.C. Gen. Stat. § 14-288.20A.

C.  Nothing in this Executive Order shall be construed to preempt or overrule a court order regarding an individual's conduct (e.g., a Domestic Violence Protection Order or similar orders limiting an individual's access to a particular place).

**Section 7.  Effective Date**

This Executive Order is effective Monday, March 30, 2020, at 5:00pm, and shall remain in effect for thirty (30) days from that date or unless repealed, replaced, or rescinded by another applicable Executive Order.  An Executive Order rescinding the Declaration of the State of Emergency will automatically rescind this Executive Order.

**IN WITNESS WHEREOF,** I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 27th  day of  March  in the year of our Lord two thousand and twenty.

_____
Roy Cooper
Governor

**ATTEST:**

_____
Rodney S. Maddox
Chief Deputy Secretary of State

195



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*PROCLAMATION OF DISASTER EMERGENCY*

*March 6, 2020*

*WHEREAS, a novel coronavirus (now known as "COVID-19") emerged in Wuhan, China, began infecting humans in December 2019, and has since spread to 89 countries, including the United States; and*

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared COVID-19 a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, the Commonwealth of Pennsylvania ("Commonwealth") has been working in collaboration with the CDC, HHS, and local health agencies since December 2019 to monitor and plan for the containment and subsequent mitigation of COVID-19; and*

*WHEREAS, on February 1, 2020, the Commonwealth's Department of Health activated its Department Operations Center at the Pennsylvania Emergency Management Agency's headquarters to conduct public health and medical coordination for COVID-19 throughout the Commonwealth; and*

*WHEREAS, on March 4, 2020, the Director of the Pennsylvania Emergency Management Agency ordered the activation of its Commonwealth Response Coordination Center in support of the Department of Health's Department Operations Center, to maintain situational awareness and coordinate the response to any potential COVID-19 impacts across the Commonwealth; and*

*WHEREAS, as of March 6, 2020, there are 233 confirmed and/or presumed positive cases of COVID-19 in the United States, including 2 presumed positive cases in the Commonwealth; and*

*WHEREAS, while it is anticipated that a high percentage of those affected by COVID-19 will experience mild influenza-like symptoms, COVID-19 is a disease capable of causing severe symptoms or loss of life, particularly to older populations and those individuals with pre-existing conditions; and*

*WHEREAS, it is critical to prepare for and respond to suspected or confirmed cases in the Commonwealth and to implement measures to mitigate the spread of COVID-19; and*

*WHEREAS, with 2 presumed positive cases in the Commonwealth as of March 6, 2020, the possible increased threat from COVID-19 constitutes a threat of imminent disaster to the health of the citizens of the Commonwealth; and*

*WHEREAS, this threat of imminent disaster and emergency has the potential to cause significant adverse impacts upon the population throughout the Commonwealth; and*

*WHEREAS, this threat of imminent disaster and emergency has already caused schools to close, and will likely prompt additional local measures, including affected county and municipal governments to declare local disaster emergencies because of COVID-19; and*

*WHEREAS, this threat of imminent disaster and emergency situation throughout the Commonwealth is of such magnitude and severity as to render essential the Commonwealth's supplementation of emergency resources and mutual aid to the county and municipal governments of this Commonwealth and to require the activation of all applicable state, county, and municipal emergency response plans.*

*NOW THEREFORE, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7101, et seq., I do hereby proclaim the existence of a disaster emergency throughout the Commonwealth.*

*FURTHER, I hereby authorize the Pennsylvania Emergency Management Agency Director or his designee, to assume command and control of all statewide emergency operations and authorize and direct that all Commonwealth departments and agencies utilize all available resources and personnel as is deemed necessary to cope with this emergency situation.*

*FURTHER, I hereby transfer up to $5,000,000 in unused appropriated funds to the Pennsylvania Emergency Management Agency for Emergency Management Assistance Compact expenses related to this emergency, to be decreased as conditions require, pursuant to the provisions of section 7604(a) of the Emergency Management Services Code, 35 Pa. C.S. § 7604(a). In addition, I hereby transfer up to $20,000,000 in unused appropriated funds, to be decreased as conditions require, to the Pennsylvania Emergency Management Agency pursuant to section 1508 of the Act of April 9, 1929 (P.L.343, No. 176) (the Fiscal Code), 72 P.S. § 1508. The aforementioned funds shall be used for expenses authorized and incurred related to this emergency. These funds shall be credited to a special account established by the Office of the Budget. I hereby direct that any funds transferred herein that remain unused after all costs related to this emergency have been satisfied shall be returned to the General Fund.*

*FURTHER, All Commonwealth agencies purchasing supplies or services in response to this emergency are authorized to utilize emergency procurement procedures set forth in Section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. § 516. This Proclamation shall serve as the written determination of the basis for the emergency under Section 516.*

*FURTHER, I hereby suspend the provisions of any regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder, or delay necessary action in coping with this emergency. Commonwealth agencies may implement emergency assignments without regard to procedures required by other laws, except mandatory constitutional requirements, pertaining to performance of public work, entering into contracts, incurring of obligations, employment of temporary workers, rental of equipment, purchase of supplies and materials, and expenditures of public funds.*

*FURTHER, pursuant to the powers vested in me by the Constitution and laws of the Commonwealth pursuant to 51 Pa. C.S. § 508, I hereby authorize the Adjutant General of Pennsylvania to place on state active duty for the duration of the emergency disaster proclamation, such individuals and units of the Pennsylvania National Guard, for missions designated by the Pennsylvania Emergency Management Agency, as are needed to address the consequences of the aforementioned emergency.*

*FURTHER, I authorize the Commissioner of the Pennsylvania State Police to use all available resources and personnel in whatever manner he deems necessary during this emergency to assist the actions of the Pennsylvania Emergency Management Agency in addressing the consequences of the emergency.*

*FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Health, in her sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Health is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.*

*FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Education, in his sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Education is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.*

*FURTHER, if investigations made on my behalf determine that the Commonwealth needs greater flexibility in the application of state and federal motor carrier regulations to accommodate truck drivers involved in emergency activities during this emergency, I hereby direct the Commonwealth Department of Transportation to waive or suspend any laws or federal or state regulations related to the drivers of commercial vehicles.*

*FURTHER, I hereby direct that the applicable emergency response and recovery plans of the Commonwealth, counties, municipalities and other entities be activated as necessary and that actions taken to implement those plans be coordinated through the Pennsylvania Emergency Management Agency.*

*STILL FURTHER, I hereby urge the governing bodies and executive officers of all political subdivisions affected by this emergency to act as necessary to meet the current exigencies as legally authorized under this Proclamation, namely, by the employment of temporary workers, by the rental of equipment, and by entering into such contracts and agreements as may be required to meet the emergency, all without regard to those time consuming procedures and formalities normally prescribed by law, mandatory constitutional requirement excepted.*



*GIVEN under my hand and the Seal of the Governor, at the City of Harrisburg, this sixth day of March in the year of our Lord two thousand twenty, and of the Commonwealth the two hundred and forty fourth.*

**TOM WOLF**
*Governor*

198



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*ORDER OF*

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING*

**WHEREAS**, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and

**WHEREAS**, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and

**WHEREAS**, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters.  35 Pa. C.S. § 7301(a); and

**WHEREAS**, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles.  35 Pa. C.S. § 7301(f); and

**WHEREAS**, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law.  35 Pa. C.S. § 7301(b); and

**WHEREAS**, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and

**WHEREAS**, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.

**NOW THEREFORE**, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:

Section 1:     *Prohibition on Operation of Businesses that are not Life Sustaining*

All prior orders and guidance regarding business closures are hereby superseded.

No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.

Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.  A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.

199

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

   *Section 2:      Prohibition on Dine-In Facilities including Restaurants and Bars*

   *All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

   *Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

*Section 3:      Effective Date and Duration*

   *This order is effective immediately and will remain in effect until further notice.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*ORDER OF*

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA*

*FOR INDIVIDUALS TO STAY AT HOME*

*WHEREAS,* the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and

*WHEREAS,* as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and

*WHEREAS,* I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters.  35 Pa. C.S. § 7301(a); and

*WHEREAS,* in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein. 35 Pa. C.S. § 7301(f); and

*WHEREAS,* in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law.  35 Pa. C.S. § 7301(b); and

*WHEREAS,* in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and

*WHEREAS,* these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.

*NOW THEREFORE,* pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:

*Section 1: Order to Stay at Home*

*All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County are ordered to stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services. For employees of life sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020 business closure Orders.*

201

*A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.*

*Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.*

*Enforcement of this Order will commence at 8:00 PM on Monday, March 23, 2020.*

*Section 2: Effective Date and Duration*

*This order is effective immediately and will remain in effect for a period of two weeks, specifically until April 6, 2020.*

*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this twenty-third day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*

202



GOVERNOR GREG ABBOTT

March 19, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:59 Am O'CLOCK
MAR 19 2020
Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

      Executive Order No. GA-08 relating to COVID-19 preparedness and mitigation.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# Executive Order

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 19, 2020**

### EXECUTIVE ORDER
### GA 08

*Relating to COVID-19 preparedness and mitigation.*

———————————

WHEREAS, the novel coronavirus (COVID-19) has been recognized globally as a contagious respiratory virus; and

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying that COVID-19 poses an imminent threat of disaster for all counties in the state of Texas; and

WHEREAS, COVID-19 continues to spread and to pose an increasing, imminent threat of disaster throughout Texas; and

WHEREAS, the Centers for Disease Control and Prevention (CDC) has advised that person-to-person contact heightens the risk of COVID-19 transmission; and

WHEREAS, the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the CDC on March 16, 2020, call upon Americans to slow the spread of COVID-19 by avoiding social gatherings in groups of more than 10 people, using drive-thru, pickup, or delivery options at restaurants and bars, and avoiding visitation at nursing homes, among other steps; and

WHEREAS, the Texas Department of State Health Services has now determined that, as of March 19, 2020, COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, under the Texas Disaster Act of 1975, "[t]he governor is responsible for meeting . . . the dangers to the state and people presented by disasters" (Section 418.001 of the Texas Government Code), and the legislature has given the governor broad authority to fulfill that responsibility.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective 11:59 p.m. on March 20, 2020, and continuing until 11:59 p.m. on April 3, 2020, subject to extension thereafter based on the status of COVID-19 in Texas and the recommendations of the CDC:

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:59 AM  O'CLOCK

MAR 1 9 2020

204

*Governor Greg Abbott*                                              *Executive Order GA-08*
March 19, 2020                                                              Page 2

Order No. 1    In accordance with the Guidelines from the President and the
               CDC, every person in Texas shall avoid social gatherings in
               groups of more than 10 people.

Order No. 2    In accordance with the Guidelines from the President and the
               CDC, people shall avoid eating or drinking at bars, restaurants,
               and food courts, or visiting gyms or massage parlors; provided,
               however, that the use of drive-thru, pickup, or delivery options
               is allowed and highly encouraged throughout the limited
               duration of this executive order.

Order No. 3    In accordance with the Guidelines from the President and the
               CDC, people shall not visit nursing homes or retirement or
               long-term care facilities unless to provide critical assistance.

Order No. 4    In accordance with the Guidelines from the President and the
               CDC, schools shall temporarily close.

This executive order does not prohibit people from visiting a variety of places,
including grocery stores, gas stations, parks, and banks, so long as the necessary
precautions are maintained to reduce the transmission of COVID-19. This
executive order does not mandate sheltering in place. All critical infrastructure
will remain operational, domestic travel will remain unrestricted, and government
entities and businesses will continue providing essential services. For offices and
workplaces that remain open, employees should practice good hygiene and, where
feasible, work from home in order to achieve optimum isolation from COVID-19.
The more that people reduce their public contact, the sooner COVID-19 will be
contained and the sooner this executive order will expire.

This executive order supersedes all previous orders on this matter that are in
conflict or inconsistent with its terms, and this order shall remain in effect and in
full force until 11:59 p.m. on April 3, 2020, subject to being extended, modified,
amended, rescinded, or superseded by me or by a succeeding governor.

Given under my hand this the
19th day of March, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:59 AM O'CLOCK

MAR 1 9 2020

205



**Commissioner John W. Hellerstedt, M.D.**

**DECLARATION OF A PUBLIC HEALTH DISASTER IN THE STATE OF TEXAS**

**March 19, 2020**

TO ALL TO WHOM THESE PRESENTS SHALL COME:

I, John W. Hellerstedt, M.D., Commissioner of the Department of State Health Services, do hereby certify that the introduction and spread of the communicable disease known as COVID-19 in the State of Texas has created an immediate threat, poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas.

THEREFORE, in accordance with the authority vested in me by Section 81.082(d) of the Texas Health and Safety Code, I do hereby declare a state of public health disaster for the entire State of Texas.

Pursuant to Section 81.002 of the code, each person shall act responsibly to prevent and control communicable disease.  The following actions, taken immediately, will reduce and delay the spread of COVID-19:

- People, businesses and communities should immediately undertake hygiene, cleanliness and sanitation practices that are accessible, affordable and known to be effective against COVID-19.
    - Wash hands often for 20 seconds and encourage others to do the same.
    - If no soap and water are available, use hand sanitizer with at least 60% alcohol.
    - Cover coughs and sneezes with a tissue, then throw the tissue away.
    - Avoid touching your eyes, nose, and mouth with unwashed hands.
    - Disinfect surfaces, buttons, handles, knobs, and other places touched often.
    - Avoid close contact with people who are sick.
- People who are known to have, or are under investigation or monitoring, for COVID-19, should adhere to the direction provided to them by duly authorized persons, including public health officials.  Failure to abide by such direction may result in involuntary quarantine or isolation for the purposes of preventing further community spread of COVID-19.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:45ᴬᴹ O'CLOCK

MAR 1 9 2020

Page **1** of **2**

206

- People who are ill, especially those with symptoms consistent with influenza or COVID-19, should isolate themselves at home until they recover.  Such persons should only present for medical evaluation and treatment if their symptoms are such that they cannot continue to be cared for in their home.  And, when seeking medical care should call their doctor or health care facility before arriving to allow them to prepare.
- Limit trips into the public to essential outings.  Traveling to work, the grocery store, the pharmacy or to seek medical care would be considered essential trips.
- Limit as much as possible close contact with other people.  Stay six feet away.
- Do not gather in social groups of more than ten (10) individuals.
- Employers should allow work at home alternatives to the greatest extent possible.
- Restaurants should not allow dine-in options, either inside or outside.  Take-out and curbside options with minimal contact are permitted and highly encouraged.

The Texas Department of State Health Services will continue to provide the most current and practical advice on how to control the spread of COVID-19 and encourages all Texans to seek additional information from a trusted source such as https://www.dshs.texas.gov/coronavirus/ or from the Centers for Disease Control and Prevention at https://www.cdc.gov/coronavirus/.

Adherence to these rules and the sound public health principles that support them will provide optimal protection for the people of Texas.  These measures are necessary to advance the health and safety of all Texans.

Copies of this proclamation will be filed with applicable authorities.

Given under my hand this the

19 day of March, 2020.

JOHN W. HELLERSTEDT, M.D.
Commissioner of Public Health

ATTESTED BY:

Ruth Hughs
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:45AM O'CLOCK

MAR 1 9 2020

207



GOVERNOR GREG ABBOTT

March 31, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___2 PM___ O'CLOCK

MAR 3 1 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

> Executive Order No. GA-14 relating to statewide continuity of essential services and activities during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# Executive Order

### BY THE
### GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 31, 2020**

### EXECUTIVE ORDER
### GA 14

*Relating to statewide continuity of essential services and activities*
*during the COVID-19 disaster.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued numerous executive orders and suspensions of Texas laws in response to the COVID-19 disaster, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating certain obligations for Texans in accordance with the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC) on March 16, 2020, which called upon Americans to take actions to slow the spread of COVID-19 for 15 days; and

WHEREAS, Executive Order GA-08 is subject to expiration at 11:59 p.m. on April 3, 2020, absent further action by the governor; and

WHEREAS, on March 29, 2020, to avoid scenarios that could lead to hundreds of thousands of deaths, the President announced that, based on advice from Dr. Anthony Fauci and Dr. Deborah Birx, the restrictive social-distancing Guidelines should extend through April 30, 2020; and

WHEREAS, DSHS Commissioner Dr. Hellerstedt and White House Coronavirus Response Coordinator Dr. Birx say that the spread of COVID-19 can be reduced by minimizing social gatherings; and

WHEREAS, on March 28, 2020, the U.S. Department of Homeland Security issued its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, which provides an advisory list of critical-infrastructure sectors, workers, and functions that should continue during the COVID-19 response; and

WHEREAS, for state agencies and their employees and agents, the Office of the Attorney General of Texas has advised that local restrictions issued in response to the COVID-19 disaster do not apply to restrict the conduct of state business; and

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___2 PM___ O'CLOCK

MAR 3 1 2020 209

WHEREAS, all government entities and businesses should be allowed to continue providing essential services during the COVID-19 disaster, and all critical infrastructure should be allowed to remain operational; and

WHEREAS, the "governor is responsible for meeting … the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders … hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business … if strict compliance with the provisions … would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and

WHEREAS, under Section 418.017(a), the "governor may use all available resources of state government and of political subdivisions that are reasonably necessary to cope with a disaster;" and

WHEREAS, under Section 418.018(c), the "governor may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area;" and

WHEREAS, under Section 418.173, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable by a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both fine and confinement.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective 12:01 a.m. on April 2, 2020, and continuing through April 30, 2020, subject to extension based on the status of COVID-19 in Texas and the recommendations of the CDC and the White House Coronavirus Task Force:

In accordance with guidance from DSHS Commissioner Dr. Hellerstedt, and to achieve the goals established by the President to reduce the spread of COVID-19, every person in Texas shall, except where necessary to provide or obtain essential services, minimize social gatherings and minimize in-person contact with people who are not in the same household.

"Essential services" shall consist of everything listed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, plus religious services conducted in churches, congregations, and houses of worship. Other essential services may be added to this list with the approval of the Texas Division of Emergency Management (TDEM). TDEM shall maintain an online list of essential services, as specified in this executive order and in any approved additions. Requests for additions should be directed to TDEM at EssentialServices@tdem.texas.gov or by visiting www.tdem.texas.gov/essentialservices.

In providing or obtaining essential services, people and businesses should follow the Guidelines from the President and the CDC by practicing good hygiene, environmental cleanliness, and sanitation, implementing social distancing, and working from home if possible. In particular, all services should be provided through remote telework from

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2PM        O'CLOCK

MAR 3 1 2020

home unless they are essential services that cannot be provided through remote telework. If religious services cannot be conducted from home or through remote services, they should be conducted consistent with the Guidelines from the President and the CDC by practicing good hygiene, environmental cleanliness, and sanitation, and by implementing social distancing to prevent the spread of COVID-19.

In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, or visiting gyms, massage establishments, tattoo studios, piercing studios, or cosmetology salons; provided, however, that the use of drive-thru, pickup, or delivery options for food and drinks is allowed and highly encouraged throughout the limited duration of this executive order.

This executive order does not prohibit people from accessing essential services or engaging in essential daily activities, such as going to the grocery store or gas station, providing or obtaining other essential services, visiting parks, hunting or fishing, or engaging in physical activity like jogging or bicycling, so long as the necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize in-person contact with people who are not in the same household.

In accordance with the Guidelines from the President and the CDC, people shall not visit nursing homes, state supported living centers, assisted living facilities, or long-term care facilities unless to provide critical assistance as determined through guidance from the Texas Health and Human Services Commission.

In accordance with the Guidelines from the President and the CDC, schools shall remain temporarily closed to in-person classroom attendance and shall not recommence before May 4, 2020.

This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts essential services allowed by this executive order or allows gatherings prohibited by this executive order. I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

This executive order supersedes Executive Order GA-08, but not Executive Orders GA-09, GA-10, GA-11, GA-12, or GA-13, and shall remain in effect and in full force until April 30, 2020, unless it is modified, amended, rescinded, or superseded by the governor.

Given under my hand this the 31st day of March, 2020.

GREG ABBOTT
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2 PM O'CLOCK

MAR 3 1 2020
211

*Governor Greg Abbott*
March 31, 2020

*Executive Order GA-14*
Page 4

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___2 PM___O'CLOCK
MAR 3 1 2020

212

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**

**ADMINISTRATIVE ISSUANCE SYSTEM**

Mayor's Order 2020-046
March 11, 2020

**SUBJECT:**   Declaration of Public Health Emergency: Coronavirus (COVID-19)

**ORIGINATING AGENCY:**        Office of the Mayor

By virtue of the authority vested in the Mayor of the District of Columbia pursuant to section 422(11) of the District of Columbia Home Rule Act, approved December 24, 1973, 87 Stat. 790, Pub. L. No. 93-198, D.C. Official Code § 1-204.22(11) (2016 Repl.), in accordance with section 5 of the District of Columbia Public Emergency Act of 1980, effective March 5, 1981, D.C. Law 3-149, D.C. Official Code § 7-2304 (2018 Repl.), and section 5a of District of Columbia Public Emergency Act of 1980, effective October 17, 2002, D.C. Law 14-194, D.C. Official Code § 7-2304.01 (2018 Repl.), it is hereby **ORDERED** that:

**I.    FINDINGS AND DECLARATION (NATURE OF A PUBLIC HEALTH EMERGENCY)**

A.   This Order follows upon the Mayor's Order 2020-045, dated March 11, 2020, declaring a Public Emergency in the District of Columbia.

B.   There is reasonable cause to believe that there is an imminent hazard of or actual occurrence of widespread exposure to an infectious agent (COVID-19) that poses a significant risk of substantial future harm to a large number of people in the District of Columbia.

C.   On January 31, 2020, the United States Department of Health and Human Services declared a public health emergency (PHE) for the United States to aid the nation's health care community in responding to COVID-19.  There have been several presumptive and confirmed cases of COVID-19 in the Washington, DC metropolitan region.  COVID-19 has been detected in numerous states, with more than 1,000 confirmed cases and at least 29 fatalities in the United States.  The World Health Organization and the Centers for Disease Control and Prevention (CDC) have declared COVID-19 to be a "public health emergency of international concern" (PHEIC).  On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

D.   Cities in the United States and foreign cities experiencing COVID-19 outbreaks have had significant health, safety, and economic impacts on their residents, businesses, and visitors. Mandatory quarantines, self-isolation, business supply chain interruptions, and cancellations of college classes and conventions are increasingly affecting peoples' lives and livelihoods.

213

E.   The person-to-person spread of COVID-19 and the increased availability of testing kits make it virtually certain that the District of Columbia will have more confirmed cases and that COVID-19 will have significant impacts on District of Columbia residents, businesses, visitors, students, and at-risk populations.

F.   The spread of COVID-19 is an imminent threat to the health, safety, and welfare of District residents that requires emergency protective actions be undertaken by the District Government.

G.   By this Order, a public health emergency is declared in the District of Columbia, effective immediately.

## II.   EMERGENCY MEASURES AND REQUIREMENTS

A.   The Mayor's Chief of Staff, in consultation with the Communications Director, shall direct all public communications and maintain coronavirus.dc.gov as a central repository for all government information relating to COVID-19 response.

B.   Within one (1) day of this Order, the Director of the Department of Health (DOH) shall issue an administrative order, approved by the City Administrator and in consultation with the Deputy Mayor for Health and Human Services, consistent with and authorized by section 5a(d) of the Public Health Protection Amendment Act, D.C. Official Code § 7-2304.01(d), and may issue updates during the period of this emergency, and notwithstanding any other laws or rules to the contrary.

C.   This Order shall apply to all departments, agencies, and instrumentalities of the District Government as necessary or appropriate to implement this Order.

## III.   DURATION OF ORDER

This Order shall remain in effect until fifteen (15) days after its effective date, unless earlier rescinded or superseded.

## IV.   EFFECTIVE DATE:   This Order shall become effective immediately.

MURIEL BOWSER
**MAYOR**

**ATTEST:** _____

**KIMBERLY A. BASSETT**
**SECRETARY OF STATE OF THE DISTRICT OF COLUMBIA**

214

GOVERNMENT OF THE DISTRICT OF COLUMBIA

ADMINISTRATIVE ISSUANCE SYSTEM

Mayor's Order 2020-053
March 24, 2020

**SUBJECT**:   Closure of Non-Essential Businesses and Prohibition on Large Gatherings During Public Health Emergency for the 2019 Novel Coronavirus (COVID-19)

**ORIGINATING AGENCY**:        Office of the Mayor

By virtue of the authority vested in me as Mayor of the District of Columbia pursuant to section 422 of the District of Columbia Home Rule Act, approved December 24, 1973, Pub. L. 93-198, 87 Stat. 790, D.C. Official Code § 1-204.22 (2016 Repl.); in accordance with the COVID-19 Response Emergency Amendment Act of 2020, effective March 17, 2020, D.C. Act 23-247, and any substantially similar subsequent emergency or temporary legislation; section 5 of the District of Columbia Public Emergency Act of 1980, effective March 5, 1981, D.C. Law 3-149, D.C. Official Code § 7-2304 (2018 Repl.); section 5a of the District of Columbia Public Emergency Act of 1980, effective October 17, 2002, D.C. Law 14-194, D.C. Official Code § 7-2304.01 (2018 Repl.); and section 1 of An Act To Authorize the Commissioners of the District of Columbia to make regulations to prevent and control the spread of communicable and preventable diseases, approved August 11, 1939, 53 Stat. 1408, D.C. Official Code §§ 7-131 *et seq.* (2012 Repl.), it is hereby **ORDERED** that:

## I.   BACKGROUND

1.   This Order is issued based on the increasing number of confirmed cases of COVID-19 within Washington, DC, and throughout the metropolitan Washington region. Scientific evidence and public health practices show that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through limiting public activities and engaging in social distancing. The age and health of a significant portion of the population of Washington, DC places thousands of residents at risk for serious health complications, including death, from COVID-19.

2.   Due to the outbreak of the COVID-19 virus, Mayor's Order 2020-045, dated March 11, 2020, and Mayor's Order 2020-046, dated March 11, 2020 declared a public emergency and public health emergency. Mayor's Order 2020-050, dated March 20, 2020, extended those declarations of a public emergency and public health emergency through April 24, 2020. Mayor's Order 2020-048, dated March 16, 2020, Mayor's Order 2020-051, dated March 20, 2020, and several directives from the Department of Health provided for additional steps required to protect public health. In addition, the President declared a national emergency on March 13, 2020, and the World Health Organization on March 11, 2020, characterized COVID-19 as a pandemic.  Further, the COVID-19 Emergency

Response Amendment Act of 2020 (D.C. Act 23-247), which was approved by the Council and the Mayor on March 17, 2020, provides the District government with additional tools to address COVID-19.

3.     Medical and public health experts agree that COVID-19 is easily transmitted and it is essential that its spread be slowed to protect the ability of public and private health care providers to handle the expected influx of ill patients and safeguard public health and safety.

4.     In epidemiology, the concept of slowing a virus's spread so that fewer people need to seek treatment at any given time is known as "flattening the curve." The faster and the more sharply the infection curve rises, the more quickly Washington, DC's health care system will be stressed, to the point that it may become overloaded beyond its capacity to treat severely sick patients. "Flattening the curve" is not expected to greatly reduce the total number of people that will become infected with COVID-19, but those infections will take place over a longer period of time, which will result in a less stressed health care system, and in turn, better patient outcomes.

5.     The latest medical findings suggest that some individuals who contract COVID-19 virus have no symptoms or only mild cold-like symptoms, which means they may not be aware they carry the virus. Their interactions with others allow the disease to spread and infect a larger number of people.

6.     One proven way to slow the transmission of COVID-19 is to limit interactions among people to the greatest extent practicable by limiting public activity.

7.     Because of the risk of the rapid spread of the virus, and the need to protect all members of Washington, DC, and the region, especially residents most vulnerable to the virus, and local health care providers and emergency first responders, this Order requires the temporary closure of the on-site operation of all non-essential businesses and implements a prohibition on large gatherings.

8.     This Order is based on guidance from Department of Homeland Security, Cybersecurity and Infrastructure Security Agency (CISA) Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, March 19, 2020 for additional detail (available at: https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce).

9.     The intent of this Order is to:

     a.     Temporarily cease all non-essential business activities in the District of Columbia other than those conducted safely from home;

           **For clarity:** Non-essential businesses include: tour guides and touring

services; gyms, health clubs, spas, and massage establishments; theaters, auditoriums, and other places of large gatherings; nightclubs; hair, nail, and tanning salons and barbershops; tattoo parlors; sales not involved in essential services; retail clothing stores; and professional services not devoted to assisting essential business operations.

b.    Prohibit large gatherings;

c.    Significantly slow the spread of COVID-19;

d.    Reduce COVID-19 virus infections, COVID-19 illness, and death caused by COVID-19 and its complications; and

e.    Protect the health, safety, and welfare of the residents of Washington, DC, other individuals located in Washington, DC, and those who ordinarily work here.

## II.   ORDER TO CEASE NON-ESSENTIAL BUSINESS ACTIVITIES AND TO PROHIBIT LARGE GATHERINGS

1.    All businesses with a facility in Washington, DC, except Essential Business as defined in section IV.1 of this Order, shall cease all activities at those facilities, except Minimum Basic Operations, as defined in section IV.4 of this Order.

**For clarity:** Businesses, including non-Essential Businesses, may continue telework operations consisting of employees or contractors performing work at their own residences (*i.e.*, working from home) and home-based businesses may continue to operate, to the extent such businesses do not involve individuals making physical contact with other persons and can be carried out in compliance with the Social Distancing Requirements, as defined in section IV.5 of this Order.

2.    All Essential Government Functions, as defined by section IV.2 of this Order, shall continue.

3.    Notwithstanding any other provision of this Order, an individual who is suspected or confirmed to be infected with COVID-19 or any other transmissible infectious disease or who has symptoms of a cold or influenza ("the flu") may not be engaged in conducting Essential Business.

4.    Large gatherings of ten (10) or more persons, as further defined by section IV.3 of this Order, are hereby prohibited in the District of Columbia.

## III.   OPERATION OF ESSENTIAL BUSINESSES AND TELEWORKING

1.    All Essential Businesses are strongly encouraged to remain open.

2.  To the greatest extent feasible, Essential Businesses that remain open shall comply with Social Distancing Requirements as defined in section IV.5 of this Order, including by separating staff by off-setting shift hours or days and maintaining a separation of at least six (6) feet among and between employees and members of the public, including when any customers, clients, or patients are standing in line or sitting in a waiting room, to the maximum extent possible, separating shifts.

3.  Essential and non-Essential businesses shall take all reasonable steps necessary for employees to work remotely from their residences and to deliver services to the businesses and their customers by telephone, video, internet, or other remote means.

## IV. DEFINITIONS

For the purposes of this Order, the following terms shall have the following meanings:

1.  "**Essential Businesses**" mean:

    a.  **Healthcare and Public Health Operations**:

        i.   For the purposes of this Order, the term "Healthcare and Public Health  Operations" includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other health care facilities, health care suppliers, home health care and assisted living services, mental health providers, medical marijuana dispensaries, calibrators and operators of medical equipment, or any related and/or ancillary health care services as defined by CISA; and

        ii.  The term "Healthcare and Public Health Operations" also includes veterinary care and all health care services provided to animals; and

        iii. This authorization shall be construed broadly to avoid any impediments to the delivery of health care, broadly defined;

    b.  **Essential Infrastructure**, including public works, such as roads, sidewalks, street lighting, traffic control devices, railways, and government facilities; utilities, such as electricity, gas, telecommunications, water and wastewater, and drainage infrastructure, and solid waste collection and removal by private and public entities;

    c.  **Food and Household Products and Services**, including grocery stores, supermarkets, licensed farmers' markets, food banks, convenience stores, liquor stores, and other establishments engaged in the retail sale,

wholesale supply or distribution of food products, alcohol, any other household consumer products (such as cleaning and personal care products), laundromats, dry cleaners, laundry service providers, and medical marijuana cultivation centers. This includes stores that sell groceries and also sell other non-grocery products, and stores that sell products necessary to maintain the safety, sanitation, and operation of residences;

    i.      Restaurants and other facilities that prepare and serve food are included in this category, but only for delivery, carry out, or "grab and go," including food trucks and rapid made-to-order meals, but not for sit down consumption;

    ii.     Schools, senior centers, and other entities that typically provide free food services to students or members of the public may continue to do so under this Order; provided, that the food is distributed to students or members of the public on a pick-up and take-away basis only; and

    iii.    Facilities that provide food services under this exemption shall neither permit the food to be eaten at the site where it is provided nor shall food be provided in a self-serve manner, such as buffet bar, salad bar, or large pots of soup where people serve themselves;

d.    **Social Services Providing the Necessities of Life**, including businesses and organizations that provide food (including food preparation), shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, and organizations or components of organizations that process eligibility for such services;

e.    **Communications and Information Technology**, including newspapers, television, radio, and other media services and the engineers, technicians and associated personnel responsible for communications and information technology infrastructure construction and restoration;

f.    **Energy and Automotive**, including businesses that maintain, ensure, or restore, or are otherwise involved in the electricity industry; or petroleum, natural, or propane gas including, gas stations, auto repair/mechanic shops, auto supply stores, and related facilities;

g.    **Financial Services**, including banks, credit unions, and related financial institutions;

h.    **Educational Institutions**, including public and private K-12 schools, colleges, and universities, but solely for purposes of:

    i.      Facilitating distance learning and facilitating distance operations;

or

ii.    Modifying facilities to provide support for addressing COVID-19 or providing support for efforts to address the public emergency and public health emergency declared by the Mayor;

i.    **Transportation and Logistics**, including:

    i.    Businesses that ship or deliver groceries, food, goods, or services directly to residences;

    ii.    Taxis, ride-sharing companies, and other private transportation providers providing transportation services necessary for Essential Businesses or Essential Governmental Functions and other purposes expressly authorized in this Order;

    iii.    Businesses providing mailing and shipping services, including post office boxes and moving companies; and

    v.    Bicycle sales, management, and repair businesses;

j.    **Construction and Building Trades**, including plumbers; pipefitters; steamfitters; electricians; boilermakers; exterminators; roofers; carpenters; bricklayers; welders; elevator mechanics; businesses that sell supplies and materials for maintenance of commercial and residential buildings and homes, including 'big box' supply stores, plumbing distributors, electrical distributors, and HVAC distributors; and other businesses that provide services that are necessary to maintaining the safety, sanitation, and operation of residences and Essential Businesses;

k.    **Housing and Living Facilities**, including residences and residential facilities; group housing and shelters; university housing; hotels, except as to conference facilities, ballrooms, and dining-in facilities of their restaurants, which are non-essential; and animal shelters;

l.    **Professional Services**, including legal, insurance, notary public, tax preparation and accounting services, but only when necessary to assist in compliance with legally mandated activities, Essential Businesses or Essential Governmental Functions;

m.    **Childcare facilities**. To the extent possible:

    i.    Childcare facilities should prioritize services for children of essential employees;  and

    ii.    Childcare facilities shall comply with OSSE, Guidance for Child

Care Providers and Families Related to Coronavirus (COVID-19);

2.    **"Essential Government Functions"** include first responders, including police, firefighting, and emergency medical services, emergency management, 911/311 call center;  law enforcement functions; services needed to ensure the continuing operation of government agencies and provide for the health, safety, and welfare of the public performed by the District of Columbia or federal government or their contractors, the District of Columbia Courts, and inter-governmental commissions and entities performing such functions, including judicial and elections functions. The DC Courts should determine what services are needed to continue its essential services.

3.    **"Large Gatherings"** include any event or convening, subject to the exceptions and clarifications set forth below, that bring together or are likely to bring together ten (10) or more persons at the same time in a single room or other single confined or enclosed space, such as, by way of example and without limitation, an auditorium, theatre, stadium (indoor or outdoor), arena, event center, meeting hall, conference center, cafeteria, or any other confined indoor or outdoor space;

   a.    A "Large Gathering" includes any event in confined outdoor spaces, which means an outdoor space that (i) is enclosed by a fence, physical barrier, or other structure and (ii) where people are present and they are within six (6) feet of one another for an extended period;

   b.    A "Large Gathering" does not include:

      i.     Essential Businesses and groups performing Essential Government Functions;

      ii.    Gatherings of people in multiple, separate enclosed spaces in a single building, so long as ten (10) people are not present in any single space at the same time;

      iii.   The use of enclosed spaces where ten (10) or more people may be present at different times during the day, so long as ten (10) or more people are not present in the space at the same time;

      iv.    Gatherings on property within the District of Columbia owned by the federal government.

      v.     Spaces where ten (10) or more persons may be in transit or waiting for transit such as buses, bus stops, bus terminals, sluglines, or subway cars, and subway stations (or shopping areas associated with the buildings housing those subway stations or bus terminals); and

      vi.    Office space, hotels, or residential buildings; excluding

conferences or large gatherings at hotels. Hotels and residential buildings may remain open for guests and as residences.

4.   **"Minimum Basic Operations"** means:

    a.   The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, and related functions;

    b.   The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences; and

    c.   The minimum necessary activities to facilitate teleworking or the remote delivery of services formerly provided in-person by the business; to provide cleaning and disinfection of a business's facilities; and to provide employee supervision of contractors or employees providing essential maintenance of the facility.

5.   **"Social Distancing Requirements"** include:

    a.   Maintaining at least six (6) feet of distance from other individuals;

    b.   Washing hands with soap and water for at least twenty (20) seconds or using hand sanitizer frequently, or after contact with potentially-infected surfaces, to the greatest extent feasible;

    c.   Covering coughs or sneezes, preferably with a tissue immediately disposed of, or into the sleeve or elbow, not hands;

    d.   Regularly cleaning high-touch surfaces; and

    e.   Not shaking hands.

## V.   SUPERCESSION

This Order supersedes Mayor's Order 2020-051, dated March 20, 2020, to the extent of any inconsistency between these Orders.

## VI.   ENFORCEMENT

Any individual or entity that knowingly violates this Order shall be subject to all civil, criminal, and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines, summary suspension or revocation of licensure.

## VII.   SEVERABILITY

222

If any provision of this Order or its application to any person or circumstance is held to be invalid, then the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.

## VIII.   WAIVER

The Mayor may grant a waiver to a business or nonprofit through the District of Columbia Homeland Security and Emergency Management Agency

## IX.   EFFECTIVE DATE AND DURATION

This Order shall be effective immediately, and non-essential businesses as defined herein shall cease operations by 10:00 p.m. on March 25, 2020.  The Order shall continue to be in effect through April 24, 2020, or until it is extended, rescinded, superseded, or amended in writing by a subsequent Order.

MURIEL BOWSER
MAYOR

ATTEST: 

KIMBERLY A. BASSETT
SECRETARY OF STATE OF THE DISTRICT OF COLUMBIA

223

## GOVERNMENT OF THE DISTRICT OF COLUMBIA

## ADMINISTRATIVE ISSUANCE SYSTEM

Mayor's Order 2020-054
March 30, 2020

**SUBJECT**:   Stay at Home Order

**ORIGINATING AGENCY**:     Office of the Mayor

By virtue of the authority vested in me as Mayor of the District of Columbia pursuant to section 422 of the District of Columbia Home Rule Act, approved December 24, 1973,  Pub. L. 93-198, 87 Stat. 790, D.C. Official Code § 1-204.22 (2016 Repl.); in accordance with the COVID-19 Response Emergency Amendment Act of 2020, effective March 17, 2020, D.C. Act 23-247, and any substantially similar subsequent emergency or temporary legislation;  section 5 of the District of Columbia Public Emergency Act of 1980, effective March 5, 1981, D.C. Law 3-149, D.C. Official Code § 7-2304 (2018 Repl.); section 5a of the District of Columbia Public Emergency Act of 1980, effective October 17, 2002, D.C. Law 14-194, D.C. Official Code § 7-2304.01 (2018 Repl.); and section 1 of An Act To Authorize the Commissioners of the District of Columbia to make regulations to prevent and control the spread of communicable and preventable diseases, approved August  11, 1939, 53 Stat. 1408, D.C. Official Code §§ 7-131 *et seq.* (2012 Repl.), it is hereby **ORDERED** that:

## I.    BACKGROUND

1.    This Order is issued based on the increasing number of confirmed cases of COVID-19 within Washington, DC, and throughout the metropolitan Washington region. Scientific evidence and public health practices show that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through social distancing. The age and health of a significant portion of the population of Washington, DC, places thousands of residents at risk for serious health complications, including death, from COVID-19.

2.    Due to the outbreak of the COVID-19 virus, Mayor's Order 2020-045, dated March 11, 2020, and Mayor's Order 2020-046, dated March 11, 2020 issued declarations of a public emergency and public health emergency. Mayor's Order 2020-050, dated March 20, 2020, extended those declarations of a public emergency and public health emergency through April 24, 2020. Mayor's Order 2020-048, dated March 16, 2020, Mayor's Order 2020-051, dated March 20, 2020, Mayor's Order 2020-053, dated March 24, 2020, and several directives from the Department of Health provided for additional steps required to protect public health. The COVID-19 Emergency Response Amendment Act of 2020 (D.C. Act 23-247), which was approved by the Council and the Mayor on March 17, 2020, empower the District government with additional tools to address

224

COVID-19. In addition, the President declared a national emergency on March 13, 2020, and the World Health Organization on March 11, 2020, characterized COVID-19 as a pandemic.

3.      The findings of prior COVID-19 Mayor's Orders are incorporated here by reference.

4.      Because of the risk of the rapid spread of the virus, and the need to protect all members of Washington, DC, and the region, especially residents most vulnerable to suffering the prolonged illness or death from the virus, and local health care providers and first responders, this Order requires all individuals anywhere in Washington, DC, to stay in their residences except to perform essential activities, engage in essential business, provide or obtain essential government services, or engage certain authorized recreational activities not involving close contact with other persons.

5.      The intent of this Order is to:

   a.      Keep the maximum number of people in their residences to the maximum extent feasible, consistent with protecting their own health and the health of others, while enabling essential activities, government services, and business to continue;

   b.      Significantly slow the spread of COVID-19;

   c.      Reduce COVID-19 virus infections, COVID-19 illness, and death caused by COVID-19 and its complications;

   d.      Protect the health, safety, and welfare of the residents of Washington, DC, and other individuals located in Washington, DC;

   e.      Allow essential activities, businesses, and government services to operate and be delivered in relative safety; and

   f.      To preserve a sphere of personal freedom by allowing outside recreational activities under conditions designed to minimize health risks.

## II.   ORDER TO STAY AT HOME

1.  a.      All individuals living in Washington, DC, are ordered to stay at their place of residence, except as specified in this Order.

    b.      Individuals experiencing homelessness are exempt from the provisions of section II.1.a., but are strongly urged to obtain shelter, and District agencies shall, and other public and private entities are strongly urged to,

make such shelter available as soon as possible and to the extent practicable, and to use COVID-19 risk mitigation practices in their operations. The District's 24-hour shelter hotline shall remain open and accessible at 202-399-7093.

2. Individuals may leave their residences (including their porches and yards) only to engage in Essential Activities including obtaining medical care that cannot be provided through telehealth and obtaining food and essential household goods; to perform or access Essential Governmental Functions; to work at Essential Businesses; to engage in Essential Travel; or engage in Allowable Recreational Activities, as defined in section IV of this Order.

3. Individuals shall not linger in common areas of apartment buildings and shall not use buildings' facilities, such as gyms, party rooms, lounges, rooftop, or courtyard spaces. Such spaces are unlikely to be disinfected often and could otherwise exposed individuals to the COVID-19 virus.

4. Leaving home for the purposes of engaging in Essential Business Activities or the Minimum Business Operations of businesses not deemed Essential in Mayor's Order 2020-053 is permissible, and persons are allowed to obtain and provide home-based services so long as the services do not involve physical touching and may be carried out in compliance with the Social Distancing Requirements, as defined in section IV.8 of this Order.

5. When engaging in Essential Travel, the following requirements and restrictions shall apply:

   a. Individuals using public transportation to engage in Essential Travel must comply with the Social Distancing Requirements defined in subsection IV.8 of this Order, to the greatest extent feasible. Entry through the back door of any bus or van with a back door is encouraged for the protection of the drivers.

   b. Drivers of ride-sharing vehicles engaged in Essential Travel must have disinfecting wipes in their vehicles and must wipe down all surfaces potentially touched by a passenger after each ride. Drivers of ride-sharing vehicles may not have more than two (2) other persons in their vehicle at any time.

   c. Individuals using shared personal mobility devices such as scooters and bicycles are strongly encouraged to bring their own disinfecting wipes and wipe down the parts of the device they touch before and after riding.

   d. Public and private transit officials shall make provisions for frequently disinfecting buses, subway cars, and any other vehicles they operate, to the highest feasible standards.

6.     Under any of the limited circumstances in which an individual is allowed to leave their residence under this Order, the individual shall comply with the Social Distancing Requirements defined in section IV.8 of this Order, to the maximum extent possible.

7.     Notwithstanding any other provision of this Order, an individual who is suspected or confirmed to be infected with COVID-19 or any other transmissible infectious disease shall not be outside their residence except as necessary to seek or receive medical care in accordance with guidance from public health officials or their health care provider.

III.   **OPERATION OF ESSENTIAL BUSINESSES & MINIMUM BUSINESS OPERATIONS**

1.     The provisions of Mayor's Order 2020-053 regarding which businesses are essential; promoting telework; and allowing Minimum Business Operations of Non-Essential Businesses and subsequent guidance published on coronavirus.dc.gov remain in effect.

2.     Additionally, at any time, the Department of Consumer and Regulatory Affairs (DCRA) may request and an Essential Business must provide, its plans for complying with the requirement to minimize person-to-person contact and achieve to the greatest extent feasible, Social Distancing.

3.     Likewise, Non-Essential Businesses conducting Minimum Business Operations pursuant to Mayor's Order 2020-053 or fuller operations under a Waiver granted by HSEMA may be asked to show their operational plan and why the activities they are conducting, and how they are conducting them, fit within allowable limits.

4.     The DCRA may impose penalties including summary closure of businesses, subject to subsequent hearings at the Office of Administrative Hearings; Notices of Infractions and Orders to Show Cause why a Business Should not be Closed; Notices of Infractions and Penalties of up to $1,000 per day for violations per site operating in violation of this Order or Mayor's Order 2020-053; and penalties of up to $5,000 per day per site for operation after an Order to close, or a visit by an inspector that resulted in a warning or a request to close, that was immediately complied with.

5.     Any Essential Business or Government Building or Facility that remains open to the public with an expected occupancy or attendance of more than ten (10) people shall promptly and conspicuously post in the building or facility a copy of the requirements for social distancing found on the coronavirus.dc.gov website as may be amended from time to time by the District of Columbia Department of Health (DC Health).

6.     These penalties are in addition to any that may be imposed by the Alcohol

Beverage Control Administration, including revocation of liquor licenses or permission for delivery services.

## IV.  **DEFINITIONS**

For the purposes of this Order, the following terms shall mean:

1.  **"Allowable Recreational Activities"** means outdoor activity with household members that complies with Social Distancing Requirements, as defined in section IV.8 of this Order, and includes the sanitizing of any equipment used both before and after the activity. Outdoor activities should not be conducted with persons other than those from one's own household.

    **Examples**: Walking, hiking, running, dog-walking, biking, rollerblading, scootering, skateboarding, playing tennis, golfing, gardening, and other activities where all participants comply with Social Distancing Requirements and there is no person-to-person contact.

2.  **"Essential Activities"** means:

    a.  Engaging in an activity or performing a task essential to an individual's own health or safety, or to the health or safety of the individual's family or household members, including pets.

        **Examples**: Obtaining medical supplies or medication; visiting a health care professional; or obtaining supplies needed to work from home.

    b.  Obtaining services or supplies for an individual's own self or the individual's family or household members; or delivering those services or supplies to others that are necessary to maintain the safety, sanitation, and operation of residences.

    c.  Performing work providing essential products and services at an Essential Business or otherwise carrying out activities specifically permitted in this Order, including Minimum Basic Operations.

    d.  Caring for a family member or pet in another household or serving as a caregiver providing essential services to another. Caregiving involves more than companionship or entertainment, but rather helps a person with activities of daily living, the supervision of children, or otherwise tends to the immediate physical needs and safety of someone who cannot attend to those needs for him or herself.

    e.  Providing or obtaining services at a Health Care Operation.

228

     i.     For purposes of this Order, the term "Health Care Operation" includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other health care facilities, health care suppliers, home health care and assisted living services, mental health providers, or any related and/or ancillary health care services.

     ii.    The term "Health Care Operation" also includes veterinary care and all health care services provided to animals.

     iii.   This authorization shall be construed broadly to avoid any impacts to the delivery of health care, broadly defined.

     iv.   The term "Health Care Operation" does not include fitness facilities, exercise gyms, spas, massage parlors, or other similar facilities.

   f.   Providing any services or performing any work necessary to the operations and maintenance of Essential Infrastructure.

     i.     For purposes of this Order, the term "Essential Infrastructure" includes critical or emergency public works or utilities construction, construction, solid waste collection and removal by private and public entities, telecommunications services; provided, that an individual shall provide these services and perform this work in compliance with the Social Distancing Requirements as defined in section IV.8 of this Order, to the extent possible.

     ii.    Other infrastructure and construction activity may be allowable as an Essential Business under section IV.3—of this Order.

3.    **"Essential Businesses"** are those defined in Mayor's Order 2020-053 and subsequent interpretive guidance.

4.    **"Essential Government Functions"** are those defined in Mayor's Order 2020-053 and include all the tasks performed by persons designated essential or emergency personnel.

5.    **"Essential Travel"** means:

   a.   Travel related to the provision of, or access to, Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations, including travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions;

   b.   Travel to care for elderly, minors, dependents, persons with disabilities, or

other vulnerable persons;

    c.     Travel required to visit a house of worship;

    d.     Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services;

    e.     Travel to return to a place of residence from outside Washington, DC;

    f.     Travel required by law enforcement or court order;

    g.     Travel required for non-residents to return to their place of residence outside Washington, DC; and

    h.     Travel within the Washington region to engage in allowable activities under that jurisdiction's laws.

6.    **"Minimum Basic Operations"** means the following:

    a.     The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, and related functions;

    b.     The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences; and

    c.     The minimum necessary activities to facilitate teleworking or the remote delivery of services formerly provided in-person by the business; to provide for the pay and benefits of the businesses' employees; to provide cleaning and disinfection of a business's facilities; or to provide employee supervision of contractors or employees providing essential maintenance of the facility.

7.    **"Residences"** include homes and apartments, hotels, motels, shared rental units, and similar facilities.

8.    **"Social Distancing Requirements"** include:

    a.     Maintaining at least six (6)-foot social distancing from other individuals;

    b.     Washing hands with soap and water for at least twenty (20) seconds or using hand sanitizer frequently, or after contact with potentially-infected surfaces, to the greatest extent feasible;

    c.     Covering coughs or sneezes, preferably with a tissue immediately

disposed of, or into the sleeve or elbow, not hands;

    d.    Regularly cleaning high-touch surfaces; and

    e.    Not shaking hands.

## V.    ENFORCEMENT

1. Any individual or entity that knowingly violates this Order shall be subject to all civil, criminal, and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including $1,000 fines, summary suspension or revocation of business licensure.

2. Any individual who willfully violates this Order may be guilty of a misdemeanor and, upon conviction, subject to a fine not exceeding $5,000, imprisonment for not more than 90 days, or both.

3. An officer or employee of the District of Columbia government that violates this Order or any related personnel issuance shall be subject to appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office.

## VI.    SEVERABILITY

If any provision of this Order or its application to any person or circumstance is held to be invalid, then the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.

## VII.    EFFECTIVE DATE

This Order shall become effective at 12:01 a.m. on April 1, 2020 and will continue to be in effect through April 24, 2020, or until it is extended, rescinded, superseded, or amended in writing by a subsequent Order.

MURIEL BOWSER
MAYOR

ATTEST: 

KIMBERLY A. BASSETT
SECRETARY OF STATE OF THE DISTRICT OF COLUMBIA